**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| FRANK APA, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| PHILIP MORRIS USA INC., a Virginia for-profit corporation; R.J. REYNOLDS TOBACCO COMPANY, a North Carolina for-profit corporation; LIGGETT GROUP LLC, a Delaware for-profit limited liability corporation; and WALGREEN, CO., an Illinois corporation, | ) ) ) ) ) ) | Dkt. No.: Action Filed: February 25, 2026 Action Served: February 26, 2026 |
| Defendants. | ) ) ) ) ) ) | Jury Demand |

**DEFENDANTS PHILIP MORRIS USA INC., R.J. REYNOLDS TOBACCO COMPANY,
<u>AND LIGGETT GROUP LLC'S NOTICE OF REMOVAL</u>**

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants Philip Morris USA Inc. ("PM USA"), R.J. Reynolds Tobacco Company ("Reynolds"), and Liggett Group LLC ("Liggett") (collectively, the "Manufacturer Defendants")[1] hereby give notice of removal of this action, captioned *Frank Apa v. R.J. Reynolds Tobacco Company, et al.*, bearing case number 2026-L-002215 from the Circuit Court of Cook County, Illinois, to the United States District Court for the Northern District of Illinois. Pursuant to 28 U.S.C. § 1446(a), the Manufacturer Defendants provide the following statement of the grounds for the removal:

## BACKGROUND

1. On February 25, 2026, Plaintiff Frank Apa filed his Complaint (Ex. 1) in the Circuit Court of Cook County, Illinois, Case No. 2026-L-002215, alleging that he was diagnosed with COPD and emphysema in or shortly after May 2024 as a result of smoking cigarettes, beginning around 1972. *See* Compl. ¶¶ 3, 9.

2. Plaintiff brought this action, in part, against the Manufacturer Defendants, all of which manufacture, market, and sell cigarettes. As to PM USA and Reynolds only, Plaintiff asserts claims for negligence (Count I), strict liability (Count II), fraudulent concealment (Count III), and fraudulent misrepresentation (Count V). Against all Manufacturer Defendants, Plaintiff asserts claims for conspiracy to commit fraudulent concealment (Count IV) and conspiracy to commit fraudulent misrepresentation (Count VI).

3. None of the Manufacturer Defendants is an Illinois citizen. *See infra* Sect. I.B. Seeking to avoid federal jurisdiction, Plaintiff—who is a citizen of Illinois—also asserts claims for

---

[1] Each of the Manufacturer Defendants has signed and hereby consents to this removal in accordance with 28 U.S.C. § 1446(b)(2)(A).

negligence (Count VII) and strict liability (Count VIII) against Walgreen Co. ("Walgreens"), an Illinois retailer.

4.    While removal on the basis of diversity jurisdiction requires complete diversity of citizenship (*see* 28 U.S.C. § 1332(a)), a fraudulently joined defendant—like Walgreens here—is ignored when determining whether there is complete diversity.  In other words, fraudulent joinder is an exception to the complete diversity requirement.  *See infra* Sect. I.C; *see also Walton v. Bayer Corp.*, 643 F. 3d 994, 999 (7th Cir. 2011) ("Suppose removing defendants argue that the nondiverse defendant was joined simply to defeat removal, as might be inferred from a demonstration that the claim against that defendant had no possible merit.  This is called 'fraudulent joinder' and **bars remand to state court**, which is why we describe it as an **exception to the requirement of complete diversity**" (emphases added)).

5.    Under well-settled Seventh Circuit case law, a party has been fraudulently joined if there is no "reasonable possibility" that the plaintiff could prevail against that party under the governing law.  *See, e.g.*, *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992). Plaintiff does not have a "reasonable possibility" of prevailing on his claims against Walgreens under Illinois law, and, accordingly, Walgreens has been fraudulently joined.

6.    The thrust of Plaintiff's Complaint is that the Manufacturer Defendants allegedly designed their cigarettes to be unreasonably dangerous; conspired to misrepresent and conceal the hazards of smoking to Plaintiff and the public; and engaged in marketing campaigns calculated to deceive Plaintiff and the public as to the health hazards and addictive nature of smoking.

7. In support of these claims, the vast majority of Plaintiff's allegations are directed against the Manufacturer Defendants. Compl. ¶¶ 14–163. For example, the Complaint includes a series of historical allegations directed *solely* to the Manufacturer Defendants. Compl. ¶¶ 14–53.

8. Although Plaintiff incorporates those allegations against the Manufacturer Defendants into the negligence and strict liability claims that he asserts against Walgreens (*see id.* ¶¶ 164, 195), none of these allegations mentions Walgreens.[2] Indeed, the Complaint does not include **any** factual allegations that Walgreens was involved in **any way** in the design or manufacture of cigarettes. Instead, Plaintiff alleges that Walgreens is liable for the cigarettes it sold, distributed, marketed, and promoted to Plaintiff. *See id.* ¶¶ 193, 197. Moreover, Plaintiff's allegations directed to Walgreens consist entirely of conclusory statements and selective quotations from documents that, on their face, do not set forth any facts that support Plaintiff's theory. *See id.* ¶¶ 164–98. At bottom, the Complaint alleges merely that Plaintiff purchased a lawful product (cigarettes) from a lawful, non-manufacturer retailer of those products who played no role in designing or manufacturing them (Walgreens).

9. As discussed in length herein (*see infra* ¶¶ 31–35), a court in this District dismissed nearly identical negligence and strict liability claims **with prejudice** against Walgreens, in a case filed by the same Plaintiff's counsel,[3] with allegations that mirror the allegations against

---

[2] Plaintiff's allegations directed solely at the Manufacturer Defendants similarly do not include any facts concerning Walgreens or its conduct.

[3] Plaintiff's Complaint and the Complaint in *Clay* were both filed by Meyers & Flowers, LLC. *Compare* Compl. at 60 *with Clay* Complaint at 50 (Ex. 2).

Walgreens here. *See Clay v. Philip Morris USA Inc., et al.*, No. 1:18-cv-03549 (N.D. Ill. Feb. 20, 2020) (Norgle, J.) ("*Clay* Order II") (Ex. 3).[4]

10.     Accordingly, the Manufacturer Defendants remove this case to federal court because there is complete diversity between Plaintiff and all of the properly joined Defendants, and the amount in controversy exceeds $75,000. *See infra* Sects. I.C–D.

11.     Removal is thus proper for these reasons, and because the other procedural requirements for removal have been met. *See infra* Sect. II.

### VENUE AND JURISDICTION

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 93, 1391, 1441(a), and 1446(a) because the Circuit Court of Cook County, Illinois, where the Complaint was filed, is a state court within the Northern District of Illinois.

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because (1) there is complete diversity of citizenship between Plaintiff and all properly joined Defendants; and (2) the amount in controversy exceeds $75,000, exclusive of interests and costs.

### ARGUMENT

**I.      REMOVAL IS PROPER BECAUSE THERE IS COMPLETE DIVERSITY OF CITIZENSHIP AND THE AMOUNT IN CONTROVERSY EXCEEDS $75,000.**

14.     Pursuant to 28 U.S.C. § 1441, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."

---

[4] While other courts in this District have found similar allegations sufficient and have granted motions to remand to state court, *see, e.g.*, Order, *Mitchell v. Philip Morris USA Inc.*, No. 18-C-7739, Dkt. No. 85 (N.D. Ill. Apr. 24, 2019) (Blakey, J.); *see also infra* fns. 8–9, Defendants maintain, for the reasons discussed herein, that the decision in *Clay* should be followed here because it correctly applied the law.

15. Section 1332(a) provides, in relevant part, that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." Federal courts have original jurisdiction in diversity cases when the parties are completely diverse. *See Page v. Democratic Nat'l Committee*, 2 F. 4th 630, 636 (7th Cir. 2021).

16. When a defendant that would otherwise destroy complete diversity has been fraudulently joined, the Court must ignore the citizenship of the fraudulently joined defendant. *See Walton*, 643 F. 3d at 999 (7th Cir. 2011).

17. There is complete diversity here because Plaintiff is a citizen of Illinois and the Manufacturer Defendants are each citizens of states other than Illinois. *See infra* Sects. I.A–B. The citizenship of Walgreens—the only non-diverse Defendant—should be ignored for purposes of determining jurisdiction because, as set forth more fully below, Walgreens is fraudulently joined. *See infra* Sect. I.C.[5]

### A. Plaintiff Is A Citizen Of Illinois.

18. The Manufacturer Defendants are informed and believe that Plaintiff is now, and was at the time of the filing of the Complaint and this Notice of Removal, and at all intervening times, domiciled in and a citizen of the state of Illinois. *See* Compl. ¶¶ 1, 12.

### B. None Of The Manufacturer Defendants Is An Illinois Citizen.

19. For purposes of diversity jurisdiction, a corporation is "a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business[.]" 28 U.S.C. § 1332(c)(1). A limited liability company is a citizen of every state in which its members are citizens. *Wise v. Wachovia Sec., LLC*, 450

---

[5] Because Walgreens was fraudulently joined, the "forum defendant" rule in 28 U.S.C. § 1441(b)(2) does not apply here since Walgreens was not "properly joined and served" under the statute.

F.3d 265, 267 (7th Cir. 2006). When an LLC is composed of parent LLCs or partnerships, those entities "must be traced through however many layers of partners or members there may be." *Meyerson v. Harrah's E. Chicago Casino*, 299 F.3d 616, 617 (7th Cir. 2002).

20. Applying these principles, none of the Manufacturer Defendants is, or was at the time of filing of the Complaint, or at any intervening time, a citizen of Illinois.

21. Defendant Reynolds is a corporation organized under the laws of North Carolina with its principal place of business in North Carolina. Compl. ¶ 5. Thus, Reynolds is a North Carolina citizen.

22. Defendant PM USA is a corporation organized under the laws of Virginia with its principal place of business in Virginia. Compl. ¶ 6. Thus, PM USA is a Virginia citizen.

23. Defendant Liggett is a limited liability company organized under the laws of Delaware with its principal place of business in North Carolina. *See* Compl. ¶ 7. Liggett's sole member is VGR Holding LLC, a Delaware limited liability company with its principal place of business in Florida. VGR Holding LLC's sole member is Vector Group Ltd., a Delaware corporation with its principal place of business in Florida. *Id.* Thus, Liggett is a citizen of Delaware and Florida.

24. Defendant Walgreens is the only non-diverse defendant. Walgreens is a corporation organized under the laws of Illinois with its principal place of business in Illinois. Compl. ¶ 8. Thus, Walgreens is a citizen of Illinois.

25. Applying these principles, removal of the Complaint is proper, and the Court has jurisdiction over this action. There is complete diversity here because Plaintiff has no reasonable possibility of succeeding on his negligence and strict liability claims against Walgreens, who has thus been fraudulently joined, and the Manufacturer Defendants are

completely diverse from Plaintiff. Furthermore, the amount in controversy exceeds $75,000, and all other procedural requirements for removal have been met. *See infra* Sects. I-D, II.

### C. Walgreens' Citizenship Should Be Ignored Because It Was Fraudulently Joined.

26. Where—as here—the face of a complaint shows a lack of complete diversity, removal based on diversity jurisdiction is nonetheless proper where the non-diverse defendant is fraudulently joined. *See Int'l Bhd. of Teamsters Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, No. 97 C 8113, 1998 WL 242130 (N.D. Ill. May 8, 1998), *aff'd on other grounds*, 196 F.3d 818 (7th Cir. 1999) (applying fraudulent joinder doctrine and denying remand in suit brought against cigarette manufacturers and Illinois distributors); *In Re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, 692 F. Supp. 2d 1025, 1031 (S.D. Ill. 2010), *aff'd sub nom. Walton v. Bayer Corp.*, 643 F.3d 994 (7th Cir. 2011); *see also* Order at 2–3, *Clay v. Philip Morris USA Inc., et al.*, No. 1:18-cv-03549 (N.D. Ill. Nov. 6, 2018) (Norgle, J.) ("*Clay* Order I") (Ex. 4) (denying remand in a tobacco case where the plaintiff brought a similar negligence claim against Walgreens because plaintiff's allegations were "not supported by well-pleaded facts, and the Court is unable to discern a reasonable inference of misconduct by the Retail Defendants from the Complaint"). Fraudulent joinder occurs when, "after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." *Poulos*, 959 F. 2d at 73.

27. Courts recognize the prejudicial effect that fraudulent joinder imposes on the out-of-state defendant. Indeed, the "out-of-state defendant may need access to federal court when the plaintiff's suit presents a local court with a clear opportunity to express its presumed bias—

when the insubstantiality of the claim against the in-state defendant makes it easy to give judgment for the in-state plaintiff against the out-of-state defendant while sparing the in-state defendant." *Id.*

28. To determine whether a defendant is fraudulently joined, the Court "must engage in an act of prediction: [I]s there any reasonable possibility that a state court would rule against the non-diverse defendant?" *Id.*; *Clay* Order I at 1–2 (citing *Poulos*). Importantly, a fraudulent joinder argument does not need to "negate any possible theory that [Plaintiff] might allege in the future: only [the] present allegations count." *Poulos*, 959 F.2d at 74. However, "[t]he heavy burden placed upon [defendant] to establish fraudulent joinder does not mean [the court] must accept blindly whatever plaintiff may assert no matter how incredible or how contrary to the overwhelming weight of the evidence." *In re Diet Drugs (Phentermine, Fenfluramine, and Dexfenfluramine) Prods. Liab. Litig.*, 352 F. Supp. 2d 533, 537 (E.D. Pa. 2004).[6]

29. Rather, removal jurisdiction is established if, in light of the evidence presented, construing all disputed questions of fact in the plaintiff's favor, the court finds that the plaintiff failed to set forth the "possibility of a valid cause of action" against the diversity-defeating defendant. *Kocot v. Alliance Mach. Co.*, 651 F. Supp. 226, 227–28 (S.D. Ill. 1986) (citation omitted) (holding that in-state defendant was fraudulently joined).

30. As set forth more fully below, Plaintiff has no reasonable possibility of prevailing on his negligence and strict liability claims against Walgreens for three independent reasons. *First,* Plaintiff's strict liability claim fails because it is barred by the Illinois "Seller's

---

[6] *See also Hernandez v. Home Depot, USA, Inc.*, No. 05 C 5963, 2006 WL 1647438, at *2 (N.D. Ill. June 5, 2006) (a defendant satisfies its burden to establish fraudulent joinder when it "offers evidence which proves to a reasonable probability that federal jurisdiction exists").

Exception Statute," as its requirements have been satisfied and no statutory exception applies. *Second,* Plaintiff has not set forth specific facts tying Walgreens to the wrongful conduct alleged in the Complaint. *See Teamsters*, 1998 WL 242130, at *5. Specifically, Plaintiff's Complaint (i) does not allege any factual basis for finding that Walgreens designed or manufactured cigarettes; (ii) does not allege any factual basis for finding that Walgreens owed or breached a duty of care to Plaintiff; (iii) does not allege any factual basis for finding that Walgreens had any non-public or superior knowledge of the health risks of smoking; and (iv) does not allege any factual basis for finding that Walgreens proximately caused Plaintiff's alleged injuries. *Third,* Plaintiff's Complaint asserts preempted theories of liability.

31. The fundamental deficiencies in Plaintiff's claims against Walgreens are readily apparent from Judge Norgle's orders in a similar tobacco case, *Clay v. Philip Morris USA Inc., et al.*, No. 1:18-cv-03549. In *Clay*, the same Manufacturer Defendants removed the case to this District on the same basis asserted here: that the retailer defendant, Walgreens, was fraudulently joined for purposes of destroying diversity. Judge Norgle agreed, and ultimately denied that plaintiff's motion to remand the case finding that plaintiff's allegations against Walgreens were "not supported by well-pleaded facts." *Clay* Order I at 2.

32. The *Clay* plaintiff was then given the opportunity to amend her complaint, and filed a new complaint that included the nearly identical allegations that Plaintiff similarly asserts against Walgreens in this case. *Compare Clay* Amend. Compl. ¶¶ 118–51 (attached hereto as Ex. 5) with Compl. ¶¶ 164–98.

10

33.     In particular, and as discussed below, the *Clay* Amended Complaint added allegations of communications between a Walgreens manager and individuals connected to the tobacco industry in 1977, Walgreens' 1993 request for indemnification from cigarette manufacturers, communications in 2008 between Walgreens and one of the Manufacturer Defendants in connection with a marketing pitch for smokeless tobacco, and various public information from a 2018 Walgreens' webpage about the health risks of smoking. Those allegations are nearly identical to the allegations Plaintiff makes here.

34.     The additional allegations in the *Clay* Amended Complaint did not save that plaintiff's strict liability and negligence claims against Walgreens, which the *Clay* court dismissed **with prejudice**. *See generally Clay* Order II.

35.     Specifically, the court found that the new allegations concerning Walgreens were insufficient to establish that "Walgreens knew or should have known of the dangers and defects of cigarettes in a way that was *superior* to the general public." *Id.* at 3 (emphasis added). The court also found that the amended complaint failed to establish any facts sufficient to maintain a strict liability claim against Walgreens and that none of the exceptions under the Illinois "Seller's Exception Statute" applied, as the plaintiff had acknowledged that Walgreens did not participate in the design, manufacture, or creation of the tobacco products at issue. *Id.* at 3–4.

36.     The same reasoning applies equally here: Plaintiff has no reasonable possibility of prevailing on his negligence or strict liability claims against Walgreens under Illinois law.[7]

---

[7] Manufacturer Defendants recognize that some other judges in this District have declined to find fraudulent joinder in other removals involving Walgreens. *See, e.g.*, Mem. Op. & Order in *Smith v. Philip Morris*, Case No. 18 C 03697, Dkt. No. 85, at p. 11 (N.D. Ill. Sept. 30, 2019) (Chang, J.) (remanding case while acknowledging that question of fraudulent joinder was a "close" call and noting that the Seventh Circuit has not clearly foreclosed this basis for removal). Manufacturer Defendants respectfully submit that the well-reasoned *Clay* opinion, not other contrary opinions like *Smith*, should be followed here.

11

Courts do not hesitate to find fraudulent joinder when a plaintiff fails to set forth essential allegations against a non-diverse defendant. *See, e.g.*, *Elrod v. Bayer Corp.*, No. 19-cv-06048, 2020 WL 4284416, at \*5 (N.D. Ill. July 27, 2020) (in a products liability action filed against diverse manufacturers and one individual, non-diverse sales representative, the court found that the non-diverse defendant was fraudulently joined where the plaintiff failed to plead sufficient facts to demonstrate that the defendant owed a duty to the plaintiff as required to establish a negligent misrepresentation claim); *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999) (finding cigarette distributors were fraudulently joined because plaintiff failed to plead sufficient facts to state a claim for negligence and failure to warn under Ohio law); *In Re Yasmin*, 692 F. Supp. 2d at 1035 (finding fraudulent joinder because "no factual basis can be drawn from plaintiffs' complaint for the entirely general and conclusory charge that [non-diverse defendants] knew or had reason to know of the risks"); *Texas Ujoints, LLC v. Dana Holding Corp. Mach. Serv.*, No. 13-C-1008, 2013 WL 6230675, at \*7–9 (E.D. Wis. Dec. 2, 2013) (finding fraudulent joinder where plaintiff "failed to plead any facts describing any aspect of" the non-diverse defendant's culpability); *First Merchs. Tr. Co. v. Wal-Mart Stores E., LP*, 630 F. Supp. 2d 964, 968 (S.D. Ind. 2008) (finding fraudulent joinder where the complaint made "no allegations of wrongdoing or of any other basis for obtaining relief from" the non-diverse defendant).

37. Moreover, courts have determined that "generic allegations of wrongdoing on the part of the non-diverse defendant are not sufficient to show that th[e] defendant was not fraudulently joined." *Howard v. CitiFinancial, Inc.*, 195 F. Supp. 2d 811, 818 (S.D. Miss. 2002), *aff'd and remanded sub nom. Ross v. Citifinancial, Inc.*, 344 F.3d 458 (5th Cir. 2003). Thus, like here, fraudulent joinder exists where a plaintiff merely asserts factual

allegations against defendants collectively, and fails to tie any facts specifically to the non-diverse defendants. *See, e.g.*, *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 391–93 (5th Cir. 2000) (affirming lower court's decision that tobacco distributors were fraudulently joined as to the conspiracy claim because plaintiff's claims were "entirely general" and it was "evident" that usage of the word "'defendants'" throughout the complaint "could not be referring to the 'Tobacco Wholesalers.'").

38. For these reasons, other courts in this District have dismissed Illinois retailers and distributors and retained cases under diversity jurisdiction in smoking-and-health cases brought against out-of-state cigarette manufacturers. Aside from *Clay*, in *Teamsters*, the plaintiff brought a pair of products liability actions against tobacco product manufacturers and distributors alleging causes of action for, *inter alia*, negligence. 1998 WL 242130, at *1–2. Although the plaintiffs alleged certain wrongful conduct against the defendants collectively, they did not include any factual allegations that implicated the distributors in particular. *Id.* at *4–5 (the court observed that it "scoured the complaints looking for any factual assertion that ties the distributor defendants into the wrongdoing alleged in the complaints, but to no avail"). The *Teamsters* court found that the plaintiffs' "bald assertions" as to the distributors' alleged conduct, including the distributors' alleged awareness of the health risks of the tobacco products, were "wholly conclusory" and "[did] not tie the distributor defendants into the allegedly wrongful acts described in the complaints." *Id.* at *4–5. The court further noted that, "[a]lthough the plaintiffs refer to the 'defendants' generally, it defies logic to include the distributors with the rest of the defendants in the general factual allegations directed at all of the defendants." *Id.* at *3. Finding the plaintiffs' allegations woefully insufficient, the court held that the distributor

13

defendants had been fraudulently joined and denied the plaintiffs' motion to remand. *Id.* at *5, 10.

39.    As explained further below, this case likewise calls for the federal jurisdiction the Manufacturer Defendants here invoke.

      **1.    Plaintiff Has No Reasonable Probability Of Prevailing On His Strict Liability Claim Against Walgreens Because It Is Subject To Dismissal Under The Illinois Seller's Exception Statute.**

40.    Plaintiff has no reasonable possibility of prevailing on his strict liability claim against Walgreens because it is subject to dismissal under the Illinois "Seller's Exception Statute," 735 ILCS 5/2-621.

41.    The Seller's Exception Statute provides that a court "**shall** order the dismissal" of a strict liability claim against a non-manufacturer defendant once the non-manufacturer defendant provides "the correct identity of the manufacturer of the product allegedly causing injury, death or damage." §§ 2-621(a)–(b) (emphasis added).

42.    As one Illinois appellate court has recognized, the Seller's Exception Statute was enacted to protect innocent non-manufacturer defendants who have not created or contributed to an alleged defect, and allow them to defer liability upstream to the manufacturer. *See Cherry v. Siemans Med. Sys., Inc.*, 565 N.E.2d 215, 218 (Ill. 1st Dist. Ct. App. 1990). Thus, the statute "should be construed liberally to provide a nonmanufacturing defendant, who is without personal fault, with a means to escape expensive litigation and obtain a dismissal at whatever point that the manufacturer becomes known to plaintiff." *Id.* at 220.

43.    Here, the manufacturers of the cigarettes allegedly causing Plaintiff's injury are already known to Plaintiff as he named them in the complaint. Indeed, Plaintiff isolates his claims

against the "Manufacturers," *i.e.*, the Manufacturer Defendants (*see* Compl., Counts I–VI)[8] and the "Distributor/Retailer," *i.e.*, Walgreens (*id.,* Counts VII–VIII). Therefore, an affidavit or certificate is not necessary, and Plaintiff's strict liability claims against Walgreens must be dismissed under the Seller's Exception Statute. *See Goesel v. Boley Intern. (H.K.) Ltd.*, 664 F. Supp. 2d 923, 924 (N.D. Ill. 2009) (finding that the precondition of correctly identifying the manufacturer "has of course been satisfied . . . by [plaintiff's] own decision to have joined [the manufacturer] as a codefendant").

44. Plaintiff has utterly failed to allege specific facts triggering any of the statutory exceptions to the Seller's Exception Statute. Under the Seller's Exception Statute, a plaintiff can avoid dismissal of his claims against a non-manufacturing defendant by showing the non-manufacturing defendant: (1) "exercised some significant control over the design or manufacture of the product;" (2) created the purported defect; or (3) had "actual knowledge" of the purported defect. 735 ILCS 5/2-621(c). None of those exceptions apply here. *See Clay* Order II at 4.

45. *First*, Plaintiff's Complaint does not allege **any** facts that Walgreens significantly controlled the design or manufacture of the defective cigarettes that allegedly caused Plaintiff's injury, or that Walgreens provided **any** instructions or warnings to the Manufacturer Defendants about their cigarettes generally, much less related to the alleged defects. *See* Compl. ¶¶ 164–98.

46. *Second*, it is undisputed that Walgreens did not create the purported defect in the cigarettes Plaintiff smoked. In fact, in his strict liability claim against PM USA and Reynolds,

---

[8] Plaintiff asserts Counts I–III and V against PM USA and Reynolds (two of the Manufacturer Defendants), and Counts IV and VI against PM USA, Reynolds, and Liggett (all Manufacturer Defendants).

Plaintiff alleges the cigarettes that they designed and manufactured reached him "in a condition without substantial change from that in which such products were when within the possession of Defendants." Compl. ¶ 71.

47. *Third*, Plaintiff's Complaint does not allege specific facts showing that Walgreens had actual knowledge of the purported defect. Under the "actual knowledge" exception, a plaintiff must allege that the non-manufacturer defendant was "at fault" in failing to disclose the "actual knowledge" in a way that "actively contributed in some way to the injury." *Murphy v. Mancari's Chrysler Plymouth Inc.*, 887 N.E. 2d 569, 576–77 (Ill. 1st Dist. Ct. App. 2008).

48. In *Murphy*, the court explained that a plaintiff must show "that a presumptively dismissed defendant had actual knowledge of the unreasonably dangerous nature of the physical characteristics/design of the product, not just actual knowledge that the physical characteristics/design existed." 887 N.E. 2d at 576. Although Plaintiff asserts in a conclusory fashion that Walgreens had "actual knowledge," the Complaint is devoid of any factual support showing **how** or **when** Walgreens supposedly gained this purported knowledge; **whether** Walgreens knew that any characteristics of cigarettes made them defective or dangerous; or **how** Walgreens was "at fault" in failing to disclose that "actual knowledge" in a way that "actively contributed in some way to the injury." *Id.* at 576–77.

49. On the contrary, Walgreens did not have actual knowledge, above and beyond the general public, of any alleged defect in the Manufacturer Defendants' cigarettes that allegedly caused Plaintiff's injury. Indeed, in his Complaint, Plaintiff concedes that the general public was, in fact, aware of the dangers of cigarettes. *See* Compl. ¶ 169 ("Cigarettes are

dangerous and well recognized to cause the death of fifty percent of consumers who smoke them.").

50.    Plaintiff unsuccessfully attempts to show that Walgreens was at fault in selling cigarettes despite alleged special knowledge of their danger, so as to fall within the aforementioned exception to the Seller's Exception Statute. But that gambit suffers from a fatal flaw: Plaintiff's Complaint, as in *Clay*, rests entirely on conclusory allegations that fail to set out any specific facts showing that Walgreens in fact had the superior knowledge on which Plaintiff's theory depends. *See Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d 779, 792 (N.D. Ill. 2010) (citing *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F. 3d 750, 754 (7th Cir. 2002) ("[W]here a plaintiff 'relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.'")); *Woodall v. Vil. of Washington Park, Ill.*, No. 02-CV-0597-DRH, 2006 WL 1131906, at *2 (S.D. Ill. Apr. 27, 2006) (granting motion to dismiss with prejudice on the basis that exhibits attached to plaintiff's complaint contradicted allegations in the complaint). In the end, as Judge Norgle found, the allegations against Walgreens do not "plausibly establish that Walgreens knew or should have known of the dangers and defects of cigarettes in a way that was superior to the general public." *Clay* Order II at 3.

51.    Indeed, in significant respects, the documents Plaintiff cites in support of his claims actually contradict his allegations. Like in *Clay*, Plaintiff first cherry-picks excerpts from Walgreens' outdated, *public* webpage—which Plaintiff last accessed in 2018—to assert that Walgreens had superior knowledge about the chemicals in cigarette smoke and the health risks of smoking. *Compare Clay* Amended Compl. ¶¶ 128–31 *with* Compl. ¶¶ 174– 77. This argument fails. Walgreens' 2018 webpage cannot show that Walgreens had

17

superior knowledge as compared to the public because this webpage is a document that was itself **open to the public** and that provided information contained in other publicly available sources. Although Plaintiff's Complaint quotes only selective excerpts from Walgreens' 2018 webpage, the webpage actually disclosed that the information it provided was drawn from seven **publicly available** and widely known documents produced by the federal government (Surgeon General, Center for Disease Control, National Health Service, etc.). *See* Ex. 6 (complete copy of Walgreens' webpage (last accessed Dec. 11, 2018)).[9]

52. Moreover, Plaintiff alleges no specific facts showing that Walgreens had this information at a time when, for example, (1) the general public did not; (2) Plaintiff did not; and (3) Plaintiff purchased cigarettes from Walgreens. Plaintiff's allegations concerning Walgreens' website are thus irrelevant to Plaintiff's claims and cannot support evasion of the Seller's Exception Statute.

53. Plaintiff next asserts that a 1977 communication between a Walgreens manager and the Tobacco Institute (a public relations trade group created by certain cigarette manufacturers, *see, e.g.*, Compl. ¶¶ 178–181) shows that Walgreens had a "close" relationship with the tobacco industry and thereby gained specific knowledge about cigarettes that was not publicly known.[10] But neither the letters that Plaintiff carefully excerpts in Paragraphs 180

---

[9] Even though Plaintiff's Complaint quotes only certain selectively excerpted portions of Walgreens' webpage, this Court can and should consider the complete copy of Walgreens' webpage. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F. 3d 657, 661 (7th Cir. 2002) (holding that if documents are "referred to in the plaintiff's complaint and are central to his claim . . . [s]uch documents may be considered by a district court . . . ."); *accord Gerritsen v. Warner Bros. Entm't, Inc.*, 116 F. Supp. 3d 1104, 1119 (C.D. Cal. 2015) ("To the extent the documents have been incorporated by reference in the first amended complaint . . . the court can consider each document in its entirety and not rely solely on the excerpts plaintiff pleads.").

[10] As with Walgreens's webpage, the Court can and should consider this letter (and the other documents discussed here) in its entirety, and attached as Exhibit 7-8. *See Rosenblum*, 299 F.3d at 661; *Gerritsen*, 116 F. Supp. 3d at 1119.

or 181 Complaint (*see* Exs. 7–8), nor the internal Tobacco Institute memorandum that Plaintiff selectively quotes in Paragraph 182 (Ex. 9), support that conclusory assertion—much less that Walgreens had some secret knowledge concerning a risk of COPD or nicotine dependence. On the contrary, the letters and memorandum show only that a member of the Tobacco Institute and a Walgreens manager discussed **publicly available** information produced and published by the Tobacco Institute.[11] None of the cited documents even hint at the disclosure of secret information about the design or manufacture of cigarettes, or the health risks of smoking. Much less do the documents provide the specific facts needed to avoid application of the Seller's Exception Statute and state a claim against Walgreens under Illinois law.

54. Plaintiff next baldly asserts that Walgreens must have known secret information about the health risks of smoking because "it sought indemnification from each of the major cigarette manufacturers for future lawsuits against it" after it "became aware in 1993 of litigation involving the tobacco industry's defective cigarette products." Compl. ¶ 183. But the act of seeking indemnification **based on public litigation** in no way suggests that Walgreens was privy to information that was not publicly available—much less information concerning the sort of injury allegedly suffered by Plaintiff. Indeed, that Walgreens sought indemnification only after litigation shows that it was *not* earlier aware of non-public

---

[11] Specifically, in one letter, the Walgreens manager discussed his lack of knowledge regarding the tobacco industry and asked for a "booklet" that the Tobacco Institute disseminated to the public. Ex. 7. The Tobacco Institute memorandum, dated a day after the letter, merely confirms Walgreens' lack of information concerning the tobacco industry, and that the Tobacco Institute might therefore send some "literature about the Institute as well as the PR project which [the Tobacco Institute] had promoted." Ex. 9. The memorandum simply recounts the earlier correspondence, without adding any new information concerning the information that was discussed.

information concerning the risks of smoking—or else it would have sought indemnification earlier.

55.     Plaintiff also cites a 2008 marketing pitch regarding smokeless tobacco in which Reynolds stated that "[n]o tobacco product has been shown to be safe and without risks" and "[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals." Compl. ¶ 184. But Plaintiff has alleged no facts, much less specific facts, to suggest that the general public did not know this information in 2008. Nor could he make any such allegation, because this information has been the public health community's message—and has even been included on some of the Manufacturer Defendants' websites—since at least 2000. *See e.g.*, https://rjrt.com/who-we-are/guiding-principles-beliefs/ (last accessed Mar. 26, 2026). Thus, this 2008 document neither shows, nor even supports, Plaintiff's bare conclusion that Walgreens "had knowledge of the defective and unreasonably dangerous nature of the cigarettes"—either in 2008 or at any earlier time—"that far exceeded the knowledge or awareness of the health risks of smoking known by reasonable consumers." Compl. ¶ 171.

56.     The bottom line is that Plaintiff's Complaint rests on entirely conclusory allegations and fails to set forth **any** specific facts showing that Walgreens had superior knowledge of the health risks of smoking as compared to the public. As courts have recognized, "a complaint that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do." *Texas Ujoints*, 2013 WL 6230675, at *7 (internal quotations omitted); *see also Coyne*, 183 F.3d at 493 (where plaintiffs did not allege that the tobacco retailers "knew of the so-called nicotine defect any sooner than members of the general public," plaintiffs failed to state a claim for both negligence and failure to warn under state law);

20

*Hoidas v. Wal-Mart Stores, Inc.*, No. 09-C-7409, 2010 WL 1790864, at \*2 (N.D. Ill. Apr. 30, 2010) (finding fraudulent joinder because the "mere formulaic recitation that [non-diverse defendant] owed a duty . . . is not sufficient to meet the pleading standard"); *Toulon v. Continental Casualty Co.*, 877 F. 3d 725, 734 (7th Cir. 2017) (finding that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to state a claim for relief (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). Indeed, courts in this District consistently reaffirm the insufficiency of conclusory statements in establishing what a party knew or should have known. *See, e.g.*, *Elrod*, 2020 WL 4284416, at \*4. Rather, courts require clear facts to support the allegation. *See id.* (finding fraudulent joinder in a products liability action where the plaintiff's allegations against the non-diverse sales representative defendant "failed to allege any *facts* suggesting that [the defendant] knew or should have known anything about the truth or falsity of [the manufacturer defendants'] statements—[plaintiff] merely provides legal conclusions" (emphasis in original)). As the *Clay* court held, these same barebones allegations and documents do not "plausibly establish that Walgreens knew or should have known of the dangers and defects of cigarettes in a way that was superior to the general public." *Clay* Order II at 3.

57.     Finally, the Seller's Exception Statute also provides that a plaintiff may, at any time, "move to vacate the order of dismissal and reinstate" the distributor if it did not identify the correct manufacturer or if the manufacturer is judgment proof, the manufacturer is not amenable to service of process, or the manufacturer is unable to satisfy any judgment or reasonable settlement. § 2-621(b)(1)–(5). Although some courts have relied on the conditional nature of § 2-621 dismissals as a basis for remanding to state court, *see, e.g.*, *Scheinman v. BMW*

*of N. Am., LLC*, No. 10 C 4848, 2010 WL 3937489, at *3 (N.D. Ill. Sept. 30, 2010), numerous other courts have declined to follow that view because it conflicts with the Seventh Circuit's approach to fraudulent joinder and diversity jurisdiction. For example, in *Steel v. Ford Motor Company*, the court stressed that the Seventh Circuit's "fraudulent joinder" test calls for a prediction "premised on the *current* allegations, not on speculation that 'some facts might turn up.'" No. 11 C 00460, 2011 WL 1485380, at *4 (N.D. Ill. Apr. 19, 2011) (quoting *Poulos*, 959 F.2d at 74). The court noted that "[a] possibility need not be premised on much, but a *reasonable* possibility does require some *reason* to believe that [the distributor] will re-appear in the case." *Id.* (emphasis in original). Because the plaintiff in *Steel* did not allege that the Illinois distributor was covered by any exception, and the manufacturer defendant was not judgment-proof, the court concluded that the possibility of recovery against the Illinois distributor was too slim to justify treating the Illinois distributor as a properly named non-diverse defendant. *Id.* at *4–5; *see also Whelchel v. Briggs & Stratton Corp.*, 850 F. Supp. 2d 926, 934 (N.D. Ill. 2012) ("To allow the conditional nature of a § 2-621 dismissal to defeat diversity jurisdiction in all cases where a distributor is nondiverse would change the *Poulos* 'reasonable possibility' test into an 'any possibility' test."); *Xiaofa Shi v. Am. Honda Motor Co., Inc.*, No. 11 C 2682, 2011 WL 5403618, at *2 (N.D. Ill. Nov. 8, 2011) ("[I]t is impossible to square *Poulos*' 'reasonable possibility' test with a categorical bar on treating defendants dismissed pursuant to § 2-621 as fraudulently joined. There is no reason why a district court cannot engage in the same 'act of prediction' in cases involving § 2-621 dismissals as it does with every other type of involuntary dismissal." (internal citation omitted)). *See also Clay* Order I at 3 (rejecting plaintiff's argument "that satisfying the general rule in § 2-621, alone,

22

cannot be the basis for a finding of fraudulent joinder because dismissal under this section is conditional, and that non-diverse defendants can be rejoined later," and noting that "Plaintiff's interpretation of § 2-621 would . . . , in effect, abrogate[e] § 2-621(a)-(b)").[12]

58. Plaintiff has not alleged that the Manufacturer Defendants are judgment proof, not amenable to service of process, or unable to satisfy any judgment or reasonable settlement, *see* § 2-621(b)(1)–(5), and thus there is no reasonable possibility that Walgreens would be reinstated as a defendant in the case under this provision of the Seller's Exception Statute. *See Steel*, 2011 WL 1485380, at *4 (plaintiff cannot defeat fraudulent joinder based on speculation that manufacturer might someday go bankrupt).

59. In sum, Plaintiff's Complaint does not and cannot allege any specific facts—as opposed to conclusory allegations—to suggest that Walgreens: (1) participated in the design or manufacture of cigarettes, (2) had actual knowledge of the alleged defect in the product, or (3) created the alleged defect in cigarettes, such that they are subject to exception under § 2- 621(c). Nor is there any reasonable possibility that Walgreens would be reinstated as a defendant in the case under this provision of the Seller's Exception Statute.

---

[12] In *Mitchell*, the district court acknowledged that the Illinois Seller's Exception Statute requires that a non-manufacturer defendant be dismissed where the statute has been satisfied. Order at 5–6, *Mitchell v. Philip Morris USA Inc., et al.*, No. 1:18-cv-07739 (N.D. Ill.) (Blakey, J.). Nevertheless, the *Mitchell* court reached the opposite conclusion from the *Clay* court and granted the plaintiff's motion to remand, in part, based on the court's conclusion that dismissal of the retailer defendants under § 2-621 was "merely conditional." *Id.* at 6–7. The Manufacturer Defendants respectfully submit that the *Mitchell* court's finding on the conditional nature of a dismissal pursuant to the Seller's Exception statute is directly contrary to *Steel* and other precedent in this jurisdiction. *See Steel*, 2011 WL 1485380, at *4; *Xiaofa Shi v. Am. Honda Motor Co., Inc.*, No. 11 C 2682, 2011 WL 5403618, at *2 (N.D. Ill. Nov. 8, 2011). Indeed, as the *Steel* court recognized, if the *Mitchell* court's finding were correct, it would preclude a court from ever finding that a retailer had been fraudulently joined "no matter the remoteness of the possibility of recovery against the non-diverse Illinois distributor"—a result which simply "does not square with . . . *Poulos*." *Steel*, 2011 WL 1485380, at *5.

### 2. Plaintiff Has No Reasonable Possibility Of Prevailing On His Negligence Claim.

60. As in *Clay* and *Teamsters*, Plaintiff's Complaint is devoid of **any** specific facts that allege (much less plausibly allege) that Walgreens (i) knew of any alleged defect in cigarettes before the general public or was in any way involved in the design or manufacture of the cigarettes; (ii) had a fiduciary relationship with Plaintiff that could give rise to any duty that would not otherwise have existed; or (iii) took any particular action that proximately caused Plaintiff's alleged injuries.

61. As the court stated in *Clay*, in order to assert a negligence claim against a non-manufacturer retailer, "Plaintiff must allege that Walgreens had knowledge *superior* to the general public of the dangers and defects of cigarettes." *Clay* Order II at 3 (emphasis added).

62. Plaintiff's factual allegations here are materially identical to the amended complaint in *Clay* (*see supra* ¶ 32 & n.7). Thus, as in *Clay*, Plaintiff's factual allegations as to Walgreens are patently insufficient to establish the requisite superior knowledge that would support a negligence claim. Thus, Plaintiff has no reasonable possibility of success on his negligence claim against Walgreens.[13]

### a. Plaintiff Has Not And Cannot Allege That Walgreens Designed Or Manufactured Cigarettes.

63. To have a reasonable possibility of success on a negligence claim under Illinois law, a plaintiff must plead specific facts establishing (1) "the existence of a duty" owed, to live up to some standard of care, (2) "a breach of that duty," and (3) "an injury proximately

---

[13] Notably, the remand orders in certain other, similar smoking-and-health cases do not even address the plaintiff's negligence claim against Walgreens. *See* Order, *Stone v. Philip Morris USA Inc.*, No. 20-C-5198 (Oct. 26, 2020) (Kennelly, J.); Memorandum Opinion, *Dispenza v. Philip Morris USA Inc.*, No. 20-C-5190 (Dec. 2, 2020) (Kocoras, J.); Order, *Andersen v. Philip Morris USA Inc.*, No. 19-C-5812 (Jan. 28, 2020) (Lee, J.); Order, *Dowdle v. Philip Morris USA Inc.*, No. 18-C-3354 (Feb. 19, 2019) (Alonso, J.).

24

caused by that breach." *Corwin v. Connecticut Valley Arms, Inc.*, 74 F. Supp. 3d 883, 888 (N.D. Ill. 2014) (citing *Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1153–54 (Ill. 2011)). Thus, a "key" feature of a negligence claim is "the concept of fault," so that (for example) a retailer of a product cannot be held liable in negligence if the plaintiff fails to plead specific facts showing that the retailer is at fault in some way. *Smith v. Phoenix Seating Sys., LLC*, 894 F. Supp. 2d 1088, 1098 (S.D. Ill. 2012).

64. Although the crux of Plaintiff's Complaint is that the cigarettes Plaintiff smoked were defective and unreasonably dangerous, Plaintiff does not and cannot allege that Walgreens **ever** designed or manufactured **any** cigarettes. As in *Teamsters*, the alleged wrongful conduct "directly relate[s] to the manufacturers, their trade associations, and their research groups." *Teamsters*, 1998 WL 242130, at *3; *see also* Compl. ¶¶ 5–7 (alleging Manufacturer Defendants engaged in the "design, manufacture, advertisement, marketing, distribution, and/or sale of [] cigarette products"). By contrast, the only breach of duty Plaintiff alleges against Walgreens is that it "sold and continued to sell" cigarettes. Compl. ¶ 192. Plaintiff's negligence claim against Walgreens thus cannot rest on any "fault" in the design or manufacture of cigarettes.

> **b.** **Plaintiff's Complaint Does Not Allege Specific Facts Supporting His Claim That Walgreens Had Superior Knowledge Of The Health Risks Of Cigarettes.**

65. Because Walgreens had nothing to do with the design or manufacture of cigarettes, Plaintiff attempts to manufacture duty and fault by concluding Walgreens had superior knowledge, above and beyond the general public, of the health risks of smoking but failed to warn its customers of those risks. *See, e.g.*, Compl. ¶¶ 8, 167, 170, 171, 172 (alleging Walgreens "distributed and/or sold cigarettes" even though it "knew or had reason to know of the dangers" associated with smoking and even though it "had a broad range of knowledge

about the components of cigarette smoke" and "knew or should have known" that cigarettes "were defective").

66. But as previously discussed, and as already determined by a court within this District, none of the publicly available documents cited by Plaintiff show Walgreens possessed any superior knowledge above and beyond the general public of the health risks of cigarettes. Indeed, Plaintiff has failed even to "allege facts that Walgreens plausibly had actual knowledge of the alleged defects." *See supra* ¶¶ 49–55; *see also Clay* Order II at 4. For that reason alone, Plaintiff's claims against Walgreens have no reasonable possibility of success.

>    **3.    Plaintiff Has Not Pleaded Any Facts Establishing That Walgreens Proximately Caused His Injuries.**

67. Plaintiff also fails to allege **any facts** supporting proximate causation, which is a required element of both negligence and strict liability claims. *See Corwin*, 74 F. Supp. 3d at 888; *see also Kleen v. Homak Manufacturing Co., Inc.*, 749 N.E.2d 26, 29 (1st Dist. 2001) ("The concept of proximate cause is the same in negligence and strict liability in tort."); *Walker v. Macy's Merchandising Group, Inc.*, 288 F. Supp. 3d 840, 855 (N.D. Ill. 2017) (citing *Kleen*, 749 N.E.2d at 29).

68. Under Illinois law, the element of proximate cause contains two separate and distinct requirements that a plaintiff must plead and prove: cause-in-fact and legal cause. *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). To satisfy the cause-in-fact requirement, a plaintiff must plead specific facts showing either: (1) that his injury would not have occurred "but for" the defendant's allegedly tortious conduct; or (2) that "the defendant's conduct . . . was a material element and a substantial factor in bringing the event about." *Id.*; *see also Krywin v. Chicago Transit Authority*, 938 N.E.2d 440, 447 (Ill.

2010) ("Conduct is a material element and a substantial factor if, absent the conduct, the injury would not have occurred.").

69.     Here, Plaintiff makes only conclusory assertions that if Walgreens did not sell products it allegedly knew were dangerous, Plaintiff would not have started smoking, or would have smoked less, or would have stopped sooner, and that he was injured "[a]s a direct and proximate result of" the vague and conclusory allegations described in the Complaint. *See* Compl. ¶¶ 193–94 (negligence); *see also id.* ¶ 198 (strict liability). These are exactly the type of conclusory allegations that courts routinely reject as legally insufficient. While Plaintiff's conclusory allegations suggest Walgreens' act of selling cigarettes somehow contributed to Plaintiff's injuries, Plaintiff fails to plead **any** facts as to how he would have avoided his injuries. As examples, Plaintiff does not allege: (1) when he bought cigarettes from Walgreens; (2) how often he bought cigarettes from Walgreens; (3) how many cigarettes he bought from Walgreens; or (4) what percentage of his cigarettes came from Walgreens, as opposed to another retailer. In short, Plaintiff alleges no specific facts showing that Walgreens' conduct played any role in causing Plaintiff's injuries, much less how "absent [Walgreens'] conduct, the injury would not have occurred." *Krywin*, 938 N.E.2d at 447. Without such facts, Plaintiff has no reasonable possibility of establishing proximate cause.

        **4.     Any Claim That Walgreens Breached A Duty To Warn About The Health Risks Of Smoking After 1969 Or Should Have Stopped Selling Cigarettes Is Preempted Under Federal Law.**

70.     Plaintiff's claims against Walgreens also fail because they are preempted by federal law. Any claim that Walgreens should have provided warnings to Plaintiff—in addition to or different from the warnings already on the cigarette packs since 1969 (*see* Compl. ¶ 173 (alleging Walgreens "only recently began disclosing its superior knowledge to the public");

27

*id.* ¶ 191 (suggesting liability based on failure to warn of known risks); *id.* ¶ 195 (reincorporating failure-to-warn allegations in strict liability claim))—is preempted by federal law. *See* 15 U.S.C. §§ 1333, 1334(b). Here, Plaintiff did not begin smoking until 1972 (*see* Compl. ¶ 3), and failure to warn claims after 1969 are expressly preempted by the Federal Cigarette Labeling and Advertising Act ("the Labeling Act"). *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524 (1992) (plurality op.); *see also Altria Group Inc. v. Good*, 555 U.S. 70, 84–85 (2008) (adopting the preemption framework applied by the plurality in *Cipollone*).

71. Likewise, Plaintiff's suggestion that Walgreens is liable because it failed to stop selling cigarettes altogether (*see* Compl. ¶¶ 189–92, 195) is also preempted. *See* 15 U.S.C. § 1334(b); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137–38 (2000) ("Congress . . . foreclosed the removal of tobacco products from the market.").

72. Accordingly, because Plaintiff is a citizen of Illinois, and because none of the properly joined Manufacturer Defendants is an Illinois citizen, there is complete diversity of citizenship. *See* 28 U.S.C. § 1332(a).

**D.      The Amount in Controversy Exceeds $75,000.**

73. "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). "[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." *Id.* at 87.

74. Here, it is readily apparent from the face of the Complaint that the amount in controversy exceeds $75,000. Plaintiff seeks to recover damages for the development of Plaintiff's "injuries, including but not limited to emphysema, in addition to other related physical

28

conditions which resulted in and directly caused him to suffer severe bodily injuries." Compl. ¶ 65; *see also id.* ¶¶ 82, 109, 122, 154, 163. As to PM USA and Reynolds only, Plaintiff asserts claims for negligence (Count I), strict liability (Count II), fraudulent concealment (Count III) and fraudulent misrepresentation (Count V). Against all Manufacturer Defendants, Plaintiff asserts claims for conspiracy to commit fraudulent concealment (Count IV) and conspiracy to commit fraudulent misrepresentation (Count VI). For each claim, Plaintiff alleges compensatory damages "in excess" of $50,000. *Id.* at ¶¶ 65 (Count I), 82 (Count II), 109 (Count III), 122 (Count IV), 154 (Count V), and 163 (Count VI).

75. These facts—especially in their totality—support a plausible inference that the amount in controversy exceeds $75,000. *See, e.g.*, *Walton, v. Bayer Corp.*, 643 F.3d 994, 998 (7th Cir. 2011) (plaintiff's claimed injuries, including personal injuries which are "permanent and lasting in nature," pain and suffering, and the need for future and ongoing medical treatment, "makes clear that [plaintiff] is seeking damages in excess of $75,000"); *Estate of Carter ex rel. Carter v. SSC Operating Co. LLC*, No. 2:19-cv-00431-JB-M, 2020 WL 3429040, at *2, n.2 (S.D. Ala. June 23, 2020) ("[T]he Court deems [the amount in controversy] to be satisfied in light of the wrongful death claim asserted in the SAC."); *cf. Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) ("Whether [plaintiff] *actually* recovers more than $75,000 is immaterial; what matters is the amount put in controversy on the day of removal.") (emphasis in original).

76. It is thus clear that the alleged amount in controversy exceeds $75,000, exclusive of interest and costs.

**II.   ALL OTHER REMOVAL REQUIREMENTS ARE SATISFIED**

**A.   Manufacturer Defendants' Notice Of Removal Is Timely Filed.**

77.   Manufacturer Defendants' Notice of Removal is timely filed.  The Manufacturer Defendants were served on February 26, 2026 (Reynolds) and March 2, 2026 (PM USA).  Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served on the Manufacturer Defendants is attached hereto as Exhibit 10.  A copy of the state court docket is attached hereto as Exhibit 11.

78.   Because the Manufacturer Defendants are filing the Notice of Removal on March 30, 2026, within 30 days of service of process on Reynolds, the earliest-served Manufacturer Defendant, removal is timely.  *See* 28 U.S.C. § 1446(b)(1).

**B.   All Properly Joined And Served Defendants Consent To Removal.**

79.   Pursuant to 28 U.S.C. § 1446(b)(2)(A), all Defendants who were properly joined and served in this action consent to removal, as indicated by their signing below.  Walgreens need not consent as it is not properly joined in this action.  *See Midland Mgmt. Co. v. Am. Alternative Ins. Corp.*, 132 F. Supp. 3d 1014, 1024 (N.D. Ill. 2015).

80.   By filing this Notice of Removal, the Manufacturer Defendants do not waive any defense that may be available to them; instead, they reserve all such defenses.  If any question arises as to the propriety of removal to this Court, Manufacturer Defendants request the opportunity to present a brief and oral argument in support of their removal.

81.   Pursuant to 28 U.S.C. § 1446(d), the Manufacturer Defendants will promptly serve upon Plaintiff's counsel and file with the Circuit Court of Cook County, Illinois, a true and correct copy of this Notice of Removal.

**CONCLUSION**

WHEREFORE, the Manufacturer Defendants hereby remove this action from the Circuit

Court of Cook County to the United States District Court for the Northern District of Illinois.

Dated: March 30, 2026

Respectfully submitted,

By  */s/ David M. Menichetti*

David M. Menichetti (No. 6333659)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, District of Columbia 20001
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
Email: david.menichetti@arnoldporter.com

*Attorney for Defendant*
*Philip Morris USA Inc.*

*/s/ José A. Isasi*

José A. Isasi (No. 6211214)
Jihan E. Walker (No. 6328896)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone: +1 312.782.3939
Fax: +1 312.782.8585
Email: jisasi@jonesday.com
Email: jihanwalker@jonesday.com

*Attorneys for Defendant*
*R.J. Reynolds Tobacco Co.*

/s/ *George D. Sax*

George D. Sax (No. 6279686)
SCHARF BANKS MARMOR LLC
30 West Hubbard Street, Suite 500
Chicago, Illinois 60654
Telephone: +1 312.726.6000
Email: gsax@scharfbanks.com

*Attorney for Defendant*
*Liggett Group LLC*

## CERTIFICATE OF SERVICE

I, David Menichetti, one of the attorneys for Defendant Philip Morris USA Inc., hereby certify that I caused the foregoing **DEFENDANTS PHILIP MORRIS USA INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP LLC'S NOTICE OF REMOVAL** to be filed through the CM/ECF system of the United States District Court for the Northern District of Illinois and served by e-mail to the following:

Peter J. Flowers, Esq.
Craig D. Brown, Esq.
Jonathan P. Minceli, Esq.
Thomas M. Connelly, Esq.
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, IL 60174
(630) 232-6333
pjf@meyers-flowers.com
cdb@meyers-flowers.com
jpm@meyers-flowers.com
tmc@meyers-flowers.com

Chicago Office:
225 W. Wacker, Suite 1515
Chicago, IL 60606

-and-

Michael A. Alvarez
Alex Alvarez Jr.
Andi Hernandez
THE ALVAREZ LAW FIRM
3251 Ponce De Leon
Coral Gables, FL 33156
(305) 444-7675
Michael@talf.law
Alexjr@talf.law
Andi@talf.law
Tobacco@integrityforjustice.com

*Attorneys for Plaintiff*

on this 30th day of March, 2026.

*/s/ David M. Menichetti*
David M. Menichetti

32

# <u>EXHIBIT 1</u>

Case: 1:26-cv-03513 Document #: 2-1 Filed: 03/30/26 Page 34 of 316 PageID #:34

FILED
2/25/2026 3:22 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36829973

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FRANK APA, )
)
Plaintiff, ).
)
v. ) Case No  2026L002215
)
R.J. REYNOLDS TOBACCO COMPANY, ) **JURY DEMANDED**
PHILIP MORRIS USA INC., LIGGETT GROUP )
LLC, and WALGREEN CO., )
)
Defendants. )

## COMPLAINT AT LAW

NOW COMES, Plaintiff, FRANK APA, by his attorneys MEYERS & FLOWERS and The

ALVAREZ FIRM, and files this Complaint at Law against the Defendants, R.J. REYNOLDS

TOBACCO COMPANY, a foreign corporation, PHILIP MORRIS USA INC., a foreign

corporation, LIGGETT GROUP LLC., a Foreign Limited Liability Company, and WALGREEN

CO. an Illinois Corporation, and alleges as follows:

### *Parties & Jurisdiction*

1. At all times material Plaintiff, FRANK APA (hereinafter sometimes referred to as "Mr. Apa")

was a resident of Cook County, Illinois.

2. FRANK APA smoked cigarette products designed, manufactured, advertised, marketed,

distributed and/or sold by the Defendants, including but not limited to Viceroy cigarettes

designed, manufactured, advertised, marketed, distributed and/or sold by defendant R.J.

REYNOLDS TOBACCO COMPANY ("R.J. Reynolds"), as well as Marlboro cigarettes

designed, manufactured, advertised, marketed, distributed and/or sold by defendant PHILIP

MORRIS USA INC. ("Philip Morris").

1

3. FRANK APA began smoking cigarettes at age 13 in 1972. He smoked Viceroy brand cigarettes from the early 1970s until the 1980s, switching to Marlboro brand cigarettes in the 1980s until he quit smoking in 2024.

4. FRANK APA smoked cigarette products that he purchased from Defendant WALGREEN CO.

5. Defendant, R.J. Reynolds, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of Kool brand cigarette products which Mr. Apa smoked and inhaled which caused and/or substantially contributed to the development of his emphysema. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

6. Defendant, Philip Morris, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Virginia with its principal place of business in the State of Virginia that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution of cigarette products and conspired with other Defendants to fraudulently misrepresent and conceal the dangers of smoking,

2

cigarettes smoked and inhaled by Mr. Apa, which caused and/or substantially contributed to the development of Mr. Apa's emphysema. Service of process over this Defendant may be had through its registered agent, United Agent Group Inc., 1320 Tower Road, Schaumburg, Illinois 60173 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

7. Defendant, LIGGETT GROUP LLC, (f/k/a LIGGETT GROUP, INC., f/k/a BROOKE GROUP, LTD., Inc., f/k/a LIGGETT & MEYERS TOBACCO COMPANY) ("Liggett"), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business located in the State of Delaware that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution of cigarette products and conspired with other Defendants to fraudulently misrepresent and conceal the dangers of smoking, cigarettes smoked and inhaled by Mr. Apa, which caused and/or substantially contributed to the development of Mr. Apa's emphysema. Service of process over this Defendant may be had through this Defendant's registered agent, C T Corporation System, 208 So. LaSalle St., Suite 814, Chicago, Illinois 60604 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

8. Defendant, WALGREEN CO. ("Walgreens"), is a corporation authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Illinois with its principal place of business located in the State of Illinois. Defendant distributed and/or sold cigarettes which Mr. Apa purchased, smoked and

3

inhaled which caused and/or substantially contributed to causing the development of his emphysema. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

9. FRANK APA, was diagnosed with COPD/emphysema on or shortly after May 2024, caused by smoking cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants named herein. Sometime thereafter, Plaintiff reasonably became aware that his emphysema was related to his smoking.

10. Plaintiff's action is an action for damages in excess of the sum of FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS.

11. The wrongful conduct herein alleged, occurred, at least in part and/or the damages complained of by Mr. Apa were sustained in the county where the above styled Court sits, or the Defendants herein reside in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

12. Plaintiff resides in the State of Illinois and/or one or more of the Defendants against whom this action is brought resides in the county where the above styled Court sits and thus venue of this action properly lies in the Circuit Court of Cook County pursuant to Illinois law.

13. The Plaintiff would further show that Defendants at all times material to this cause of action, through their agents, alter-egos, officers and representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state; committed a tortious act within the state by allowing Mr. Apa to be exposed to an unreasonably dangerous product, to-wit: cigarette and/or cigarette smoke. Defendants failed

4

FILED DATE: 2/25/2026 3:22 PM    2026L002215

to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Mr. Apa, or other persons similarly situated, of the risks, dangers and harm, to-wit: the contracting of the diseases of lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and other diseases and/or injuries to which he was exposed by smoking cigarettes, resulting from the ordinary and foreseeable use of said products, and said tortious conduct is continuing and presently existing; caused injuries and death, which arose out of the acts and/or omissions which occurred inside and outside of the State of Illinois during the relevant period of time, at which time Defendants were engaged in solicitation or service activities within the State of Illinois, resulting in injuries to Mr. Apa. Therefore, jurisdiction properly lies in this Court, as to Plaintiff's action, pursuant to Illinois law.

14. The cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by Defendants herein, when used as intended, were more likely than not to induce in foreseeable users, such as Mr. Apa, a state of addiction, habituation, habit formation and/or dependence characterized by the user's inability to terminate or restrict his/her chronic use.

15. At all times material to this action, the cigarette manufacturers, including but not limited to Philip Morris, R.J. Reynolds, individually and as successor by merger to Lorillard Tobacco Company, individually and as a successor by merger to Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company, as well as British American Tobacco, Liggett Group LLC, Vector Group LTD., Liggett and their predecessors, successors, agents and/or alter-egos (hereinafter referred to as "cigarette manufacturers") knew or should have known the following:

   a. that smoking cigarettes greatly increased the risk of a smoker developing lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory

FILED DATE: 2/25/2026 3:22 PM   2026L002215

system, immune system, genetic makeup and other related physical conditions when used as intended;

b.  that the diseases and/or injuries listed above would be more likely experienced if users such as the Smoker did not restrict their intake of Defendants' cigarettes, or if they began to use such products at an early age;

c.  that use of the products as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

d.  that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

e.  that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

f.  that cigarette sellers could develop a reasonably safe dose for foreseeable users;

g.  that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the Smoker;

h.  that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced; and

i.  that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

### *Historical Allegations of the Defendants' Unlawful Conduct Giving Rise to the Lawsuit*

16.  Prior to 1900, lung cancer was virtually unknown as a cause of death in the United States. By 1935, there were an estimated 4,000 lung cancer deaths annually, and by 1945 that figure had almost tripled.

17.  By the 1920s, scientists were beginning to investigate the relationship between the concomitant rise in cigarette consumption and lung cancer, and to focus on the health consequences of smoking.

18. By the end of the 1940s and early 1950s, far more evidence linking smoking to disease began to appear, ranging from the ground-breaking statistical studies of two eminent British statisticians, Bradford Hill and Sir Richard Doll, to the Graham and Wynder studies at Washington University, to animal research studies pointing to the carcinogenicity of cigarettes.

19. The mainstream media began to pay attention to the growing scientific literature and report on the scientists' findings. For example, in 1953, Reader's Digest, which was at the time one of the most popular publications in the country, published a series of articles titled "Cancer by the Carton" which relayed the scientific findings of Drs. Wynder and Graham. The magazine quoted one of the conclusions they reached in their American Cancer Society study which had been published in the American Medical Association's Journal of May 27, 1950 ("JAMA"), namely that "Excessive and prolonged use of tobacco, especially cigarettes, seems to be an important factor in the induction of bronchiogenic carcinoma." Such mainstream media publicity in popular magazines such as Time, Life, and Reader's Digest triggered understandable public concern.

20. In short, by 1953, there had been a very substantial rise in the annual per capita consumption of cigarettes and the number of deaths attributable to lung cancer; scientists were more and more convinced that a relationship existed between cigarette smoking and lung cancer; and the public was growing increasingly aware of and anxious about both developments.

21. In December 1953, Paul M. Hahn, President of American Tobacco Co., (American), sent telegrams to the presidents of the seven other major tobacco companies and one tobacco growers' organization, inviting them to meet and develop an industry response to counter the negative publicity generated by the studies linking cigarette smoking and lung cancer. The

7

telegrams were sent to: Edward A. Darr, President of Defendant Reynolds; Benjamin F. Few, President of Defendant Liggett; William J. Halley, President of Lorillard Tobacco Co., (Lorillard); Timothy V. Hartnett, President of Brown & Williamson Tobacco Co., (B&W); O. Parker McComas, President of Defendant Philip Morris; Joseph F. Cullman, Jr., President of Benson & Hedges, J.B. Hutson, President of Tobacco Associates, Inc.; and J. Whitney Peterson, President of United States Tobacco Co.

22. Executives from every tobacco company listed above, except for Liggett, met in New York City at the Plaza Hotel on December 14, 1953. The executives discussed (i) the negative publicity from the recent articles in the media, (ii) responding to the problem by jointly engaging a public relations counsel, and (iii) removing health themes from advertising. They also discussed Liggett's decision not to attend the meeting because "in the course of time the whole thing would blow over." The executives also authorized the five members of the group who had their offices in New York to engage the services of Hill & Knowlton on behalf of the whole committee; to meet with John Hill at the Plaza Hotel the next day, December 15th, to discuss the negative publicity problem; and to request that Hill & Knowlton, if it accepted the assignment, submit recommendations to the full committee at a subsequent meeting as to how to proceed. It is clear from all the surrounding circumstances that representatives of Hill & Knowlton had been contacted about taking on this assignment prior to December 14, 1953.

23. The tobacco company executives did not meet, as they have suggested, in an altruistic response to requests from the scientific community that the industry fund research on smoking and health. Rather, they convened a strategy meeting of the highest company officials to formulate an industry-wide response (a) to the public's growing anxiety generated by the negative publicity about the direction of scientific research on cigarettes and cancer, and (b)

8

to what they accurately understood to be a major threat to their corporations' economic future. While it is true that there was a recommendation "to do good science, independent science,", the minutes of the meeting reveal that:

> "It was recommended that this [research] group undertake to enlist the cooperation of the National Institutes of Health of the U.S. Public Health Service in working out a program of scientific investigation through which the facts in the present controversy would be developed. This was considered highly advisable in that it would give to the program an aspect of independence to the program to a degree not obtainable in any other way."

24. At the December 14, 1953, meeting, Paul Hahn of American and Timothy Hartnett of B&W told the other company presidents that they had taken definite steps to remove the health themes from the advertising programs on Pall Mall and Viceroy. Darr [of Reynolds] made the point that he could not concur in sponsoring an industry paid advertising campaign (if this is the course recommended by the Public Relations Counsel) if the health theme continued to be featured by any one of the companies represented on the committee. J. Whitney Peterson of United States Tobacco and Hartnett "expressed their agreement with Mr. Darr's views in this matter." Hill & Knowlton wanted to develop some understanding with the Defendants that

> "none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. (No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a given brand less likely to cause you-know-what. No "Play-Safe-with-Luckies.)"

25. At the December 15, 1953, meeting, the participants were Paul Hahn of American, O. Parker McComas of Philip Morris, Joseph Cullman, Jr. of Benson & Hedges, J. Whitney Peterson of United States Tobacco, and representatives from Hill & Knowlton, including John Hill and Bert Goss. Hill & Knowlton was told that the industry viewed the "problem [posed by the scientific studies] as being extremely serious and worthy of drastic action." According to a

9

Hill & Knowlton memo dated December 22, 1953, the public relations firm was asked to develop suggestions for dealing with the public relations problem confronting the industry because of widely publicized assertions by a few medical research men regarding the link between cigarette smoking and lung cancer.

26. In an internal planning memorandum, Hill & Knowlton assessed their tobacco clients' problems in the following manner:

> "There is only one problem -- confidence, and how to establish it; public assurance, and how to create it -- in a perhaps long interim when scientific doubts must remain. And most important, how to free millions of Americans from the guilty fear that is going to arise deep in their biological depths -- regardless of any pooh-poohing logic -- every time they light a cigarette. No resort to mere logic ever cured panic yet, whether on Madison Avenue, Main Street, or in a psychologist's office. And no mere recitation of arguments pro, or ignoring of arguments con, or careful balancing of the two together, is going to deal with such fear now. That, gentlemen, is the nature of the unexampled challenge to this office."

27. Ten days later, on December 24, 1953, Hill & Knowlton submitted a proposal regarding the tobacco industry's public relations campaign, recommending that the companies form a joint industry research committee that would sponsor independent scientific research on the health effects of smoking and announce the formation of the research committee nationwide as news and in advertisements. Hill & Knowlton also recommended that the companies fund objective research by scientists who were independent of the tobacco industry, and that an advisory board be established composed of a group of distinguished scientists from the fields of medicine, research and education "whose integrity is beyond question."

28. In fact, one of the questions posed by Hill & Knowlton to the Defendants was

> "whether the companies considere[d] that their own advertising and competitive practices have been a principal factor in creating a health problem? The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it."

10

FILED DATE: 2/25/2026 3:22 PM    2026L002215

29.     Four days later, on December 28, 1953, another meeting was held at the Plaza Hotel and was attended by Paul Hahn of American; Edward Darr of Reynolds; Herbert A. Kent, Chairman of Lorillard; Timothy Hartnett of B&W; O. Parker McComas of Philip Morris; Joseph Cullman of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; J. Whitney Peterson of United States Tobacco; and three people from the public relations firm of Hill & Knowlton, John Hill, Bert Goss, and Richard Darrow. The attendees agreed on Tobacco Industry Research Committee ("TIRC") as the official name of the research committee; chose Paul Hahn as temporary chairman of the committee; agreed that the search should begin immediately for a qualified director who, together with the companies' research directors, would recommend members for the research advisory board; and reviewed and accepted the Hill & Knowlton proposal regarding the tobacco industry's public relations campaign. The attendees also agreed on a mission statement for the new organization which stated that its "purposes and objectives" were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject.

30.     Hill & Knowlton played a major role in creating, refining, and implementing the strategies adopted by the participants at the December meetings.

31.     Following Hill & Knowlton's advice, the formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers" published in 448 newspapers throughout the United States. All sponsoring cigarette manufacturers and other tobacco industry entities were clearly identified.

32.     The Frank Statement was subscribed to by the following domestic cigarette and tobacco product manufacturers, organizations of leaf tobacco growers, and tobacco warehouse

associations that made up TIRC: American by Paul Hahn, President; B&W by Timothy Hartnett, President; Lorillard by Herbert Kent, Chairman; Defendant, Philip Morris by O. Parker McComas, President; Defendant, Reynolds by Edward A. Darr, President; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc. by W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager; Stephano Brothers, Inc. by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson, President.

33. The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years -- that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence.

The "Frank Statement" in its entirety stated as follows:

"RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings. Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest

12

to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.

Distinguished authorities point out: 1. That medical research of recent years indicates many possible causes of lung cancer. 2. That there is no agreement among the authorities regarding what the cause is. 3. That there is no proof that cigarette smoking is one of the causes. 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of disease is a matter of deep concern to us.

Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer:1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. 3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

34.     The issuance of the "Frank Statement to Cigarette Smokers," was an effective public relations step. By promising the public that the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with an effective rationale for continuing to smoke.

13

FILED DATE: 2/25/2026 3:22 PM    2026L002215

35.   The Frank Statement was but the first of hundreds, if not thousands, of statements reassuring the public of the safety of cigarette smoking. The industry would push the "open question" as far as the late 1990s.

36.   Shortly after the Frank Statement was published, Philip Morris, through a publicized speech, told the public that the industry would "stop business tomorrow" if it thought its products was harming smokers.

37.   TIRC focused its energies and resources in two areas -- public relations and scientific research. First, it served as a sophisticated public relations unit for Defendants, especially in relation to growing public concern about the risks of smoking, by repeatedly attacking scientific studies that demonstrated the harms of cigarette smoke and insisting on the notion of an "open question" regarding cigarette smoking and health. Second, it developed a scientific research program that focused on basic processes of disease rather than evaluating the risks and harms associated with smoking -- the very subject that the industry had pledged to pursue through TIRC. From the outset, the dual functions of TIRC were intertwined, with the scientific program of TIRC always subservient to the goals of public relations.

38.   In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish many advertisements, including one entitled "Some frank words about Smoking and Research," which stated in part:

> "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come about only through persistent scientific research."

> "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public"

14

FILED DATE: 2/25/2026 3:22 PM 2026L002215

"In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study."

"We know we have a special responsibility to help scientists determine the facts about tobacco use and health.:

"The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

39. Defendants' denials of the link between smoking and disease kept away many excellent researchers. In an October 1969 memorandum to Ross R. Millhiser of Philip Morris, Helmut Wakeham, Vice President and Director of Research for Philip Morris, expressed concern that the efforts of the tobacco industry through CTR[1] and the American Medical Association have failed to involve the best investigators. "At the beginning of our support of smoking and health research, this failure may have been connected with our consistent denial of the statistics and our continued assertion that there is nothing to the cigarette causation hypothesis."

40. A year later, Wakeham again discussed CTR's strategy of frequent and public denials, in a December 1970 memorandum to Joseph Cullman, Chairman of Philip Morris and Chairman of the Executive Committee of the Tobacco Institute: "It has been stated that CTR is a program to find out the 'truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes cancer."

---

[1] In January of 1964, the TIRC Executive Committee agreed to change the name of the organization to the Council for Tobacco Research-U.S.A. (CTR).

15

FILED DATE: 2/25/2026 3:22 PM   2026L002215

41. Virtually none of the research funded by TIRC/CTR centered on immediate questions relating to carcinogenesis and tobacco that could resolve the question of the harms brought about by cigarette smoking. Although some TIRC/CTR-funded researchers explored alternative hypotheses, TIRC/CTR did not typically pursue direct research on cigarettes and disease. Rather than addressing the constituents in tobacco smoke and their demonstrated effect on the human body, TIRC/CTR directed most of its resources to alternative theories of the origins of cancer centering on genetic factors and environmental risks. The major thrust of TIRC/CTR was to emphasize that human cancers were complex processes, difficult to study and difficult to understand, and to focus on the "need for more research." Although research funded by the Scientific Advisory Board (SAB) was irrelevant to the immediate questions associated with tobacco smoking and health, it did "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.'"

42. During a four-week visit to the United States in 1958, the three British scientists who met with representatives of TIRC and TIRC's SAB, as well as representatives of American, Liggett, and Philip Morris, reported that "Liggett & Meyers stayed out of TIRC originally because they doubted the sincerity of TIRC's motives and believed that the organization was too unwieldy to work efficiently. They remain convinced that their misgivings were justified. In their opinion TIRC has done little if anything constructive, the constantly reiterated 'not proven' statements in the face of mounting contrary evidence has thoroughly discredited TIRC, and the SAB of TIRC is supporting almost without exception projects which are not related directly to smoking and lung cancer."

43. The Defendants knew that the TIRC/CTR was funding research concerning cancer as a general issue, rather than the relationship of smoking to cancer.

16

44.    In January 1968, Addison Yeaman, B&W Vice President and General Counsel, wrote: "Review of SAB's current grants indicates that a very sizable number of them are for projects in what might be called 'basic research' without specific orientation to the problem of the relationship of the use of tobacco to human health."

45.    In addition, Defendants appreciated the delays associated with the basic research approach. Janet Brown, outside counsel for American, explained CTR's strategy of undertaking only basic research funding, as opposed to funding questions directly related to tobacco and health to Cy Hetsko, Vice President and General Counsel for American, and Addison Yeaman, Vice President and General Counsel for B&W, at a January 1968 meeting. The rationale was that basic research kept alive the Defendants' open question argument on causation. Yeaman summarized Brown's position as: "First, we maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco, and Secondly, that the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco."

46.    Following a 1964 Surgeon General's report which discussed the connection between smoking and lung cancer, the industry publicly called for "more research" for the purpose of suggesting that the health question about cigarette smoking was not yet clear, despite the industry's own internal decision not to conduct research directly related to tobacco and health.

47.    In 1966 the Tobacco Institute issued a press release where it stated on behalf of the industry:

> "Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. The tobacco industry is supporting much of this research and will continue to do so."

17

48. Defendants continued throughout the 1970s, 1980s, and 1990s to encourage the impression that there was a genuine and continuing controversy regarding the health hazards of smoking.

49. The tobacco industry frequently attacked the Surgeon General. For example, the industry preempted the Surgeon General's 1979 report on national news networks, stating the report was "suspect from the start". The industry later attacked the Surgeon General following the 1988 report on the addictive nature of cigarettes with a press release titled, "CLAIMS THAT CIGARETTES ARE ADDICTIVE CONTRADICT COMMON SENSE".

50. Later in 1994, after the industry executives testified before congress that cigarettes were not addictive and had not been proven to cause cancer, Philip Morris continued to adhere to the controversy by stating "Both smokers and non-smokers deserve to know the facts, not innuendo, about cigarettes.

> Yesterday, Philip Morris and other U.S. tobacco manufacturers helped to set the record straight by speaking before a Congressional committee…
> Fact: Philip Morris does not add nicotine to its cigarettes…
> Fact: Philip Morris does not "manipulate" nicotine levels…
> Fact: Philip Morris does not believe cigarette smoking is addictive…
> Fact: None of the ingredients added in the manufacture of cigarettes is harmful as used…

51. From 1953 through 2009 and continuing through today, Defendants made false or misleading statements including but not limited to the following:

- denying that smoking "is" addictive;

- that smoking is not injurious to health;

- that it is unknown if smoking causes serious diseases;

- that scientific and medical community has not reached a consensus about the harms of smoking;

- that no one knows what causes cancer;

18

FILED DATE: 2/25/2026 3:22 PM   2026L002215

- that the tobacco industry made an honest effort to study the harms of smoking and a causal relationship had not need proven; and

- that filter, low tar and low nicotine, lights and ultra-light are safe, safer and/or directly and/or indirectly made statements about their safety and efficacy.

52. Throughout the same period, Defendants publicly attacked the validity of research suggesting any harmful effects from smoking.

53. The purpose of this campaign was to create an impression in the public's mind—including smokers like Mr. Apa—that the health issue remained undecided and smoking was not addictive or injurious to health.

## COUNT I: NEGLIGENCE (Manufacturers)

This count applies only to R.J. REYNOLDS and PHILIP MORRIS.

54. The allegations contained in paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

55. Mr. Apa smoked Viceroy and Marlboro brand cigarette products that were designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants, which Mr. Apa used and smoked in his daily life.

56. Mr. Apa was exposed to Defendants' products as a smoker and/or bystander. Each exposure to such cigarette products of Defendant caused Mr. Apa to inhale smoke from said products which caused Mr. Apa to develop emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries. Each exposure to such products was harmful and caused or contributed substantially to Mr. Apa's injuries. Mr. Apa's injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendants of their cigarette products.

19

57. Mr. Apa was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants.

58. The damages of Mr. Apa are the direct and proximate cause of the negligence of the Defendants, in that they produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendants knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to Mr. Apa's health and well-being. The Defendants, prior to selling and/or distributing their cigarette products, to which Mr. Apa was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. The Defendants also knew that Mr. Apa and others similarly situated would use and be exposed to their cigarette products in such a way as to cause Mr. Apa to inhale the smoke from said products.

59. Defendants' cigarette products, including Viceroy and Marlboro cigarettes, contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Mr. Apa was exposed to them in that said products contained tar, nicotine and other harmful substances which the Defendants knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death, to those, such as Mr. Apa who used and/or was exposed to them.

60. Defendants knew that their cigarette products would be used by and around Mr. Apa without inspection for defects and that any such inspection would not have advised Mr. Apa of the fact that the Defendants' cigarette products could cause the injuries which he suffered. Such

20

facts made Defendants' cigarette products inherently and unreasonably dangerous in that Mr. Apa was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendants' cigarette products which he used or was exposed to.

61.   Mr. Apa alleges that there were methods of design and manufacture available and/or known to the Defendants and unknown to him which could have been used by the Defendants in the design and manufacture of its cigarette products to which Mr. Apa was exposed to make such products less dangerous.   Defendants were in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Mr. Apa and others similarly situated would encounter its cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of fatal and life threatening injuries including, but not limited to, head and neck cancer. Defendants were negligent in all the following respects, same being the proximate cause of Mr. Apa's injuries, disabilities and ultimate death which acts of negligence have continued to the present time:

    a.   in designing and developing cigarette products that were more mild, had better taste and contained nicotine so that foreseeable users, such as Mr. Apa, would find smoking Defendants' products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

    b.   in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products the Defendants designed, manufactured, advertised, marketed, distributed and/or sold;

    c.   in continuing to manufacture, distribute and sell cigarette products when the Defendants knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Mr. Apa, when used as intended;

21

FILED DATE: 2/25/2026 3:22 PM   2026L002215

d.  in concealing information while affirmatively misrepresenting to Mr. Apa and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Mr. Apa to unknowingly use and/or continue to use Defendant's cigarette products himself and expose himself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

e.  in failing to test and/or adequately test Defendants' cigarette products before offering them for sale and use by Mr. Apa, and other persons similarly situated;

f.  in failing to remove and recall all said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

g.  in manipulating, failing to reduce and/or eliminating nicotine from the Defendants' cigarette products to prevent Mr. Apa, who was addicted to the nicotine in Defendants' cigarette products, from quitting and/or reducing consumption;

h.  in including nicotine, or artificially high levels of nicotine, in Defendants' cigarette products to prevent Mr. Apa and other persons similarly situated from quitting and/or reducing consumption;

i.  in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

j.  by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous; and/or

k.  by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

62.  The Defendants' cigarette products to which Mr. Apa was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendants.

22

63. The Defendants' cigarette products failed to perform as safely as Mr. Apa expected it would in that they caused him to develop head and neck cancer because of his inhalation of cigarette smoke from Defendants' cigarette products.

64. Each of the Defendants' cigarette products suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars and other substances which Defendants knew or should have known was extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

65. As a direct and proximate result of Defendants' negligent acts and/or omissions, Plaintiff, Frank Apa, developed injuries, including but not limited to emphysema , in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA, prays for judgment against the Defendants R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

## COUNT II: STRICT LIABILITY (Manufacturers)

This count applies only to Defendants R.J. REYNOLDS  and PHILIP MORRIS.

66. The allegations contained in paragraphs 1 through 53 are reincorporated and are realleged as if fully set forth herein.

67. Defendants were and have been designers, manufacturers, advertisers, distributors and/or sellers of cigarette products, including but not limited to Viceroy and Marlboro cigarettes.

23

68. The products complained of were cigarette products designed, manufactured, advertised, distributed and/or sold by Defendants and used by and/or in the vicinity of the Mr. Apa.

69. The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by the Defendants.

70. Mr. Apa was exposed to Defendants' cigarette products over many years during which time smoke from Defendants' cigarette products were inhaled by Mr. Apa which caused him to develop head and neck cancer and/or other injuries and death.

71. At the time Defendants designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to, and did, reach Mr. Apa in a condition without substantial change from that in which such products were when within the possession of Defendants.

72. The Defendants' cigarette products were in a condition unreasonably dangerous to users and/or bystanders, such as Mr. Apa and said products were expected to, and did, reach Mr. Apa without substantial change affecting that condition.

73. The Defendants' cigarette products were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Mr. Apa, and said products were expected to, and did, reach Mr. Apa without substantial change affecting that condition.

74. The Defendants' cigarette products were unreasonably dangerous because of their design in that the risk of danger to users and/or bystanders, such as Mr. Apa, outweighed the benefits.

75. The Defendants' cigarette products were dangerous beyond the expectation of the ordinary user/consumer/bystander when used as intended or in a manner reasonably foreseeable by Defendants.

76. The Defendants' cigarette products were unreasonably dangerous because a less dangerous design and/or modification was economically and scientifically feasible.

77. Defendants' cigarette products were in a defective condition, unreasonably dangerous, in that those products:

a. by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to Mr. Apa;

b. contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substances or containing less of them;

c. failed to filter the harmful substances so that during ordinary use, such materials would not be liberated into the air and/or breathed by the smoker such as Mr. Apa;

d. through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

e. utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

f. the nature and degree of the danger of Defendants' cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

g. by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous; and/or

h. by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

25

FILED DATE: 2/25/2026 3:22 PM   2026L002215

78.     Mr. Apa, unaware of the defective and unreasonably dangerous condition of the Defendants' cigarette products, and at a time when such products were being used for the purposes for which they were intended, was exposed to and breathed smoke from Defendants' cigarette products.

79.     Defendants knew that their cigarette products would be used without inspection for defects, and by placing them on the market, represented that they would be safe.

80.     Mr. Apa was unaware of the hazards and defects in the cigarette products of the Defendants, to-wit: That exposure to said products would cause Mr. Apa to develop cigarette related disease(s) which made said products unsafe for use.

81.     Mr. Apa was caused to contract emphysema , in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

82.     As a direct and proximate result of the strict liability of the Defendants, Plaintiff, Frank Apa, developed injuries, including but not limited to emphysema , in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA, prays for judgment against Defendant R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

### COUNT III: FRAUDULENT CONCEALMENT (Manufacturer)

This count applies only to R.J. REYNOLDS and PHILIP MORRIS.

83.     The allegations contained in paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

26

FILED DATE: 2/25/2026 3:22 PM   2026L002215

84. Defendants and other cigarette manufacturers had a duty to disclose material information regarding cigarettes' health hazards because they were in a superior position to consumers, including Mr. Apa. This superior position was established due to the following:

  a. As the designers, developers and manufacturers of their cigarette products, Defendants and other cigarette makers solely possessed knowledge of the ingredients in their products, which they kept strictly confidential from the public;

  b. As the designers, developers and manufacturers of their cigarette products, Defendants and other cigarette makers were solely aware of additives to their cigarette products and the amounts of such additives, which they kept strictly confidential from the public;

  c. As the designers, developers and manufacturers of their cigarette products, Defendants and other cigarette makers were solely aware of the effects that additives to their cigarette products had on consumers, which they kept strictly confidential from the public;

  d. Defendants and other cigarette makers undertook research regarding the addictive nature of their cigarettes and knew that nicotine was highly addictive. Moreover, they knew that their cigarettes are highly addictive due to the amount of nicotine they chose to maintain in each cigarette;

  e. Defendants and other cigarette makers advertised and sold filtered, low-tar, and mild cigarettes products, which touted or implied health benefits. However, Defendants knew that these purported benefits were illusory, and that the public—even the US government and physicians—were being misled by their false promises;

  f. Defendants and other cigarette makers undertook internal research regarding the health effects of their cigarettes and knew that cigarette use caused COPD, cancer and other diseases. More importantly, they knew that consumers, including Mr. Apa, were not aware of this scientific determination, and that the public's ignorance was the driving force behind their cigarette sales and growing revenue;

  g. The dangers of smoking are not open and obvious to consumers, especially young consumers, because the harm could occur and accumulate imperceptibly for decades before resulting in COPD and cancer;

  h. The significant increase in cancer caused by cigarettes is detectable only in aggregate over decades of statistical studies, which the tobacco industry persistently discredited and publicly disputed over client's lifetime;

  i. The tobacco industry had superior knowledge not only to consumers but even to the FDA in that it knew the FDA's methodology of measuring tar from filtered cigarettes did not accurately measure tar-intake in actual consumer use; and

j.  The addictiveness of nicotine at the level that Defendants put into each cigarette was known to the tobacco manufacturers, and specifically designated by the manufacturers to maintain sales, but was impossible for consumers to detect.

85.  Defendants and other cigarette makers also assumed a duty to disclose material information to their consumers, including Mr. Apa. Their assumption of duty began with the Frank Statement but continued and was reaffirmed repeatedly throughout Mr. Apa's lifetime, as exhibited by the following conduct:

a.  As part of the Frank Statement published in over 400 newspapers across the United States, the tobacco industry stated, "we believe the products we make are not injurious to health." The companies "accept[ed] an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health" thereby assuming a duty to disclose to the public of any hazards discovered that might affect smokers' health.

b.  In addition to the Frank Statement above, the Defendants individually or through the acts of their agents, employees and representatives, further assumed or acknowledged their duty to disclose, and not fraudulently conceal, the harms and addictive nature of smoking cigarettes through various statements to the public or through internal correspondence, including but not limited to the following:

i.  Shortly after the Frank Statement was published, George Weissman, a Philip Morris Vice President, through a publicized speech in 1954, told the public that "if we had any thought or knowledge that in any way we were selling a product harmful to consumers, we would stop business tomorrow."

ii.  Robert N. Dupuis, Chairman of the Industry Technical Group of the Tobacco Industry Research Committee, stated in 1955 on See It Now on CBS, regarding harmful components in smoke: "As we find these components we publish the results of our work in technical journals which are available to any scientist in any part of the world. So far we've found none that give us any cause for concern. *If we do find any that we consider harmful, and so far we have not, we will remove these from smoke and still retain the pleasure of your favorite cigarette*." [Emphasis added].

iii.  On June 7, 1955, Timothy Hartnett, Chairman of the Tobacco Industry Research Committee, repeated that the industry had "accepted an interest in people's health as a basic responsibility paramount to every other consideration in our business. And that's where we stand today."

28

iv. Lorillard's 1953 annual report told its shareholders: "[w]e believe Lorillard products are not injurious to anyone's health, but that we accept as an inherent responsibility of our corporate citizenship the obligation to make the public's health our business."

v. In 1971, Joseph Cullman III, the Chairman and Chief Executive Officer of Philip Morris, appeared on Face the Nation on CBS and stated, "when as and if any ingredient in cigarette smoke is identified as being injurious to human health we are confident that we can eliminate that ingredient."

vi. Internally, the industry recognized it assumed a duty to inform the public of hazards associated with cigarettes. On April 4, 1978, Ernest Pepples, General Counsel for B&W, sent a letter to J.E. Edens at B&W Industries describing the purpose of the CTR and its statements to the public: "Originally, the CTR was organized as a public relations effort. The industry told the world CTR would look at the diseases which were being associated with smoking. *There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. The manufacturer has a duty to know its product…*" [Emphasis added].

vii. Horace Kornegay, President and Executive Director of the Tobacco Institute, stated on the NBC Today Show on January 10, 1979, stated "if we know what the criminal element is…then every effort will be made to remove it from the product."

viii. RJ Reynolds president Gerald H. Long, in a May 19, 1986, interview for Insight Magazine asserted that if he ever "saw or thought there were any evidence whatsoever that conclusively proved that, in some way, tobacco was harmful to people, and I believed it in my heart and my soul, then I would get out of the business."

c. In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish many advertisements, including one entitled "Some frank words about Smoking and Research," which stated in part:

i. "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come about only through persistent scientific research."

ii. "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public"

29

iii. "In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study."

iv. "We know we have a special responsibility to help scientists determine the facts about tobacco use and health."

v. "The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

d. In 1966 the Tobacco Institute issued a press release where it stated on behalf of the industry: "Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. The tobacco industry is supporting much of this research and will continue to do so."

e. The TIRC was formed in 1954 by cigarette manufacturers, including the Defendants in this case, with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking. However, despite these promises, the TIRC and later CTR concealed information regarding the lack of bona fide research being done on the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease.

f. The tobacco industry and its organizations invested an enormous amount of time, effort and money to curate a decades-long promise, which instilled a false belief in the public that Defendants and their fellow cigarette makers proactively sought the truth regarding smoking's health hazards and would discontinue a product that they knew to be cancer-causing. This false belief was passed down, overtly or implicitly, from adults to children through generations of American consumers, including Mr. Apa.

86. The Defendants also had a duty to disclose by making half-truths about the harms of smoking while also actively concealing their knowledge as to the actual harms. In making the aforementioned half-truths, suppressing the totality of material facts and passing them

30

off as the entirety of the truth regarding what it knew about the health consequences of smoking and the addictive nature of cigarettes, Defendants also created in itself a duty to disclose all material information in its possession.

87.    Due to the Defendants' superior position, assumption of duty to disclose material information by express statements, and assumption of duty by affirmative misrepresentations, active concealment and half-truths, Mr. Apa placed his trust and confidence in Defendants to disclose all of the harmful effects of their cigarettes. Mr. Apa and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendants herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after the industry chose to voluntarily speak regarding their cigarette products, efforts to support research into the harms and addictive nature of smoking, ensuring the public they would disclose and remove any harmful elements of tobacco smoke they discovered, and even remove cigarettes from the market or stop business if they found them harmful to human health. Mr. Apa also reasonably and justifiably relied on Defendants to disclose information including but not limited to the fact that smoking causes small cell lung cancer and COPD, that the nicotine level designed into each of Defendants' cigarettes would cause strong addiction, and that filter, low-tar and mild cigarette designs do not actually reduce the risk of smoking.

88.    However, rather than disclosing the truth, Defendants, other cigarette makers, TIRC and TI collectively undertook a misinformation campaign to fraudulently induce the public and Mr. Apa to believe that they were in favor of protecting consumers' health, and that the issues of nicotine addictiveness and the carcinogenic nature of tobacco were unproven by scientific research.

31

89. Beginning at an exact time unknown to Mr. Apa and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Mr. Apa, physicians, the government and others as to the true dangers of smoking cigarettes. Defendants and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning:

   a. the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendants' cigarettes did in fact contain carcinogenic materials;

   b. their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;

   c. the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

   d. the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

   e. the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

   f. the risks of contracting cancer, including but not limited to lung cancer, laryngeal cancer esophageal cancer, other head and neck cancers, tongue/oral cavity cancer, bladder cancer and other forms of cancer, from smoking cigarettes;

   g. the dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

   h. that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease;

   i. that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

   j. the use of ammonia technology and/or certain tobacco blends to boost the ph of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is

32

less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k.   the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l.   the lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m.   that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n.   that cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

o.   that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of Defendants' cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p.   that smoke from Defendants' cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments including but not limited to lung cancer, bronchitis and pneumonia;

q.   that the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters and/or tumor initiators including but not limited to those such as PAHs and nitrosamines found within cigarette smoke.

r.   that switching to filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

33

FILED DATE: 2/25/2026 3:22 PM   2026L002215

s.   by continuing even today to fraudulently market and sell multiple brands as "filtered" causing smokers to wrongly believe that filtered cigarettes reduce the harms of smoking based on the implication of filtration of smoke and therefore relative safety compared to unfiltered cigarettes  However, Defendants and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes; and/or

t.   that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

90.   The cigarette manufacturers, including Defendants herein, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by the Defendants and have withheld and/or failed to release over the last almost 65 years both because he does not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

91.   The cigarette manufacturers, including Defendants herein, carried out their campaign of concealment by concealing and suppressing facts, information and knowledge about the health dangers of smoking, including addiction. They concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of

34

the nicotine content of their products to create and perpetuate smokers' addiction to cigarettes. The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

92.    In 1953 Dr. Ernst Wydner had published an article titled Experimental Production of Carcinoma with Cigarette Tar in the journal Cancer Research. In his experiments he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954 LIGGETT & MEYERS, assuming that whatever cigarettes were used in Dr. Wydner's study were not CHESTERFIELD or L & M, decided to repeat Dr. Wydner's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for LIGGETT & MEYERS, Mr. Darkis writes:

> "If Chesterfield turn out to be negative, and X (used by Wydner) as positive, it would then be possible to say, that by using Dr. Wydner's techniques, Chesterfield did not produce cancer in mice."

Of course, when the experiments were finished in 1955 the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

93.    A confidential "limited" LIGGETT & MEYERS document dated March 15, 1961 states, in part: (L&M - A Perspective Review)

    a.    There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...

    b.    What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what good is this? We've known this for several years - so what?

35

This document was written by an industry consultant for LIGGETT & MEYERS. This industry consultant conducted animal research from 1954-1984 for LIGGETT & MEYERS. This memo contained material facts known to and concealed by the Defendant since at least 1961 and unknown to Mr. Apa.

94. In 1964, TIRC changed its name to CTR, and was joined by Defendant, Liggett. Defendants, R.J. Reynolds, and Philip Morris were founding members of the TIRC/CTR. The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

95. Despite their "promise" which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

96. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was withheld from Mr. Apa and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison

36

Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

97. In a July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation.""

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed, industry insiders knew it was nothing more than a "public relations" sham.

98. In that same July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "Moreover, nicotine is addictive.  We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:
>
> 1)They cause, or predispose to, lung cancer.
>
> 2)They contribute to certain cardiovascular disorders.
>
> 3)They may well be truly causative in emphysema, etc, etc."

The 1964 Surgeon's General Report was not issued for another 6 months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive, but the cigarette

37

FILED DATE: 2/25/2026 3:22 PM   2026L002215

industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite what the industry told the public the industry clearly understood that nicotine was addictive, and cigarettes were a cause of lung cancer and other diseases.

99. The cigarette manufacturers, including Defendants herein, knew for decades that the "tar and nicotine levels", as measured by the so-called Cambridge Filter Method or FTC method, were inaccurate – and seriously underestimated the levels of poisons delivered into the lungs. Yet they continued to tout the tar and nicotine numbers on cigarette packs and marketing materials, inducing smokers to believe lower tar and lower nicotine cigarettes were safer, until 2008 when the Federal Trade Commission ultimately rescinded its guidance concerning tar and nicotine yields.

100. The cigarette manufacturers, including Defendants herein, continue even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking and despite knowing internally that such cigarettes are just as addictive, dangerous, and deadly as non-filtered cigarettes.

101. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Mr. Apa to smoke, fail to quit or reduce consumption for the Defendant's own pecuniary gain.

102. Mr. Apa and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendant herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after

38

FILED DATE: 2/25/2026 3:22 PM    2026L002215

the industry chose to repeatedly and publicly deny the harms of smoking, the addictive nature of cigarettes/nicotine and the carcinogenic effects of tobacco.

103. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Mr. Apa to smoke, fail to quit or reduce consumption. Mr. Apa was unaware of the extent of danger of the Defendants' cigarette products, the addictive nature of the Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as unfiltered cigarettes. The knowledge and information concealed by the cigarette manufacturers, including the Defendants named herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Mr. Apa.

104. Indeed, Mr. Apa was not aware of any dangers of smoking cigarettes when he first began to smoke in the early 1960s or prior thereto. Had the Defendants not for many years concealed and/or suppressed its knowledge of the dangers of its cigarette products (or spread false information designed to cause confusion) from Mr. Apa and the public, including that the products caused cancer and other serious health issues, Mr. Apa would not have started smoking, and his risk of injury from cigarettes, including emphysema , would have been eliminated.

105. Mr. Apa was also not aware that cigarettes were as addictive as they are. Had the Defendants not concealed and/or suppressed its knowledge of the addictiveness of its cigarette products from Mr. Apa and the public, Mr. Apa would not have started smoking or would have stopped smoking at an earlier age or significantly reduced his cigarette intake, and his risk of injury from cigarettes, including emphysema, would have been reduced or eliminated.

106. Had the Defendants not concealed and/or suppressed their knowledge of the dangers of its cigarette products from Mr. Apa and the public, including the dangers of light cigarettes, Mr. Apa would have stopped smoking entirely or significantly reduced his cigarette intake, and his risk of injury from cigarettes, including COPD, would have been reduced or eliminated.

107. The knowledge and information concealed by the cigarette manufacturers, including the Defendants named herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Mr. Apa.

108. Mr. Apa did not have access to the Defendants' research, information and/or knowledge about the true dangers of the cigarette products that was concealed, hidden and/or suppressed by Defendants and their co-conspirators, did not have the resources or ability to perform such research or otherwise learn this information, and could not have discovered through reasonable diligence the information about the true dangers of cigarettes that was known and concealed and/or suppressed by Defendants.

109. As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including Defendants herein and its co-conspirators, Frank Apa, smoked and/or continued to smoke and was otherwise exposed to Defendants' cigarette products which caused him to develop injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendant R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

40

## COUNT IV: CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT
### (Manufacturers)

This count applies to Defendants R.J. Reynolds, Philip Morris, and Liggett.

110. The allegations in paragraphs 1-53 and 83 through 108 are reincorporated and realleged as if fully contained herein.

111. The Defendants, along other tobacco manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by the Defendants unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

112. The Defendants R.J. Reynolds, Phillip Morris, and later Liggett, along with other entities including the TIRC/CTR, TI and persons including their in-house lawyers and outside retained counsel entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

113. The Defendants, through their employees, agents and representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

114. During its four decade history, the TIRC/CTR never acknowledged that smoking had been proven to be a cause of multiple cancer types or other serious diseases in smokers, the addictive nature of nicotine, and the fact that light cigarettes are no safer than regular cigarettes, even though the vast majority of CTR funded scientists themselves believed that

41

FILED DATE: 2/25/2026 3:22 PM    2026L002215

cigarette smoking was responsible for a wide range of serious, and often fatal, injuries including multiple cancers, understood the addictive nature of nicotine and also knew that light cigarettes were no safer than regular cigarettes.

115.   After the year 2000, the Defendants continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking including but not limited to the following acts:

    a.   Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

    b.   Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

    c.   Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

    d.   Continuing to market and/or advertise lights, ultra-lights, and low tar cigarettes under color brand name descriptors such as "Gold" and "Silver" and informing smokers "pack will be changing, but your cigarette will stay the same" following the federal ban on the use of "lights," "mild" and "low" tar descriptors in 2010.

    e.   Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

116.   The Defendants as it relates to their acts in furtherance of their conspiracy as alleged in this complaint continues through the present.

117.   The concealed and omitted information described in the aforementioned and preceding paragraphs was material information.

118.   Mr. Apa relied both directly and indirectly to his detriment upon the Defendants' concealment and omission of such material information.  Mr. Apa, during the course of his smoking history, heard some or all these false and misleading statements and/or similar statements made directly or indirectly by the Defendants, believed some or all of the Defendants' and their co-conspirators' false and misleading statements, and relied to his

42

FILED DATE: 2/25/2026 3:22 PM    2026L002215

detriment by smoking and continuing to smoke based on such false and misleading statements.

119. Had Defendants and their co-conspirators not concealed and omitted the aforementioned information from Mr. Apa and the public, Mr. Apa would have not started smoking and/or reduced the number of cigarettes and/or stopped smoking at an earlier age, and his risk of injury from cigarettes would have been reduced or eliminated.

120. Each Defendant's acts and omissions, and those of TIRC/CTR, TI and other tobacco manufacturers, as well as their in-house and retained counsel, and all of them, constitute a successful conspiracy to commit fraud.

121. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as members of a civil conspiracy are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

122. As a direct and proximate result of the fraudulent concealment of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendants and their co-conspirators, Frank Apa, smoked and continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused injuries,

including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendants R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP, LLC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

<u>**COUNT V: FRAUDULENT MISREPRESENTATION (Manufacturer)**</u>

This count applies to only the following Defendant R.J. Reynolds and Philip Morris.

123. The allegations contained in paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

124. Beginning at an exact time unknown to Mr. Apa, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Mr. Apa, the government and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements and/or misrepresentations of material facts in interviews, testimony and print, radio and television advertising.

125. The cigarette manufacturers, including Defendants herein, made literally hundreds of misrepresentations to Mr. Apa and others similarly situated over the course of the last 50 years. Mr. Apa is unable to allege in full the thousands of pre-1969 advertisements, and the continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and their co-conspirators, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, the TOBACCO INSTITUTE, INC. ("TI") formed in 1958, and COUNCIL

44

for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because he does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

126. The cigarette manufacturers, including Defendants herein, carried out their campaign of fraud, false statements and/or misrepresentations in at least five ways:

a. they agreed falsely to represent to Mr. Apa and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

b. they misrepresented and confused the facts about the health dangers of smoking, including addiction. The cigarette manufacturers claimed, falsely, that there is insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

c. the cigarette manufacturers, including Defendants herein, used lawyers to misdirect what purported to be objective scientific research, yet maintained to Mr. Apa and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

d. to discourage meritorious litigation by Mr. Apa injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence to protect the cigarette manufacturers, including Defendants herein, existence and profits.

e. by designing, selling and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers. Defendants knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker. Notwithstanding same, the Defendants marketed its "Light" cigarettes to consumers as a safer alternative. Defendants manipulated the design of cigarettes to produce test results that were artificially low. Furthermore, Defendants knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes.

45

FILED DATE: 2/25/2026 3:22 PM   2026L002215

f. by continuing to fraudulently market and sell "mild", "low tar", and "light" cigarettes through 2010 despite knowing they were no safer than full flavor cigarettes and knowing consumers perceived them as safer. The cigarette manufacturers, including Defendant herein, were ultimately prohibited by Congress from marketing "mild", "low tar", and "light" cigarettes when Congress passed the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (June 22, 2009), which became effective on June 22, 2010. Despite the congressional ban, the cigarette manufacturers, including Defendant herein, have continued to market and sell even today the same "mild", "low tar", and "light" cigarettes, only now these cigarettes are marketed with a new coloring scheme instead of the banned light descriptors. These cigarettes are the same or substantially the same cigarettes as the pre-prohibition cigarettes. Consumers often perceive the color descriptors on packaging as suggesting less harmful to smoke than regular or full flavor brands. The cigarette manufacturers, including Defendant herein, is thus able to continue fraudulently misrepresenting the "light", "low tar" and "mild" cigarette marketing the ban was designed to prevent.

g. by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking. The word "filter" implies filtration of the smoke and therefore relative safety. However, Defendants and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes.

127. Cigarette manufacturers, including the Defendants knew that cigarettes were dangerous and addictive. It became the practice, purpose and goal of the cigarette manufacturers to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals and through testimony before governmental bodies.

128. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general

46

counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

129. Despite Defendants' and the industry's promises "to help scientists determine the facts about tobacco use and health" and claiming to support research concerning tobacco and health, Defendants and the industry did not conduct the research they represented that they would conduct.

130. Instead of conducting the research it promised to do, Defendants focused its efforts on attacking health-related research that showed the dangers of smoking to keep alive a public controversy over whether tobacco smoke was harmful.

131. The industry paid for advertisements in major newspapers to attack legitimate research. For example, in 1969 the American Tobacco Company, a successor to R.J. Reynolds Tobacco Company stated in the New York Times, "[w]e believe the anticigarette theory is a bum rap."

132. Defendants continued to avoid studying the health effects of smoking while at the same time continuing to publicly insist on the need for more research.

133. The industry's purpose was to give smokers what one industry executive called a "crutch" that would justify their continued smoking.

134. Instead of focusing their efforts on health issues as it represented it would do, Defendants focused on research into modifying their cigarettes to increase their addictiveness.

47

135. Rather than making its research public as it had represented it would do, Defendants publicly denied and suppressed the results of its research.

136. Defendants continued to engage in a course of conduct where it represented to the public many times throughout the years that they would conduct research and disclose results to the public, while at the same time either hiding any potentially damning results or not conducting bona fide research at all.

137. Throughout the years, Defendants have continued to state that cigarettes were not dangerous, and they would either remove harmful constituents or stop making cigarettes altogether. Some examples include:

> A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, authenticated information about cigarette smoking and health."

> In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we don't accept that."

> In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

> Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

> In a 1978 magazine interview William Dwyer, vice president of the Tobacco Institute, stated: "we take the view that the best science can say is that cigarette smoking may be hazardous. And then it may not be."

> A 1978 Philip Morris publication entitled "Facts About the Smoking Controversy" stated: "scientists have not determined what causes cancer…cigarettes have never been proven unsafe."

48

In 1984, Ed Horrigan, Chairman of R.J. Reynolds spoke on Nightline and told the public, "It is not known whether cigarettes cause cancer. It has not been causally established."

In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health…Science is science. Proof is proof. That is why the controversy over smoking and health remains an open one."

In 1988, in response to the United States Surgeon General's report that cigarettes are addictive, and nicotine is the drug in tobacco that causes addictions, issuing a press release knowingly and disingenuously stating "Claims that cigarettes are addictive is irresponsible and scare tactics."

In 1994, CEOs from the seven largest cigarette companies, including Defendants herein, knowingly providing false and misleading testimony under oath before the United States Congress that it had not been proven that cigarettes were addictive, caused disease, or caused one single person to die.

138. Defendants continued to make these and similar statements well into the 1990s with the goal of convincing smokers to keep smoking, not reducing their smoking, and/or not quitting.

139. Defendants and the tobacco industry promoted their message through many press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. Defendants and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

140. Industry spokespersons appeared on news shows, on commercials and public television to state that the evidence concerning the health effects of tobacco was based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease, and that cigarette smoking was not addictive.

49

FILED DATE: 2/25/2026 3:22 PM   2026L002215

141. Cigarette manufacturers when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

142. Cigarette manufacturers claimed attorney-client privilege to shield as many documents as possible from disclosure and destroyed and/or refused to produce documents related to health issues and Mr. Apa's claims.

143. Cigarette manufacturers when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimant for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

144. The acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and its co-conspirators were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

145. The aforementioned acts, false statements and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators for the purposes of inducing Mr. Apa and others similarly situated to rely on such false statements and/or misrepresentations to induce persons such as Mr. Apa to smoke, fail to quit or reduce consumption.

146. Defendants knew that Mr. Apa, as well as other customers, did not hold sufficient information to understand or appreciate the dangers of the cigarettes that he smoked. These misrepresentations and false statements about the health hazards of cigarettes also include the following statements which were heard, read, and relied upon by Plaintiff, FRANK APA, who remembered these statements or substantially similar statements, made by the Defendants, their co-conspirators, and their spokesmen and women:

50

FILED DATE: 2/25/2026 3:22 PM   2026L002215

a. "The record shows many of the most well-respected doctors openly challenge anti-cigarette claims. A California doctor said as a scientist, I find no persuasive evidence that cigarette smoking causes Chronic Obstructive Pulmonary Disease and Congestive Heart Failure." The "Other Side of the Smoking Controversy" published in 1971 by the Tobacco Institute Project Truth.

b. "It is not known whether cigarettes cause cancer, it has not been casually established." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

c. "Despite all of the research to date there has been no causal link established [between cigarette smoking and cancer.]" Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

d. "As a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over 10 years that would say again that science is still puzzled over these forces." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

e. "There is absolutely no proof that cigarettes are addictive." Edward Horrigan, CEO of R.J. Reynolds, Congressional Testimony 1982.

f. "To my knowledge, it's not been proven that cigarette smoking causes cancer." William Campbell, CEO Philip Morris, Congressional Testimony, 1993.

g. "No, I don't believe that tobacco smoking is addictive." William Campbell, CEO Philip Morris, Congressional Testimony, 1993.

h. "Is it your position that it has never been proven that cigarette smoking has caused a single person to die? That is my position, yes." James Johnston, R.J. Reynolds Tobacco Company, Congressional Testimony 1994.

147. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by or on behalf of Defendants and the other cigarette manufacturers were made to induce the public and Mr. Apa to believe that cigarettes were not addictive or harmful to their health, to start smoking and become addicted to nicotine.

148. Furthermore, Mr. Apa relied on all the Defendants' false and misleading marketing and advertising of cigarettes about the health hazards of cigarettes, including, but are not limited to, the following:

51

a. False and misleading statements and suggestions from Defendants, claiming that filter makes the smoking safer or cleaner. These false and misleading marketing tactics regarding filtered cigarettes caused Mr. Apa to smoke a filtered cigarette and continue to smoke filtered cigarettes.

b. False and misleading statements from Defendants' CEOs at the 1994 Congressional hearing, where they denied that nicotine is addictive or that smoking causes cancer;

149. Mr. Apa, during the course of his smoking history, heard some or all of the false or misleading statements and/or similar statements made directly or indirectly by the Defendants, including advertisements and other marketing materials falsely representing or suggesting that cigarettes were not as dangerous from a health standpoint than they actually are, that there was no link between cigarettes and various types of lung diseases such as emphysema, COPD, that cigarettes was not addictive, and that light cigarettes were safer and less hazardous than other cigarettes.

150. Believing and relying upon these false and misleading statements made by the cigarette manufacturers in its direct advertisements to consumers and by the manufacturers and its co-conspirators in interviews, testimony and publications, Mr. Apa did not recognize the significant health risk posed by cigarettes not limited to but including the risk of developing emphysema.

151. In further reliance upon the false and misleading statements made by the cigarette manufacturers in its direct advertisements to consumers and by the manufacturers and its co-conspirators in interviews, testimony and publications, Mr. Apa switched to filtered cigarettes, believing them to reduce any potential health risk connected to cigarette smoking.

152. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers either directly or indirectly, including Defendants herein, were justifiably relied upon by Mr. Apa, resulting in him being unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of

52

Defendants' cigarette products. Such acts, false statements and/or misrepresentations were made by the Defendant who had knowledge superior to Mr. Apa regarding the health aspects of cigarettes including their addictive nature.

153. Had Defendants not made the aforementioned false statements and/or misrepresentations about the dangers of its cigarette products to Mr. Apa and the public, Mr. Apa would have stopped smoking at an earlier age and/or reduced the number of cigarettes that he consumed, and his risk of injury from cigarettes, including emphysema, would have been reduced or eliminated.

154. As a direct and proximate result of the aforementioned acts, false statements and/or fraudulent misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, Mr. Apa continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused him to develop injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA, prays for judgment against Defendant R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

## COUNT VI: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION
### (Manufacturers)

This count applies to only the following Defendants: R.J. Reynolds, Philip Morris, and Liggett.

155. The allegations in paragraphs 1 through 53 and 123 through 153are realleged and reincorporated as if fully set forth herein.

156. The Defendants, along with other cigarette manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), unlawfully agreed to commit, and did commit, overt acts, false statements and/or fraudulent misrepresentations concerning information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

157. During its four decade history the TIRC/CTR never acknowledged that smoking had been proven to be a cause of cancer or other serious diseases in smokers while maintaining publicly that smoking had not been proven to cause disease, even though the vast majority of CTR funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often, fatal diseases.

158. The acts, false statements and/or fraudulent misrepresentations described in the preceding paragraphs were material information.

159. Mr. Apa relied to his detriment upon the acts, false statements and/or fraudulent misrepresentations of such information. Mr. Apa, during the course of his smoking history heard, some or all the false or misleading statements and/or similar statements made directly or indirectly by the Defendants and their co-conspirators, believed some or all of the Defendants' and their co-conspirators false or misleading statements and relied to his detriment and continued to smoke cigarettes based on such false or misleading statements.

160. Had Defendants not made the aforementioned false statements and fraudulent misrepresentations of such information to Mr. Apa, he would have reduced the number of

54

FILED DATE: 2/25/2026 3:22 PM    2026L002215

cigarettes that he consumed and/or stopped smoking at an earlier age, and his risk of injury from cigarettes, including emphysema, would have been reduced or eliminated.

161. Each Defendant's acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and all of them, constitute a successful conspiracy to commit fraudulent misrepresentation.

162. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as a member of a civil conspiracy is liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

163. As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statements and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendants and their co-conspirators, Mr. Apa continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused him to develop injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendants, R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP

LLC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

### COUNT VII: NEGLIGENCE (Distributor/Retailer)

This count applies to only Defendant Walgreens.

164. The allegations of paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

165. At all relevant times Mr. Apa was a smoker who purchased and consumed cigarettes from Defendant Walgreens.

166. At all relevant times, Defendant Walgreens knew or should have known that Plaintiff, as a member of the public for whose use cigarettes were placed into commerce, would be likely to use cigarettes in the manner described in this Complaint.

167. At all relevant times, Defendant Walgreens knew or had reason to know of the dangers associated with the manner and circumstances of Mr. Apa's foreseeable use of cigarettes.

168. Tobacco products, such as cigarettes smoked and or consumed by Mr. Apa, are not an ordinary or innocuous product.

169. Cigarettes are dangerous and well recognized to cause the death of fifty percent of consumers who smoke them.

170. There is no other product in Defendant Walgreens' inventory that is more dangerous or kills more consumers than cigarettes. Defendant Walgreens had a broad range of knowledge about the components of cigarette smoke and how those components were unreasonably dangerous to its consumers, including that the components of cigarettes smoke contain carcinogenic, toxic and dangerous compounds.

56

FILED DATE: 2/25/2026 3:22 PM   2026L002215

171. At all relevant times, Defendant Walgreens had knowledge of the defective and unreasonably dangerous nature of the cigarettes it sells to its consumers that far exceeded the knowledge or awareness of the health risks of smoking known by reasonable consumers, including Mr. Apa.

172. At all relevant times, Defendant Walgreens knew or should have known that reasonable consumers, including Mr. Apa, did not have the knowledge about how cigarettes were defective that was possessed by Defendant Walgreens.

173. Defendant Walgreens only recently began disclosing its superior knowledge to the public, long after Mr. Apa had already been exposed to the defective and unreasonably dangerous cigarettes sold by Defendant Walgreens

174. For example, Defendant Walgreens' own website now details particular, specific and scientific evidence of the dangerous components of the smoke from the cigarettes they sold.



*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018). WALGREEN CO. now acknowledges that there are

57

FILED DATE: 2/25/2026 3:22 PM   2026L002215

7,000 chemicals in every puff of cigarette smoke from the cigarettes it sells to its consumers. These carcinogenic, toxic and dangerous components in cigarette smoke are not generally known by the reasonable consumer.

   a. Acetone
   b. Arsenic,
   c. Butane
   d. Cadmium
   e. Ammonia
   f. Toluene and
   g. Formaldehyde

175. Mr. Apa and other reasonable consumers would not have knowledge of these dangerous chemicals in cigarettes.

176. Defendant Walgreens acknowledges in its website that its knowledge is superior to that of its consumers and candidly admits that particular harms from smoking are not well known or recognized by its consumers. Defendant WALGREEN CO.'s website states **"Smoking affects you in more ways <u>than you know</u>…"**:



58

FILED DATE: 2/25/2026 3:22 PM   2026L002215

*See*   https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018).

177.   Defendant Walgreens' website cites to many diseases not generally known to be caused by smoking cigarettes, including "[i]ncreased risk of cataracts and macular degeneration, which could lead to blindness…[r]isks of stroke, heart disease…[i]ncreased risk of erectile dysfunction and damaged/decreased sperm, which can lead to infertility or genetic defects in offspring." *Id*.

178.   Defendant Walgreens' superior knowledge about the inherent dangers and defects of cigarettes arose in part from its close relationship with the tobacco industry. Defendant WALGREEN CO. was aware as of 1977 at the latest that the tobacco industry including the co-defendant cigarette manufacturers, had engaged in creating a "controversy" to dispute the harmful effects of tobacco products.

179.   Defendant Walgreens was actively engaged with the tobacco industry and the industry's co-conspirator, the Tobacco Institute, as shown by correspondence between Defendant Walgreens and tobacco industry executives.

180.   For example, Defendant Walgreens reached out to the tobacco industry in March 1977 to declare what one tobacco executive described as its "willingness to take part in the smoking and health controversy on the side of the tobacco industry." *See* Letter from J. Kendrick Wells, III to Horace R. Kornegay dated March 29, 1977, Bates Number 687020794. [2]

181.   Defendant Walgreens Manager of News and Information Services, David C. Carlson, wrote to the president of the Tobacco Institute, Horace R. Kornegay, to explore possibilities of using its role as a "health center" to gain support for the tobacco industry:

---

[2] Documents referenced by Bates Numbers can be accessed through UCSF Library and Center for Knowledge Management tobacco document archive located at https://www.industrydocumentslibrary.ucsf.edu/tobacco/.

> As you know, we at Walgreens are exploring the possibilities of an information program which will help both the tobacco Industry and ourselves. We don't want to step into the middle of a raging controversy, but as an established "health center" there are many, many things we can do to 'gain and maintain the understanding and support of the public."

*See* Letter from to Horace R. Kornegay, dated March 16, 1977, Bates Number TIMN0083432.

182. Defendant Walgreens had a "real interest in being of every possible assistance" to the tobacco industry "in getting the true word put about." *See* Memorandum dated March 17, 1977, Bates Number TIMN0083434.

183. As further example of its close relationship with the tobacco industry and its involvement in selling what it knew to be defective and unreasonably dangerous cigarettes to the public, including Mr. Apa, when Defendant Walgreens became aware in 1993 of litigation involving the tobacco industry's defective cigarette products, it sought indemnification from each of the major cigarette manufacturers for future lawsuits against it. *See* Letter from David L. Grobart to Jackie Gilbert, dated June 2, 1993, Bates Number 2064877537.

184. Additionally, Defendant Walgreens was told directly by R.J. Reynolds personnel in 2008 that "[n]o tobacco product has been shown to be safe and without risks" and "[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals and is in the best interest of consumers, manufacturers and society". *See* RJRT Presentation, Bates Number 557062850.

185. These and other contacts that Defendant Walgreens had with the tobacco industry, including the cigarette manufacturers, show that Defendant Walgreens was aware of the defective and unreasonably dangerous nature of cigarettes, and that its knowledge was superior to the knowledge of the public, including Mr. Apa.

60

FILED DATE: 2/25/2026 3:22 PM    2026L002215

186. Indeed, Defendant Walgreens knew as early as the 1990s that its co-defendants manufactured less hazardous cigarette products, like denicotinized cigarettes, low nicotine cigarettes, and non-combustible cigarette products.

187. Defendant Walgreens chooses to continue selling defective cigarettes to the public despite industry standards and norms set by other national retailers, such as Target and CVS, and most independent pharmacies and drugstores which have ceased cigarette sales.

188. Tobacco sales in pharmacies directly contradict the pharmacist's code of ethics, which states that pharmacists must be committed to the welfare of their patients and must act with honesty and integrity in professional relationships, avoid actions that compromise dedication to the best interests of their patients. *See* American Pharmacists Association Code of Ethics https://www.pharmacist.com/code-ethics (last accessed on November 1, 2018).Since 1971, the American Pharmaceutical Association position has recommended against the display and sale of cigarettes in pharmacies, which is in direct contradiction to the role of the pharmacy as a public health facility.

189. Defendant Walgreens is aware that smoking is the leading cause of death in the United States but chooses to ignore statistics to profit from the sale of defective cigarettes.

190. Defendant Walgreens continues to sell defective cigarettes to consumers like Mr. Apa to profit further on smoking cessation devices, such as nicotine replacement patches, gum and lozenges, as well as prescription nicotine replacement therapies, such as varenicline and bupropion.

191. At all relevant times, Defendant Walgreens had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product

61

which it knew or should have known was unreasonably dangerous and defective when put to the use for which it was designed, manufactured, distributed, marketed, and sold and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others when it knew or should have known that consumers and other users lacked such knowledge about the defects or dangerous conditions of the product.

192. In breach of this duty, Defendant Walgreens sold and continued to sell cigarettes to Mr. Apa and the public which it knew were defective and unreasonably dangerous.

193. Had Defendant Walgreens not sold to Mr. Apa cigarette products that it knew were defective and unreasonably dangerous, Mr. Apa would have smoked less cigarettes and/or stopped smoking at an earlier age, and his risk of injury from cigarettes would have been reduced or eliminated.

194. As a direct and proximate result of the aforementioned negligent acts and/or omissions of the Defendant, Mr. Apa developed injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendant WALGREEN CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

## COUNT VIII: STRICT LIABILITY (Distributor/Retailer)

This count applies to only Defendant Walgreens.

195. The allegations contained in paragraphs 1 through 82 are reincorporated and realleged as if fully set forth herein.

196. The Defendant, Walgreens owed a duty to Mr. Apa and the public to sell only products which were reasonably safe for their intended use, and to refrain from selling any product which was

unreasonably dangerous, and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others.

197. The Defendant Walgreens breached said duty by placing into the stream of commerce, distributing, marketing, promoting and selling cigarette products that at the time the tobacco products left the possession of Defendant Walgreens, and at the time the tobacco products entered into the stream of commerce, were in an unreasonably dangerous and defective condition. These defects, of which Defendant Walgreens had actual knowledge, include but are not limited to:

    a. the tobacco products contained tar that is deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

    b. the tobacco products contained tar that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

    c. the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and made it unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

    d. the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

    e. the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

    f. the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

    g. the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

    h. the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is

63

reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

i.  through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and made the tobacco product unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

j.  through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

k.  the nature and degree of the danger of Defendant's cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

l.  the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco product;

m.  the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe that when put to a use that is reasonably foreseeable, posing dangers that go beyond that of which an ordinary consumer would expect;

n.  the tobacco products were in an unreasonably dangerous condition and not suitable for the uses intended and were defective;

o.  the tobacco products failed to perform as safely as an ordinary consumer would expect when used in the manner reasonably foreseeable by the Defendant WALGREENS CO.; and/or

p.  the risk of danger of the tobacco products outweighed the benefits.

64

FILED DATE: 2/25/2026 3:22 PM   2026L002215

198.    As a direct and proximate result of the aforementioned defects described herein, Mr. Apa developed injuries caused by the consumption of cigarette products purchased from Defendant Walgreens, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendant WALGREEN CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) , plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just..

## JURY DEMAND

Plaintiff respectfully requests the Court for a trial by jury.

Dated: February 25, 2026

Respectfully submitted,

FRANK APA

MEYERS & FLOWERS, LLC.


/s/ Peter J. Flowers
Peter J. Flowers, One of its Attorneys


Peter J. Flowers, Esq.
Craig D. Brown, Esq.
Jonathan P. Mincieli, Esq.
Thomas M. Connelly, Esq.
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois   60174
(630) 232-6333
pjf@meyers-flowers.com
cdb@meyers-flowers.com
jpm@meyers-flowers.com
tmc@meyers-flowers.com

Chicago Office:
225 W. Wacker, Suite 1515
Chicago, IL  60606

-- and --

Michael A. Alvarez
Alex Alvarez Jr.
Andi Hernandez
THE ALVAREZ LAW FIRM
3251 Ponce De Leon
Coral Gables, FL 33156
(305) 444-7675
Michael@talf.law
Alexjr@talf.law
Andi@talf.law
Tobacco@integrityforjustice.com

66

# **EXHIBIT 2**

ELECTRONICALLY FILED
4/16/2018 5:14 PM
Cook County 2018-L-003851
CALENDAR: B
PAGE 1 of 50
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| THOMASINA CLAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Gen No.:** |
| | ) | |
| | ) | **Jury Demanded** |
| PHILIP MORRIS USA, INC., a foreign corporation; R.J. REYNOLDS TOBACCO COMPANY, a foreign corporation; LIGGETT GROUP, LLC., a foreign corporation; ITG Brands, LLC, a foreign corporation; WALGREENS, Co., an Illinois corporation; STEVE'S FOOD & LIQUOR, INC. d/b/a 200 Liquors, an Illinois Corporation, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT FOR DAMAGES

NOW COMES, THOMASINA CLAY, hereinafter "Plaintiff," and files this Complaint against the Defendants, Philip Morris USA, INC., a foreign corporation, R.J. Reynolds Tobacco Company, a foreign corporation, Liggett Group, LLC., a Foreign Limited Liability Company; and Walgreens Co, an Illinois Corporation, and Steve's Food & Liquor, Inc. d/b/a 200 Liquors, an Illinois Corporation, and alleges as follows:

### *Parties & Jurisdiction*

1. At all times material the Plaintiff was and is a resident of Cook County, Illinois.

2. Thomasina Clay smoked cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants.

1

*Cook County Firm No: 56079*

3. Thomasina Clay smoked cigarette products distributed and/or sold by Defendants, WALGREENS, CO. and STEVE'S FOOD & LIQUOR, INC. d/b/a 200 LIQUORS.

4. Defendant, PHILIP MORRIS USA, INC., is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Virginia with its principal place of business in the State of Virginia that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of the cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of laryngeal cancer. Service of process over this Defendant may be had through its registered agent, CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

5. Defendant, R.J. REYNOLDS TOBACCO COMPANY, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of her laryngeal cancer. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 2 of 50

2

*Cook County Firm No: 56079*

officer or agent of this Defendant located at the Defendant's principal place of business.

6. Defendant, LIGGETT GROUP LLC, (f/k/a LIGGETT GROUP, INC., f/k/a BROOKE GROUP, LTD., Inc., f/k/a LIGGETT & MEYERS TOBACCO COMPANY), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business located in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of her laryngeal cancer. Service of process over this Defendant may be had through this Defendant's registered agent or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

7. Defendant, ITG Brands, LLC, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of her laryngeal cancer. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 3 of 50

3

Cook County Firm No: 56079

or agent of this Defendant located at the Defendant's principal place of business.

8. Defendant, WALGREENS, CO., is a corporation authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Illinois with its principal place of business located in the State of Illinois. Defendant distributed and/or sold cigarettes which the Ms. Clay smoked and inhaled which caused and/or substantially contributed to causing the development of her laryngeal cancer. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 4 of 50

9. Defendant, STEVE'S FOOD & LIQUOR, INC. d/b/a 200 LIQUORS is a corporation authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Illinois with its principal place of business located in the State of Illinois. Defendant distributed and/or sold cigarettes which the Ms. Clay smoked and inhaled which caused and/or substantially contributed to causing the development of her laryngeal cancer. Service of process over this Defendant may be had through its registered agent, Harry J. Fournier, 2001 Midwest Road, Suite 206, Oak Brook, Illinois 60523, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

10. Plaintiff, Thomasina Clay, was diagnosed with laryngeal cancer on or about April 18, 2016, caused by smoking cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants named herein.

4

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 5 of 50

11. Plaintiff's action is an action for damages in excess of the sum of FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS.

12. The wrongful conduct herein alleged, occurred, at least in part and/or the damages complained of by Ms. Clay were sustained in the county where the above styled Court sits or the Defendants herein reside in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

13. Plaintiff resides in the State of Illinois and/or one or more of the Defendants against whom this action is brought resides in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

14. The Plaintiffs would further show that Defendants at all times material to this cause of action, through their agents, alter-egos, officers and representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state; committed a tortious act within the state by allowing Ms. Clay to be exposed to an unreasonably dangerous product, to-wit: cigarette and/or cigarette smoke. Defendants failed to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Ms. Clay, or other persons similarly situated, of the risks, dangers and harm, to-wit: the contracting of the diseases of lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and other diseases and/or injuries to which she was exposed by smoking cigarettes, resulting from the ordinary and foreseeable use of said products, and said tortious conduct is continuing and presently existing; caused injuries and death, which arose out of the acts and/or omissions which occurred inside and outside of the State of Illinois during the relevant period of time, at which time Defendants were engaged in solicitation or service activities within the State of Illinois, resulting in injuries to Ms. Clay. Therefore, jurisdiction

properly lies in this Court, as to Plaintiff's action, pursuant to Illinois law.

15. The cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by Defendants herein, when used as intended, were more likely than not to induce in foreseeable users, such as the smoker, a state of addiction, habituation, habit formation and/or dependence characterized by the user's inability to terminate or restrict his/her chronic use.

16. At all times material to this action, the cigarette manufacturers, including but not limited to Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, individually and as successor by merger to Lorillard Tobacco Company, individually and as a successor by merger to Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company, as well as British American Tobacco, Liggett Group LLC, Vector Group LTD., and their predecessors, successors, agents and/or alter-egos (hereinafter referred to as "cigarette manufacturers") knew or should have known the following:

    a. that smoking cigarettes greatly increased the risk of a smoker developing lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup and other related physical conditions when used as intended;

    b. that the diseases and/or injuries listed above would be more likely experienced if users such as the Smoker did not restrict their intake of Defendants' cigarettes, or if they began to use such products at an early age;

    c. that use of the products as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

    d. that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

    e. that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

    f. that cigarette sellers could develop a reasonably safe dose for foreseeable users;

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 6 of 50

6

g.  that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the Smoker;

h.  that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

i.  that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

### *Historical Allegations of the Defendants' Unlawful Conduct Giving Rise to the Lawsuit*

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 7 of 50

17.  Prior to 1900, lung cancer was virtually unknown as a cause of death in the United States. By 1935, there were an estimated 4,000 lung cancer deaths annually, and by 1945 that figure had almost tripled.

18.  By the 1920s, scientists were beginning to investigate the relationship between the concomitant rise in cigarette consumption and lung cancer, and to focus on the health consequences of smoking.

19.  By the end of the 1940s and early 1950s, far more evidence linking smoking to disease began to appear, ranging from the ground-breaking statistical studies of two eminent British statisticians, Bradford Hill and Sir Richard Doll, to the Graham and Wynder studies at Washington University, to animal research studies pointing to the carcinogenicity of cigarettes.

20.  The mainstream media began to pay attention to the growing scientific literature and report on the scientists' findings. For example, in 1953, Reader's Digest, which was at the time one of the most popular publications in the country, published a series of articles titled "Cancer by the Carton" which relayed the scientific findings of Drs. Wynder and Graham. The magazine quoted one of the conclusions they reached in their American Cancer Society study which had

7

been published in the American Medical Association's Journal of May 27, 1950 ("JAMA"), namely that "Excessive and prolonged use of tobacco, especially cigarettes, seems to be an important factor in the induction of bronchiogenic carcinoma." Such mainstream media publicity in popular magazines such as Time, Life, and Reader's Digest triggered understandable public concern.

21. In short, by 1953, there had been a very substantial rise in the annual per capita consumption of cigarettes and the number of deaths attributable to lung cancer; scientists were more and more convinced that a relationship existed between cigarette smoking and lung cancer; and the public was growing increasingly aware of and anxious about both developments.

22. In December 1953, Paul M. Hahn, President of American Tobacco Co., (American), sent telegrams to the presidents of the seven other major tobacco companies and one tobacco growers organization, inviting them to meet and develop an industry response to counter the negative publicity generated by the studies linking cigarette smoking and lung cancer. The telegrams were sent to: Edward A. Darr, President of Defendant Reynolds; Benjamin F. Few, President of Defendant Liggett; William J. Halley, President of Lorillard Tobacco Co., (Lorillard); Timothy V. Hartnett, President of Brown & Willliamson Tobacco Co., (B&W); O. Parker McComas, President of Defendant Philip Morris; Joseph F. Cullman, Jr., President of Benson & Hedges, J.B. Hutson, President of Tobacco Associates, Inc.; and J. Whitney Peterson, President of United States Tobacco Co..

23. Executives from every tobacco company listed above, with the exception of Liggett, met in New York City at the Plaza Hotel on December 14, 1953. The executives discussed (i) the negative publicity from the recent articles in the media, (ii) responding to the problem by jointly engaging a public relations counsel, and (iii) removing health themes from advertising.

8

*Cook County Firm No: 56079*

They also discussed Liggett's decision not to attend the meeting because "in the course of time the whole thing would blow over." The executives also authorized the five members of the group who had their offices in New York to engage the services of Hill & Knowlton on behalf of the whole committee; to meet with John Hill at the Plaza Hotel the next day, December 15th, to discuss the negative publicity problem; and to request that Hill & Knowlton, if it accepted the assignment, submit recommendations to the full committee at a subsequent meeting as to how to proceed. It is clear from all the surrounding circumstances that representatives of Hill & Knowlton had been contacted about taking on this assignment prior to December 14, 1953.

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 9 of 50

24. The tobacco company executives did not meet, as they have suggested, in an altruistic response to requests from the scientific community that the industry fund research on smoking and health. Rather, they convened a strategy meeting of the highest company officials to formulate an industry-wide response (a) to the public's growing anxiety generated by the negative publicity about the direction of scientific research on cigarettes and cancer, and (b) to what they accurately understood to be a major threat to their corporations' economic future. While it is true that there was a recommendation "to do good science, independent science,", the minutes of the meeting reveal that:

> "It was recommended that this [research] group undertake to enlist the cooperation of the National Institutes of Health of the U.S. Public Health Service in working out a program of scientific investigation through which the facts in the present controversy would be developed. This was considered highly advisable in that it would give to the program an aspect of independence to the program to a degree not obtainable in any other way."

25. At the December 14, 1953 meeting, Paul Hahn of American and Timothy Hartnett of B&W told the other company presidents that they had taken definite steps to remove the health themes from the advertising programs on Pall Mall and Viceroy. Darr [of Reynolds] made the

point that he could not concur in sponsoring an industry paid advertising campaign (if this is the course recommended by the Public Relations Counsel) as long as the health theme continued to be featured by any one of the companies represented on the committee. J. Whitney Peterson of United States Tobacco and Hartnett "expressed their agreement with Mr. Darr's views in this matter." Hill & Knowlton wanted to develop some understanding with the Defendants that

> "none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. (No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a given brand less likely to cause you-know-what. No "Play-Safe-with-Luckies.)"

26. At the December 15, 1953 meeting, the participants were Paul Hahn of American, O. Parker McComas of Philip Morris, Joseph Cullman, Jr. of Benson & Hedges, J. Whitney Peterson of United States Tobacco, and representatives from Hill & Knowlton, including John Hill and Bert Goss. Hill & Knowlton was told that the industry viewed the "problem [posed by the scientific studies] as being extremely serious and worthy of drastic action." According to a Hill & Knowlton memo dated December 22, 1953, the public relations firm was asked to develop suggestions for dealing with the public relations problem confronting the industry as a result of widely publicized assertions by a few medical research men regarding the link between cigarette smoking and lung cancer.

27. In an internal planning memoranda, Hill & Knowlton assessed their tobacco clients' problems in the following manner:

> "There is only one problem -- confidence, and how to establish it; public assurance, and how to create it -- in a perhaps long interim when scientific doubts must remain. And, most important, how to free millions of Americans from the guilty fear that is going to arise deep in their biological depths -- regardless of any pooh-poohing logic -- every time they light a cigarette. No resort to mere logic ever cured panic yet, whether on Madison Avenue, Main

10

*Cook County Firm No: 56079*

Street, or in a psychologist's office. And no mere recitation of arguments pro, or ignoring of arguments con, or careful balancing of the two together, is going to deal with such fear now. That, gentlemen, is the nature of the unexampled challenge to this office."

28. Ten days later, on December 24, 1953, Hill & Knowlton submitted a proposal regarding the tobacco industry's public relations campaign, recommending that the companies form a joint industry research committee that would sponsor independent scientific research on the health effects of smoking and announce the formation of the research committee nationwide as news and in advertisements. Hill & Knowlton also recommended that the companies fund objective research by scientists who were independent of the tobacco industry, and that an advisory board be established composed of a group of distinguished scientists from the fields of medicine, research and education "whose integrity is beyond question."

29. In fact, one of the questions posed by Hill & Knowlton to the Defendants was

"whether the companies considere[d] that their own advertising and competitive practices have been a principal factor in creating a health problem? The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it."

30. Four days later, on December 28, 1953, another meeting was held at the Plaza Hotel and was attended by Paul Hahn of American; Edward Darr of Reynolds; Herbert A. Kent, Chairman of Lorillard; Timothy Hartnett of B&W; O. Parker McComas of Philip Morris; Joseph Cullman of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; J. Whitney Peterson of United States Tobacco; and three people from the public relations firm of Hill & Knowlton, John Hill, Bert Goss, and Richard Darrow. The attendees agreed on Tobacco Industry Research Committee ("TIRC") as the official name of the research committee; chose Paul Hahn as temporary chairman of the committee; agreed that the search should begin immediately for a qualified director who, together with the companies' research directors,

11

*Cook County Firm No: 56079*

would recommend members for the research advisory board; and reviewed and accepted the Hill & Knowlton proposal regarding the tobacco industry's public relations campaign. The attendees also agreed on a mission statement for the new organization which stated that its "purposes and objectives" were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject.

31.     Hill & Knowlton played a major role in creating, refining, and implementing the strategies adopted by the participants at the December meetings.

32.     Following Hill & Knowlton's advice, the formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers" published in 448 newspapers throughout the United States. All sponsoring cigarette manufacturers and other tobacco industry entities were clearly identified.

33.     The Frank Statement was subscribed to by the following domestic cigarette and tobacco product manufacturers, organizations of leaf tobacco growers, and tobacco warehouse associations that made up TIRC: American by Paul Hahn, President; B&W by Timothy Hartnett, President; Lorillard by Herbert Kent, Chairman; Defendant, Philip Morris by O. Parker McComas, President; Defendant, Reynolds by Edward A. Darr, President; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc. by W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager; Stephano Brothers, Inc. by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson,

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 12 of 50

12

President.

34.     The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years -- that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence.

The "Frank Statement" in its entirety stated as follows:

"RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings. Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.

Distinguished authorities point out: 1. That medical research of recent years indicates many possible causes of lung cancer. 2. That there is no agreement among the authorities regarding what the cause is. 3. That there is no proof that cigarette smoking is one of the causes. 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even

13

be suspected as a cause of disease is a matter of deep concern to us.

Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer: 1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. 3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 14 of 50

35. The issuance of the "Frank Statement to Cigarette Smokers," was an effective public relations step. By promising the public that the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with an effective rationale for continuing to smoke.

36. TIRC focused its energies and resources in two areas -- public relations and scientific research. First, it served as a sophisticated public relations unit for Defendants, especially in relation to growing public concern about the risks of smoking, by repeatedly attacking scientific studies that demonstrated the harms of cigarette smoke and insisting on the notion of an "open question" regarding cigarette smoking and health. Second, it developed a scientific research program that focused on basic processes of disease rather than evaluating the risks and harms associated with smoking -- the very subject that the industry had pledged to pursue through TIRC. From the outset, the dual functions of TIRC were intertwined, with the scientific program of TIRC always subservient to the goals of public relations.

37. Defendants' denials of the link between smoking and disease kept away many excellent researchers. In an October 1969 memorandum to Ross R. Millhiser of Philip Morris, Helmut

*Cook County Firm No: 56079*

Wakeham, Vice President and Director of Research for Philip Morris, expressed concern that the efforts of the tobacco industry through CTR[1] and the American Medical Association have failed to involve the best investigators. "At the beginning of our support of smoking and health research, this failure may have been connected with our consistent denial of the statistics and our continued assertion that there is nothing to the cigarette causation hypothesis."

38. A year later, Wakeham again discussed CTR's strategy of frequent and public denials, in a December 1970 memorandum to Joseph Cullman, Chairman of Philip Morris and Chairman of the Executive Committee of the Tobacco Institute: "It has been stated that CTR is a program to find out the 'truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes cancer."

39. Virtually none of the research funded by TIRC/CTR centered on immediate questions relating to carcinogenesis and tobacco that could resolve the question of the harms brought about by cigarette smoking. Although some TIRC/CTR-funded researchers explored alternative hypotheses, TIRC/CTR did not typically pursue direct research on cigarettes and disease. Rather than addressing the constituents in tobacco smoke and their demonstrated effect on the human body, TIRC/CTR directed the majority of its resources to alternative theories of the origins of cancer centering on genetic factors and environmental risks. The major thrust of TIRC/CTR was to emphasize that human cancers were complex processes, difficult to study and difficult to understand, and to focus on the "need for more research." Although research funded by the Scientific Advisory Board (SAB) was irrelevant to the immediate questions

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 15 of 50

---

[1] In January of 1964, the TIRC Executive Committee agreed to change the name of the organization to the Council for Tobacco Research-U.S.A. (CTR).

15

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 16 of 50

associated with tobacco smoking and health, it did "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.'"

40.   During a four-week visit to the United States in 1958, the three British scientists who met with representatives of TIRC and TIRC's SAB, as well as representatives of American, Liggett, and Philip Morris, reported that "Liggett & Meyers stayed out of TIRC originally because they doubted the sincerity of TIRC's motives and believed that the organization was too unwieldy to work efficiently. They remain convinced that their misgivings were justified. In their opinion TIRC has done little if anything constructive, the constantly reiterated 'not proven' statements in the face of mounting contrary evidence has thoroughly discredited TIRC, and the SAB of TIRC is supporting almost without exception projects which are not related directly to smoking and lung cancer."

41.   The Defendants knew that the TIRC/CTR was funding research concerning cancer as a general issue, rather than the relationship of smoking to cancer.

42.   In January 1968, Addison Yeaman, B&W Vice President and General Counsel, wrote: "Review of SAB's current grants indicates that a very sizable number of them are for projects in what might be called 'basic research' without specific orientation to the problem of the relationship of the use of tobacco to human health."

43.   In addition, Defendants appreciated the delays associated with the basic research approach. Janet Brown, outside counsel for American, explained CTR's strategy of undertaking only basic research funding, as opposed to funding questions directly related to tobacco and health to Cy Hetsko, Vice President and General Counsel for American, and Addison Yeaman, Vice President and General Counsel for B&W, at a January 1968 meeting. The rationale was that

16

Cook County Firm No: 56079

basic research kept alive the Defendants' open question argument on causation. Yeaman summarized Brown's position as: "First, we maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco, and Secondly, that the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco."

### COUNT I: NEGLIGENCE (Manufacturers)

This count applies ONLY to PHILIP MORRIS USA, INC., R.J. Reynolds Tobacco Company, Liggett Group LLC, and ITG Brands, LLC.

44.    All of the allegations contained in paragraphs 1 through 43 are realleged herein.

45.    Ms. Clay smoked various brands of cigarettes products that were designed, manufactured, advertised, marketed, distributed and/or sold by Defendants.

46.    Ms. Clay alleges that she was exposed to Defendants' products as a smoker and/or bystander. Each exposure to such cigarette products of Defendants, caused Ms. Clay to inhale smoke from said products which caused Ms. Clay to develop laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Each exposure to such products was harmful and caused or contributed substantially to Ms. Clay's aforementioned injuries. Ms. Clay's aforementioned injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendants of their cigarette products.

47.    Ms. Clay was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by Defendants.

48.    The aforementioned damages of Ms. Clay are the direct and proximate cause of the negligence

17

of the Defendants, in that they produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendants knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to Ms. Clay's health and well-being. The Defendants, prior to selling and/or distributing its cigarette products, to which Ms. Clay was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. The Defendants also knew that Ms. Clay and others similarly situated would use and be exposed to their cigarette products in such a way as to cause Ms. Clay to inhale the smoke from said products.

49. Defendants' cigarette products contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Ms. Clay was exposed to them in that said products contained tar, nicotine and other harmful substances which Defendants knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death, to those, such as Ms. Clay who used and/or was exposed to them.

50. Defendants knew that their cigarette products would be used by and around Ms. Clay without inspection for defects and that any such inspection would not have advised Ms. Clay of the fact that the Defendants' cigarette products could cause the injuries which she suffered. Such facts made Defendants' cigarette products inherently and unreasonably dangerous in that Ms. Clay was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the aforementioned injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendants' cigarette products which she used or was

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 18 of 50

18

Cook County Firm No: 56079

exposed to.

51. Ms. Clay alleges that there were methods of design and manufacture available and/or known to Defendants and unknown to her which could have been used by Defendants in the design and manufacture of their cigarette products to which Ms. Clay was exposed to make such products less dangerous. Defendants were in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Ms. Clay and others similarly situated would come in contact with their cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of fatal and life threatening injuries including, but not limited to, head and neck cancer. Defendants were negligent in all of the following respects, same being the proximate cause of Ms. Clay's injuries and disabilities which acts of negligence have continued to the present time:

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 19 of 50

   a. prior to July 1, 1969 in failing to warn and/or adequately warn foreseeable users, such as the Ms. Clay, of the dangerous characteristics of cigarette products in that Defendants failed to warn foreseeable users that they could develop fatal injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer, as a result of smoking and/or inhaling smoke from Defendants' cigarette products;

   b. prior to July 1, 1969 in failing to adequately warn foreseeable users, such as Ms. Clay, of the extent of the dangers to one's health of smoking and/or inhaling smoke from Defendants' cigarette products and of the gravity of the risk and extent of danger that foreseeable users expose themselves to by smoking and/or inhaling smoke from Defendants' cigarette products;

   c. prior to July 1, 1969 in failing to warn foreseeable users, such as Ms. Clay, to restrict their intake of cigarette smoke and in failing to provide guidelines on amount of consumption and reasonable safe dosage so as to reduce and/or eliminate the danger to the Plaintiff and others similarly situated;

   d. prior to July 1, 1969 in failing to warn foreseeable users, such as Ms. Clay, that the use of cigarettes would more likely than not lead to addiction, habituation and/or dependence;

   e. prior to July 1, 1969 in failing to warn foreseeable users, such as Ms. Clay, that quitting and/or limiting use would be extremely difficult if consumption was

19

initiated at an early age and as cumulative consumption increased;

f.  prior to July 1, 1969 in failing to disclose to consumers of cigarettes, such as Ms. Clay, the results of scientific research conducted by and/or known to Defendants which indicated that cigarettes may be dangerous, defective and/or addictive;

g.  in designing and developing cigarette products that were more mild, had better taste and contained nicotine so that foreseeable users, such as Ms. Clay, would find smoking Defendants' products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

h.  in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products Defendants designed, manufactured, advertised, marketed, distributed and/or sold;

i.  in continuing to manufacture, distribute and sell cigarette products when Defendants knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Ms. Clay, when used as intended;

j.  in concealing information while affirmatively misrepresenting to Ms. Clay and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Ms. Clay to unknowingly use and/or continue to use Defendants' cigarette products herself and expose herself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

k.  in failing to test and/or adequately test Defendants' cigarette products before offering them for sale and use by Ms. Clay, and other persons similarly situated;

l.  in failing to remove and recall all of said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

m.  prior to July 1, 1969 in failing to advise Ms. Clay and others similarly situated in the general community, whom the Defendants knew and/or should have known, and/or could have known, had been exposed to the inhalation of the cigarette smoke resulting from the ordinary and foreseeable use of said cigarette products, to cease all future exposure to the inhalation of all types of other fumes, smoke, dust and fibers, to keep dust and fibers on work clothes and tools away from the home

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 20 of 50

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 21 of 50

environment, to be examined by a medical specialist to determine the nature and the extent of any and all disease caused by such exposure and inhalation and to receive any available medical treatment for such diseases;

n. in manipulating, failing to reduce and/or eliminating nicotine from Defendants' cigarette products to prevent Ms. Clay, who was addicted to the nicotine in Defendants' cigarette products, from quitting and/or reducing consumption;

o. in including nicotine, or artificially high levels of nicotine, in Defendants' cigarette products to prevent Ms. Clay and other persons similarly situated from quitting and/or reducing consumption; and/or,

p. in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process.

q. by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous.

r. by placing additives and ingredients in cigarettes to making them easier to inhale and addictive;

52. The Defendants' cigarette products to which Ms. Clay was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendants.

53. The Defendants' cigarette products failed to perform as safely as Ms. Clay expected they would in that they caused her to develop head and neck cancer as a result of her inhalation of cigarette smoke from Defendants' cigarette products.

54. Each of the Defendants' cigarette products suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars and other substances which Defendants knew or should have known were extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

55. As a direct and proximate result of Defendants' negligence, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, in addition to other related

physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

## COUNT II: STRICT LIABILITY (Manufacturers)

This count applies all Defendants: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, LIGGETT GROUP, LLC., and ITG BRANDS, LLC.

56. All of the allegations contained in paragraphs 1 through 43 are realleged herein.

57. Defendants were and have been designers, manufacturers, advertisers, distributors and/or sellers of cigarette products.

58. The products complained of were cigarette products designed, manufactured, advertised, distributed and/or sold by Defendants and used by and/or in the vicinity of the Ms. Clay.

59. The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by the Defendants.

60. Ms. Clay alleges that she was exposed to Defendants' cigarette products over many years during which time smoke from Defendants' cigarette products were inhaled by Ms. Clay which caused her to develop head and neck cancer and/or other injuries.

61. At the time Defendants designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to, and did, reach Ms. Clay in a condition without substantial change from that in which such products were when within the

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 22 of 50

22

possession of Defendants.

62. The Defendants' cigarette products were in a condition unreasonably dangerous to users and/or bystanders, such as Ms. Clay, and said products were expected to, and did, reach Ms. Clay without substantial change affecting that condition.

63. The Defendants' cigarette products were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Ms. Clay, and said products were expected to, and did, reach Ms. Clay without substantial change affecting that condition.

64. The Defendants' cigarette products were unreasonably dangerous because of their design in that the risk of danger to users and/or bystanders, such as Ms. Clay, outweighed the benefits.

65. The Defendants' cigarette products were dangerous beyond the expectation of the ordinary user/consumer/bystander when used as intended or in a manner reasonably foreseeable by Defendants.

66. The Defendants' cigarette products were unreasonably dangerous because a less dangerous design and/or modification was economically and scientifically feasible.

67. Defendants' cigarette products were in a defective condition, unreasonably dangerous, in that those products:

   a. did not provide an adequate warning prior to July 1, 1969 of the potential harm that might result from exposure to said products and, alternatively, did not have adequate instructions for safe use of the products;

   b. prior to July 1, 1969 did not have warnings to persons, such as Ms. Clay, who had been, or reasonably may have been, exposed to Defendants' cigarette products, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic chest x-rays and medical examinations including the giving of a detailed medical history regarding previous exposure, and the need to have immediate and vigorous medical treatment for any and all respiratory problems;

   c. by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to Ms. Clay;

   d. contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious,

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 23 of 50

23

*Cook County Firm No: 56079*

poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substances or containing less of them;

e. failed to filter the harmful substances so that during ordinary use, such materials would not be liberated into the air and/or breathed by the smoker such as Ms. Clay;

f. through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

g. utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process; and/or,

h. the nature and degree of the danger of Defendants' cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably forseeable manner.

i. by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous.

j. by placing additives and ingredients in cigarettes to making them easier to inhale and addictive;

68. Ms. Clay, unaware of the defective and unreasonably dangerous condition of the Defendants' cigarette products, and at a time when such products were being used for the purposes for which they were intended, was exposed to and breathed smoke from Defendants' cigarette products.

69. Defendants knew that their cigarette products would be used without inspection for defects, and by placing them on the market, represented that they would be safe.

70. Ms. Clay was unaware of the hazards and defects in the cigarette products of the Defendants, to-wit: That exposure to said products would cause Ms. Clay to develop cigarette related disease(s) which made said products unsafe for use.

71. Ms. Clay was caused to contract laryngeal cancer, in addition to other related physical

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 24 of 50

24

*Cook County Firm No: 56079*

conditions which resulted in and directly caused him to suffer severe bodily injuries.

72. As a direct and proximate result of the product defects as described herein, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, and, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Thomasina Clay has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

## COUNT III: FRAUDULENT CONCEALMENT (Manufacturer)

This count applies ONLY to PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

73. All of the allegations contained in paragraphs 1 through 43 are realleged herein.

74. Beginning at an exact time unknown to Plaintiff, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Ms. Clay, physicians, the government and others as to the true dangers of smoking cigarettes. Defendants and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning:

a. the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendants' cigarettes did in fact contain carcinogenic materials;
b. their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;
c. the importance of animal experiments in determining the ability of cigarettes to

25

cause disease in humans;

d.  the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

e.  the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

f.  the risks of contracting cancer, including but not limited to lung cancer and throat cancer, from smoking cigarettes;

g.  the dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

h.  that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease;

i.  that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

j.  the use of ammonia technology and/or certain tobacco blends to boost the ph of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k.  the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l.  the lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m.  that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n.  that cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

o.  that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of Defendants' cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p.  that smoke from Defendants' cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments including but not limited to lung

*Cook County Firm No: 56079*

cancer, bronchitis and pneumonia;

q. that the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters and/or tumor initiators including but not limited to those such as PAHs and nitrosamines found within cigarette smoke.

r. that switching to filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

s. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

75. The cigarette manufacturers, including Defendants herein, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by the Defendants and have withheld and/or failed to release over the last almost 65 years both because she does not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

76. The cigarette manufacturers, including Defendants herein, carried out their campaign of concealment by concealing and suppressing facts, information and knowledge about the health dangers of smoking, including addiction. They concealed their actual knowledge concerning

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 27 of 50

27

their own negative health and addiction research results and their manipulation and control of the nicotine content of their products to create and perpetuate smokers' addiction to cigarettes. The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

77. In 1953 Dr. Ernst Wydner had published an article titled <u>Experimental Production of Carcinoma with Cigarette Tar</u> in the journal Cancer Research. In his experiments he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954 LIGGETT & MEYERS, assuming that whatever cigarettes were used in Dr. Wydner's study were not CHESTERFIELD or L & M, decided to repeat Dr. Wydner's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for LIGGETT & MEYERS, Mr. Darkis writes:

> "If Chesterfield turn out to be negative, and X (used by Wydner) as positive, it would then be possible to say, that by using Dr. Wydner's techniques, Chesterfield did not produce cancer in mice."

Of course when the experiments were finished in 1955 the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

78. A confidential "limited" LIGGETT & MEYERS document dated March 15, 1961 states, in part: (L&M - A Perspective Review)

    a. There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...

    b. What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what

28

good is this? We've known this for several years - so what?

This document was written by an industry consultant for LIGGETT & MEYERS. This industry consultant conducted animal research from 1954-1984 for LIGGETT & MEYERS. This memo contained material facts known to and concealed by the Defendants since at least 1961 and unknown to Ms. Clay.

79. In 1964, TIRC changed its name to CTR, and was joined by Defendant, LIGGETT & MEYERS. Defendants, R.J. REYNOLDS TOBACCO COMPANY, and PHILIP MORRIS USA, INC. were founding members of the TIRC/CTR. The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

80. Despite their "promise" which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

81. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was withheld from Ms.

*Cook County Firm No: 56079*

Clay and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

82. In a July 17, 1963 memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation.""

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed, industry insiders knew it was nothing more than a "public relations" sham.

83. In that same July 17, 1963 memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "Moreover, nicotine is addictive. We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:

> 1) They cause, or predispose to, lung cancer.

> 2) They contribute to certain cardiovascular disorders.

> 3) They may well be truly causative in emphysema, etc, etc."

30

The 1964 Surgeon's General Report was not issued for another 6 months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive but the cigarette industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite what the industry told the public the industry clearly understood that nicotine was addictive and cigarettes were a cause of lung cancer and other diseases.

84. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was material information which Defendants were under a duty to disclose and/or which it had assumed the duty of disclosing.

85. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Ms. Clay to smoke, fail to quit or reduce consumption for the Defendants' own pecuniary gain.

86. Ms. Clay and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendants herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Ms. Clay to smoke, fail to quit or reduce consumption. Ms. Clay was unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as unfiltered cigarettes. The knowledge and information concealed by the

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 31 of 50

31

cigarette manufacturers, including the Defendants herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Ms. Clay.

87. As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries. Plaintiff, Thomasina Clay has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

**COUNT IV: CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT**

This count applies to the following Defendants ONLY to: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

88. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 43 and 73 through 87.

89. The Defendants, along other tobacco manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by the Defendants unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public would rely on

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 32 of 50

32

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 33 of 50

this information to their detriment. The Defendants agreed to execute their scheme by performing the above mentioned unlawful acts and/or by doing lawful acts by unlawful means.

90. The Defendants PHILLIP MORRIS USA, R.J. REYNOLDS and later LIGGETT GROUP, LLC, along with other entities including the TIRC/CTR, TI and persons including their in-house lawyers and outside retained counsel entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

91. The Defendants, through their employees, agents and representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

92. After the year 2000, the Defendants continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking including but not limited to the following acts:

a. Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

b. Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

c. Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

d. Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

93. The Defendants as it relates to their acts in furtherance of their conspiracy as alleged in this complaint continues through the present.

94. The concealed and omitted information described in the aforementioned and preceding paragraphs was material information.

33

95. Ms. Clay relied to her detriment upon the concealment and omission of such information.

96. Each Defendant's acts and omissions, and those of TIRC/CTR, TI and other tobacco manufacturers, as well as their in-house and retained counsel, and all of them, constitute a successful conspiracy to commit fraud.

97. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as members of a civil conspiracy are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

98. As a direct and proximate result of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay, smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms.

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 34 of 50

Clay has suffered these losses.

## COUNT V: FRAUDULENT MISREPRESENTATION (Manufacturer)

This count applies to the following Defendants ONLY: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

99. All of the allegations contained in paragraphs 1 through 43 are realleged herein.

100. Beginning at an exact time unknown to Ms. Clay, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Ms. Clay, the government and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements and/or misrepresentations of material facts.

101. The cigarette manufacturers, including Defendants herein, made literally hundreds of misrepresentations to Ms. Clay and others similarly situated over the course of the last 50 years. Ms. Clay is unable to allege in full the thousands of pre-1969 advertisements, and the continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and their co-conspirators, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, the TOBACCO INSTITUTE, INC. ("TI") formed in 1958, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because he does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendant herein, which have this knowledge and information, and are in the best position to know the

35

contents of each and every such misrepresentation and/or false statement.

102.  The cigarette manufacturers, including Defendants herein, carried out their campaign of fraud, false statements and/or misrepresentations in at least five ways:

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 36 of 50

a.  they agreed falsely to represent to Ms. Clay and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

b.  they misrepresented and confused the facts about the health dangers of smoking, including addiction. The cigarette manufacturers claimed, falsely, that there is insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

c.  the cigarette manufacturers, including Defendants herein, used lawyers to misdirect what purported to be objective scientific research, yet maintained to Ms. Clay and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

d.  to discourage meritorious litigation by Ms. Clay injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence in order to protect the cigarette manufacturers, including Defendants herein, existence and profits.

e.  by designing, selling and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers. Defendants knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker. Notwithstanding same, the Defendants marketed its "Light" cigarettes to consumers as a safer alternative. Defendants manipulated the

36

design of cigarettes to produce test results that were artificially low. Furthermore, Defendants knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes.

103. Cigarette manufacturers knew that cigarettes were dangerous and addictive. It became the practice, purpose and goal of the cigarette manufacturers to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals and through testimony before governmental bodies.

104. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

105. Cigarette manufacturers when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

106. Cigarette manufacturers claimed attorney-client privilege to shield as many documents as

possible from disclosure and destroyed and/or refused to produce documents related to health issues and the Plaintiff's claims.

107. Cigarette manufacturers when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimant for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

108. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

109. The aforementioned acts, false statements and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators for the purposes of inducing Plaintiff and others similarly situated to rely on such false statements and/or misrepresentations so as to induce persons such as Plaintiff to smoke, fail to quit or reduce consumption.

110. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators were justifiably relied upon by Plaintiff, resulted in Plaintiff being unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as regular and/or unfiltered cigarettes. Such acts, false statements and/or misrepresentations were made by the Defendants who had knowledge superior to Plaintiff regarding the health aspects of cigarettes including their addictive nature.

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 38 of 50

38

111. As a direct and proximate result of the aforementioned acts, false statements and/or fraudulent misrepresentations which were made and/or caused to be made or concealed by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay, smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to head and neck cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

## COUNT VI: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION

This count applies to the following Defendants ONLY: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

112. Plaintiffs hereby realleges and incorporates the allegations contained in paragraphs 1 through 43 and 99 through 111.

113. The Defendants, along with other cigarette manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), unlawfully agreed to commit, and did commit, overt acts, false statements and/or fraudulent misrepresentations concerning information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 39 of 50

performing the above mentioned unlawful acts and/or by doing lawful acts by unlawful means.

114. The acts, false statements and/or fraudulent misrepresentations described in the preceding paragraph was material information.

115. Ms. Clay relied to her detriment upon the acts, false statements and/or fraudulent misrepresentations of such information.

116. Each Defendant's acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and all of them, constitute a successful conspiracy to commit fraudulent misrepresentation.

117. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as a member of a civil conspiracy is liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

118. As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statements and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay, smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 40 of 50

40

which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

## COUNT VII: STRICT LIABILITY (Distributor/Retailer)

This count applies to the following Defendants ONLY: WALGREENS, CO. and STEVE'S FOOD & LIQUOR, INC. d/b/a 200 LIQUORS

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 41 of 50

119. All of the allegations contained in paragraphs 1 through 43 are realleged herein.

120. The Defendant, WALGREENS, CO. and STEVE'S FOOD & LIQUOR, INC. d/b/a 200 LIQUORS, owed a duty to Ms. Clay and the general public to sell only products which were reasonably safe for their intended use, and to refrain from selling any product which was unreasonably dangerous and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others.

121. The Defendants breached said duty by placing cigarette products into the stream of commerce which were unreasonably dangerous and hazardous to the public, including Ms. Clay, for the following reasons:

   a. The products were in an unreasonably dangerous condition and not suitable for the uses intended and were defective;

   b. The products failed to perform as safely as an ordinary consumer would expect when used in the manner reasonably foreseeable by the Defendant;

   c. The risk of danger of the product outweighed the benefits.

41

*Cook County Firm No: 56079*

122. As a direct and proximate result of the product defects described herein, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

**COUNT VIII: NEGLIGENCE (Distributor/Retailer)**

This count applies to the following Defendant ONLY: WALGREENS, CO. and STEVE'S FOOD & LIQUOR, INC. d/b/a 200 LIQUORS

123. All of the allegations contained in paragraphs 1 through 43 are realleged herein.

124. At all relevant times, Defendants WALGREENS, CO. and STEVE'S FOOD & LIQUOR, INC. d/b/a 200 LIQUORS had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product which was unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed, and sold and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others.

125. Defendants knew or should have known that Thomasina Clay, as a member of the general public for whose use the tobacco products were placed into commerce, would be likely to use the tobacco products in the manner described in this Complaint.

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 42 of 50

42

126. Defendants knew or had reason to know of the danger associated with the manner and circumstances of Thomasina Clay's foreseeable use of the tobacco products.

127. That notwithstanding the aforesaid duty, WALGREENS, CO. and STEVE'S FOOD & LIQUOR, INC. d/b/a 200 LIQUORS negligently and carelessly committed one or more of the following acts or omissions:

a. Distributed, marketed, and sold and continues to distribute, market and sell the tobacco products at issue which it knew, or through the exercise of reasonable diligence and care should have known, that the tobacco products were unreasonably dangerous and hazardous to the public, including Ms. Clay;

b. Distributed, marketed, and sold and continues to distribute, market and sell the tobacco products at issue which it knew, or through the exercise of reasonable diligence and care should have known the products were in an unreasonably dangerous condition and not suitable for the uses intended and were defective;

c. Distributed, marketed, and sold and continues to distribute, market and sell the tobacco products at issue which it knew, or through the exercise of reasonable diligence and care should have known the products failed to perform as safely as an ordinary consumer would expect when used in the manner reasonably foreseeable by the Defendant;

d. Distributed, marketed, and sold and continues to distribute, market and sell the tobacco products at issue which it knew, or through the exercise of reasonable diligence and care should have known that the risk of danger of the product outweighed the benefits.

e. Defendant knew or should have reasonably known that the cigarettes being sold were

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 43 of 50

43

*Cook County Firm No: 56079*

defective and unreasonably dangerous. Defendant further knew or should have reasonably known that the cigarettes being sold, were likely to cause injury and or death if use by its consumers.

    f.   Negligently and carelessly ignored that tobacco products posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others by continuing to distribute, market, and sell the tobacco products at issue despite the fact that other similarly situated retailers have ceased to distribute, market and sell said tobacco products;

    g.   Otherwise negligently and carelessly engaged in distributing, marketing, promoting, and selling the tobacco products at issue.

128.   As a direct and proximate result of the product defects described herein, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

## COUNT IX: WILLFUL AND WANTON (Manufacturers)

This count applies to the following Defendants ONLY to: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC. All of the allegations contained in paragraphs 1 through 118 are realleged herein.

129. At all times relevant herein, Defendants owed a duty to Ms. Clay to refrain from willful and wanton misconduct.

130. At all times relevant herein, Defendants, with a conscious disregard or utter indifference to the safety of Ms. Clay was guilty of willful and wanton misconduct in one or more of the following respects:

    a. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn and/or adequately warn foreseeable users, such as the Ms. Clay, of the dangerous characteristics of cigarette products in that Defendants failed to warn foreseeable users that they could develop fatal injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer, as a result of smoking and/or inhaling smoke from Defendants' cigarette products;

    b. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to adequately warn foreseeable users, such as Ms. Clay, of the extent of the dangers to one's health of smoking and/or inhaling smoke from Defendants' cigarette products and of the gravity of the risk and extent of danger that foreseeable users expose themselves to by smoking and/or inhaling smoke from Defendants' cigarette products;

    c. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn foreseeable users, such as Ms. Clay, to restrict their intake of cigarette smoke and in failing to provide guidelines on amount of consumption and reasonable safe dosage so as to reduce and/or eliminate the danger to the Plaintiff and others similarly situated;

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 45 of 50

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 46 of 50

d. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn foreseeable users, such as Ms. Clay, that the use of cigarettes would more likely than not lead to addiction, habituation and/or dependence;

e. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn foreseeable users, such as Ms. Clay, that quitting and/or limiting use would be extremely difficult if consumption was initiated at an early age and as cumulative consumption increased;

f. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to disclose to consumers of cigarettes, such as Ms. Clay, the results of scientific research conducted by and/or known to Defendants which indicated that cigarettes may be dangerous, defective and/or addictive;

g. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed in designing and developing cigarette products that were milder, had better taste and contained nicotine so that foreseeable users, such as Ms. Clay, would find smoking Defendants' products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

h. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products Defendants designed, manufactured, advertised,

46

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 47 of 50

marketed, distributed and/or sold;

i.  knowingly, intentionally, and with a conscious and reckless disregard for the safety of others continued to manufacture, distribute and sell cigarette products when Defendants knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Ms. Clay, when used as intended;

j.  knowingly, intentionally, and with a conscious and reckless disregard for the safety of others concealed information while affirmatively misrepresenting to Ms. Clay and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Ms. Clay to unknowingly use and/or continue to use Defendants' cigarette products herself and expose herself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

k.  knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to test and/or adequately test Defendants' cigarette products before offering them for sale and use by Ms. Clay, and other persons similarly situated;

l.  knowingly, intentionally, and with a conscious and reckless disregard for the safety

47

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 48 of 50

of others failed to remove and recall all of said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

m. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to advise Ms. Clay and others similarly situated in the general community, whom the Defendants knew and/or should have known, and/or could have known, had been exposed to the inhalation of the cigarette smoke resulting from the ordinary and foreseeable use of said cigarette products, to cease all future exposure to the inhalation of all types of other fumes, smoke, dust and fibers, to keep dust and fibers on work clothes and tools away from the home environment, to be examined by a medical specialist to determine the nature and the extent of any and all disease caused by such exposure and inhalation and to receive any available medical treatment for such diseases;

n. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others in manipulating, failing to reduce and/or eliminating nicotine from Defendants' cigarette products to prevent Ms. Clay, who was addicted to the nicotine in Defendants' cigarette products, from quitting and/or reducing consumption;

o. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others included nicotine, or artificially high levels of nicotine, in Defendants' cigarette products to prevent Ms. Clay and other persons similarly situated from quitting and/or reducing consumption; and/or,

48

p. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process.

q. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others designed and manufactured their cigarettes to be inhalable and thus unreasonably dangerous.

r. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed placed additives and ingredients in cigarettes to making them easier to inhale and addictive.

131. As a direct and proximate result of Defendants' aforesaid willful and wanton conduct, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

**WHEREFORE**, Plaintiffs, pray for judgment against the Defendants and each of them jointly, individually and severally, on all of the aforementioned counts for compensatory damages against all Defendants herein, for their costs expended herein, for interest and for such other and

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 49 of 50

ELECTRONICALLY FILED
4/16/2018 5:14 PM
2018-L-003851
PAGE 50 of 50

*Cook County Firm No: 56079*

further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

### JURY DEMAND

Plaintiff respectfully requests the Court for a trial by jury.

Respectfully submitted this 16th day of April, 2018.

Thomasina Clay

MEYERS & FLOWERS, LLC.

Craig Brown, One of its Attorneys

Craig D. Brown, Esq. (#06210554)
cdb@meyers-flowers.com
Gladys P. Santana, Esq. (#6308131)
gps@meyers-flowers.com
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois 60174
(630) 232-6333

Chicago Office:
225 W. Wacker, Suite 1515
Chicago, IL 60606

50

# **EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMASINA CLAY,                         )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )          No. 18-cv-03549
                                        )
PHILIP MORRIS USA INC., et al.,         )          Hon. Charles R. Norgle
                                        )
          Defendants.                   )

## ORDER

Defendant Walgreens, Co.'s Motion to Dismiss the Amended Complaint [99] is granted. Plaintiff's negligence and strict liability claims against Walgreens in Counts VII and VIII of Plaintiff's First Amended Complaint are dismissed with prejudice.

## STATEMENT

Before the Court is Defendant Walgreens, Co.'s Rule 12(b)(6) motion to dismiss the negligence and strict liability claims asserted against it in Counts VII and VIII of Plaintiff's First Amended Complaint. Dkt. 99. For the following reasons, the Court grants Walgreens' motion and dismisses Counts VII and VIII of Plaintiff's First Amended Complaint with prejudice.

On April 16, 2018, Plaintiff Thomasina Clay, an Illinois resident, filed this tobacco product liability action in the Circuit Court of Cook County, Illinois against four diverse, non-Illinois tobacco product manufacturers – Philip Morris USA Inc., R.J. Reynolds Tobacco Company, Liggett Group LLC, ITG Brands, LLC (collectively, "Manufacturer Defendants") – and two Illinois retailers of the Manufacturer Defendants' tobacco products – Walgreens, Co. and Steve's Food & Liquor, Inc. d/b/a 200 Liquors (collectively, "Retail Defendants"). After Philip Morris, R.J. Reynolds, and ITG Brands removed the case to this Court, the Court denied Plaintiff's motion to remand on the basis that Plaintiff fraudulently joined the non-diverse Illinois-based Retail Defendants to destroy diversity jurisdiction because Plaintiff's Complaint included only conclusory assertions to support her strict liability and negligence claims against the Retail Defendants. Dkt. 72.

Plaintiff thereafter filed an amended complaint with leave of Court. Plaintiff's amended complaint dropped Steve's Food & Liquor as a Defendant, and asserts claims against the Manufacturer Defendants for negligence and strict liability, Counts I and II; against Philip Morris, R.J. Reynolds, and Liggett Group for fraudulent concealment, conspiracy to commit fraudulent concealment, fraudulent misrepresentation, conspiracy to commit fraudulent misrepresentation, and willful and wanton conduct, Counts III, IV, V, VI, and IX; and against Walgreens for negligence and strict liability, Counts VII and VIII, respectively. Dkt. 87. In relevant part, Plaintiff's amended complaint alleges that Plaintiff smoked cigarette products distributed or sold by Walgreens, which caused, or substantially contributed to causing the development of Plaintiff's

laryngeal cancer, with which Plaintiff was diagnosed on about April 18, 2016. Dkt. 87 at ¶¶ 3, 8-9.

Walgreens moves to dismiss with prejudice both of Plaintiff's claims against it, for negligence in Count VII and strict liability in Count VIII, pursuant to Fed. R. Civ. P. 12(b)(6). "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, if accepted as true, to state a claim to relief that is plausible on its face.'" Toulon v. Continental Cas. Co., 877 F.3d 725, 734 (7th Cir. 2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In deciding the motion to dismiss, the Court accepts "all well-pleaded allegations of the complaint as true and view[s] them in the light most favorable to the plaintiff." Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 934 (7th Cir. 2012). However, legal conclusions and "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Toulon, 877 F. 3d at 734 (quoting Iqbal, 556 U.S. at 678).

As for Plaintiff's negligence claim against Walgreens in Count VII, Walgreens argues that Plaintiff fails to allege any factual basis that Walgreens breached a duty of care owed to Plaintiff or proximately caused Plaintiff's alleged injury. Walgreens notes that Plaintiff's allegations concerning Walgreens' website do not establish that Walgreens had superior knowledge than the general public of the inherent dangers and defects of cigarettes and, in fact, those portions of Walgreens' website are based on publicly available information. According to Walgreens, the same analysis applies to Plaintiff's allegations regarding 1977 communications between Walgreens and individuals connected to the tobacco industry, Walgreens' proactive 1993 request for indemnification from cigarette manufacturers, and R.J. Reynolds' 2008 statement to Walgreens – they do not support Plaintiff's ultimate assertion that Walgreens had superior knowledge than the general public of the inherent dangers and defects of cigarettes. Walgreens also argues that Plaintiff fails to allege any facts that establish that Walgreens proximately caused Plaintiff's alleged injury, including even basic allegations like when Plaintiff purchased cigarettes from Walgreens or how many cigarettes Plaintiff purchased from Walgreens. Finally, Walgreens argues that Plaintiff's negligence claim is impliedly preempted because imposing liability against Walgreens under a claim that Walgreens had a duty not to sell cigarettes would inherently conflict with and contradict Congress's conclusion that cigarettes are a legal product, citing FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000), and, to the extent Plaintiff has asserted a failure to warn claim against Walgreens, any such claim is expressly preempted by the Federal Cigarette Labeling and Advertising Act.

In response, Plaintiff disclaims that her negligence claim against Walgreens in Count VII includes a failure to warn theory and argues that her claim is not impliedly preempted because Brown & Williamson only addressed the FDA's lack of regulatory authority to ban cigarettes. Plaintiff further insists that her allegations regarding Walgreens' relationship with the tobacco industry and the disclosures on Walgreens' website regarding the dangers and risks of cigarettes are sufficient to plausibly allege that Walgreens owed a duty of care to Plaintiff based on its knowledge of the defects and dangers of cigarettes that were unknown to consumers. Plaintiff also argues that it plausibly alleged that Plaintiff's laryngeal cancer was proximately caused by smoking cigarettes purchased from Walgreens.

Product liability actions based on negligence are evaluated under the framework of common law negligence such that Plaintiff must allege: (1) the existence of a duty of care owed by Walgreens; (2) a breach of that duty by Walgreens; (3) an injury to Plaintiff that was proximately caused by Walgreens' breach of duty; and (4) damages. Calles v. Scripto-Tokai Corp., 224 Ill. 2d 247, 270 (2007). Whereas a strict product liability claim is focused solely on the

condition of the product at issue, a product liability claim based on negligence adds to that a requirement that the defendant be at fault. Id. Though neither Walgreens nor Plaintiff cites caselaw that is directly on point, both parties apparently agree that to state a claim for negligence, Plaintiff must allege that Walgreens had knowledge superior to the general public of the dangers and defects of cigarettes. See Dkt. 101, Walgreens Memo in Support of Mot. at 5-6; Dkt. 105, Pl.'s Response at 3-7 (citing Jones v. UPR Products, Inc., No. 14 C 1248, 2015 WL 3463367 (N.D. Ill. May 29, 2015), Brobbey v. Enterprise Leasing Co. of Chicago, 404 Ill. App. 3d 420, 935 N.E.2d 1084 (2010), Restatement (Second) of Torts § 389, and Lewis v. Lead Industries Ass'n, Inc., 342 Ill. App. 3d 95, 793 N.E.2d 869 (2003)).

Even under that standard, the Court agrees with Walgreens that Plaintiff's claim for negligence in Count VII of her amended complaint fails to allege facts that Walgreens plausibly had knowledge superior to the general public of the dangers and defects of cigarettes. Plaintiff's allegations regarding Walgreens' 1977 communications with individuals connected to the tobacco industry merely reference Walgreens' "willingness to take part in the smoking and health controversy on the side of the tobacco industry," exploration of "possibilities of using its role as a 'health center' to gain support for the tobacco industry," and "'real interest in being of every possible assistance' to the tobacco industry 'in getting the true word put out.'" Dkt. 87 at ¶¶ 134-36. But viewing those allegations in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor does not lead to the conclusion that Walgreens plausibly knew or should have known of the dangers and defects of cigarettes in a way superior to the general public. The same is true of Plaintiff's allegation regarding Walgreens' proactive 1993 request for indemnification from cigarette manufacturers and R.J. Reynolds alleged 2008 statement to Walgreens that "'[n]o tobacco product has been shown to be safe and without risks' and '[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals and is in the best interest of consumers, manufacturers and society.'" Dkt. 87 at ¶¶ 137-38. So too with Plaintiff's allegations that Walgreens' website contains information regarding the components of and risks associated with cigarettes. Dkt. 87 at ¶¶ 128-29. Those allegations do not plausibly establish that Walgreens knew or should have known of the dangers and defects of cigarettes in a way that was superior to the general public.

Walgreens also asserts that Plaintiff's strict liability claim against it in Count VIII is barred by the Illinois Seller's Exception Statute, 735 ILCS 5/2-621. Walgreens notes that section 2-621(b) mandates dismissal of non-manufacturer defendants like Walgreens when that defendant files an affidavit identifying the correct identity of the manufacturer of the product at issue. Walgreens also argues that none of the exceptions to the Illinois Seller's Exception Statute in section 2-621(c) apply as Plaintiff does not allege that Walgreens designs or manufactures cigarettes or that Walgreens created the alleged defect in the cigarettes that Plaintiff smoked. Additionally, like Plaintiff's negligence claim against Walgreens, Walgreens argues that Plaintiff has failed to allege that Walgreens had actual knowledge of the defect.

Plaintiff responds by that she has sufficiently alleged that Walgreens had actual knowledge of the characteristics of cigarette products that made them unreasonably dangerous and defective.

The Illinois Distributor Statute, 735 ILCS 5/2-621,[1] states that "[i]n any product liability action based in whole or in part on the doctrine of strict liability in tort," a non-manufacturer defendant who "file[s] an affidavit certifying the correct identity of the manufacturer of the product

---

[1] The Court is applying the version of the Distributor Statute that existed prior to the 1995 amendment. See Whelchel v. Briggs & Stratton Corp., 850 F. Supp. 2d 926, 932 n. 4 (N.D. Ill. 2012).

allegedly causing injury, death or damage," § 2-621(a), shall be dismissed from the strict liability claim after the manufacturer has been sued and ordered to answer or otherwise plead, § 2-621(b).

Walgreens filed with its motion the affidavit of Dale Johnson, Walgreens' Divisional Merchandise Manager of Consumables (Tobacco, Household, Grocery, Perishables, Pet/Home Essentials), that certifies that the correct identities of the tobacco products at issue in this case are the Manufacturer Defendants. Dkt. 101, Ex. 4 at ¶¶ 5-7. And each of the Manufacturer Defendants have answered or otherwise responded to Plaintiff's amended complaint. Dkt. 95-96, 98, 102. Accordingly, the Court must dismiss Plaintiff's strict liability claim against Walgreens unless one of the exceptions identified in section 2-621(c) apply.

The exceptions to dismissal apply when the plaintiff can show that the non-manufacturer defendant (1) participated in the design or manufacture of the product, (2) had actual knowledge of the defect in the product, or (3) created the defect in the product. 735 ILCS 5/2–621(c). Plaintiff acknowledges that she has not alleged that Walgreens participated in the design or manufacture of or created the defect in the tobacco products at issue. And as discussed above with respect to Plaintiff's negligence claim against Walgreens, Plaintiff has failed to allege facts that Walgreens plausibly had actual knowledge of the alleged defects. Accordingly, the Court grants Walgreens' motion to dismiss in its entirety and dismisses Plaintiff's claims against Walgreens for negligence in Count VII and strict liability in Count VIII of Plaintiff's amended complaint with prejudice.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: February 20, 2020

4

# **EXHIBIT 4**

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMASINA CLAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-03549 |
| | ) | |
| PHILIP MORRIS USA INC., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff's Motion for Remand [28] is denied.

**STATEMENT**

Before the Court is a motion to remand a product liability case involving tobacco products. For the following reasons, the motion is denied.

On April 16, 2018, Thomasina Clay ("Plaintiff") filed this action in the Circuit Court of Cook County Illinois. See Case No. 2018-L-003851. Plaintiff alleged several causes of action against Philip Morris USA Inc., R.J. Reynolds Tobacco Company, Liggett Group LLC, ITG Brands, LLC (collectively, "Manufacturer Defendants"), including: strict liability; negligence; fraudulent concealment; fraudulent misrepresentation; conspiracy to fraudulently conceal; conspiracy to fraudulently misrepresent; and willful and wanton conduct. In addition, Plaintiff alleged two causes of action, strict liability and negligence, against Walgreens, Co. and Steve's Food & Liquor, Inc. d/b/a 200 Liquors (collectively, "Retail Defendants"). Plaintiff alleges that both Walgreens and 200 Liquors are Illinois corporations and have their principal place of business in Illinois.

On May 18, 2018, Manufacturer Defendants removed this case asserting removal was proper based on diversity and that Plaintiff had fraudulently joined Retail Defendants to destroy diversity jurisdiction. On June 14, 2018, Plaintiff filed her Motion for Remand, which argued on several grounds that this case should be remanded to the state court. The Court has previously concluded that the Manufacturer Defendants are diverse from Plaintiff, see Dkt. 58, but now must determine if Retail Defendants were fraudulently joined by Plaintiff, which would preclude remand.

The fraudulent joinder doctrine prevents a plaintiff from joining a "nondiverse defendant to destroy diversity jurisdiction." Morris v. Nuzzo, 718 F.3d 660, 666 (7th Cir. 2013) (quoting Schur v. L.A. Weight Loss Centers, Inc., 577 F.3d 752, 762 (7th Cir. 2009). To establish fraudulent joinder, the defendant "must show that, after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant." Id. (quoting Poulos v. Naas Foods, Inc., 959 F.2d 69, 72 (7th Cir. 1992). Stated differently, "the district court must ask whether there is 'any reasonable possibility' that the plaintiff could prevail against the

non-diverse defendant." Schur, 577 F.3d at 764 (quoting Poulos, 959 F.2d at 73). Even though a defendant bears a heavy burden to establish fraudulent joinder, it is not required to negate all possible theories a plaintiff might allege in the future; only present allegations matter. Poulos, 959 F.2d at 74.

Plaintiff alleges she smoked cigarette products distributed by Retail Defendants. Compl. at ¶¶ 3, 8-9. Regarding her strict liability claim, Plaintiff avers that Retail Defendants sold "unreasonably dangerous" and "defective" products, and these products caused her to suffer from laryngeal cancer. Id. at ¶¶ 119-23. Her negligence claim contains similar allegations. Id. ¶¶ at 127-28. Defendants provide several arguments why Retail Defendants were fraudulently join based on the allegations as pleaded. The Court finds addressing each cause of action and the corresponding arguments for and against remand to be the most straightforward approach.

Turning to the strict liability claim, Defendants argue the Illinois Distributor Statute, 735 ILCS 5/2-621,[1] precludes the Plaintiff from bringing a claim under a theory of strict liability against Retail Defendants. The Illinois Distributor Statute states that "[i]n any product liability action based in whole or in part on the doctrine of strict liability in tort," a non-manufacturer defendant who "file[s] an affidavit certifying the correct identity of the manufacturer of the product allegedly causing injury, death or damage," § 2-621(a), shall be dismissed from the strict liability claim after the manufacturer has been sued and ordered to answer or otherwise plead. § 2-621(b). The exceptions to dismissal apply when the plaintiff can show that the non-manufacturer defendant (1) participated in the design or manufacture of the product, (2) had actual knowledge of the defect in the product, or (3) created the defect in the product. Id. at § 2–621(c).

Retail Defendants have sworn, in notarized affidavits, that they were not involved in designing, manufacturing, packaging, or labeling of the cigarette products at issue in this case; Plaintiff does not plead to the contrary. Mfg. Def. Resp. Mot. Remand., Ex. A, B; Compl. at ¶¶ 119-23. Retail Defendants have identified the correct manufacturers (i.e. Philip Morris USA Inc., R.J. Reynolds Tobacco Company, Liggett Group, Inc., and ITG Brands, LLC) of the cigarette products, satisfying the § 2-621(a) requirement, see id., and the Manufacturer Defendants have answered the Complaint. Dkt. 38.

Plaintiff fails to establish any reasonable possibility that Retail Defendants would be held strictly liable. Specifically, Plaintiff argues that Retail Defendants had actual knowledge of the alleged product defects. But the Complaint does not contain any supporting claims—only conclusory allegations, which are disregarded. The allegation that "Defendants knew or should have known," is not a factual statement that supports the claim that Retail Defendants had actual knowledge. See Compl. at ¶¶ 125-27. The Plaintiff's allegations are dissimilar to the allegations found in Cochran v. Smith & Nephew, Inc., No. 16-1121, 2016 WL 4923505 (C.D. Ill. 2016) and Kopitke v. Depuy Orthopaedics, Inc., No. 11-CV-912, 2011 WL 856865 (N.D. Ill. 2011), which Plaintiff cites for support. Pl. Mot. Remand, Ex. A at 6-7. For example, in Kopitke, a case involving an orthopedic hip replacement, the plaintiff alleged the defendant was in regular communications with surgeons who complained about the product defects and defendants informed the manufacturer about the defects. 2011 WL 856865, at *3. Here, Plaintiff's allegations are plainly distant from those found in Kopitke and Cochran. The allegations are not supported by well-pleaded facts, and the Court is unable to discern a reasonable inference of misconduct by the Retail Defendants from the Complaint. In short, Plaintiff's conclusory allegations are insufficient in establishing that there is a reasonable possibility that Retail Defendant would be held strictly liable.

---

[1] The Court is applying the version of the Distributor Statute that existed prior to the 1995 amendment. See Whelchel v. Briggs & Stratton Corp., 850 F. Supp. 2d 926 (N.D. Ill. 2012).

Next, Plaintiff argues that satisfying the general rule in § 2-621, alone, cannot be the basis for a finding of fraudulent joinder because dismissal under this section is conditional, and that non-diverse defendants can be rejoined later. For support, Plaintiff cites numerous district court opinions, including opinions from this district and others. See e.g., Benson v. Unilever U.S., Inc., 884 F. Supp. 2d 708 (S.D. Ill. 2012); Kopitke, No. 11-CV-912, 2011 WL 856865 (N.D. Ill. 2011); Scheinman v. BMW of N. Am., LLC, No. 10 C 4848, 2010 WL 3937489 (N.D. Ill. 2010). The Court is not bound by other district court rulings because they hold no precedential weight. See Wirtz v. City of S. Bend, 669 F.3d 860, 863 (7th Cir. 2012). Plaintiff's interpretation of § 2-621 would prevent all cases from being removed on the grounds of diversity jurisdiction because any degree of remoteness of recovery is required to be accepted, in effect, abrogating § 2-621(a)-(b). This view is contrary to the fraudulent joinder test adopted by Poulos. Steel v. Ford Motor Co., No. 11 C 00460, 2011 WL 1485380, at *5 (N.D. Ill. 2011). Therefore, the Court declines to accept Plaintiff's position.

Plaintiff's negligence claim is also unsuccessful. "As in any negligence action, a plaintiff must establish the existence of a duty, a breach of that duty, an injury that was proximately caused by that breach, and damages." Jablonski v. Ford Motor Co., 955 N.E.2d 1138, 1153–54 (Ill. 2011). Plaintiff states Retailed Defendants "had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product which was unreasonably dangerous." Compl. ¶ 124. Plaintiff alleges that Retail Defendants breached this duty by selling unreasonably dangerous, defective cigarette products. Id. at ¶ 127. These allegations are insufficient. First, Plaintiff's allegations are conclusory, and nearly identical to the previously discussed strict liability allegations. The allegations add no other specific facts. Second, Plaintiff fails to sufficiently allege that Retail Defendants breached any standard of care. Plaintiff also fails to provide caselaw supporting the premise that selling a product, which may be harmful but is still sanctioned by the state legislature, imposes negligence liability in the absence of a breach of ordinary care. See Strang v. R.J. Reynolds Tobacco Co., No. 05 C 50108, 2008 WL 4951325, at *5 (N.D. Ill. Nov. 18, 2008). Thus, without factually supported allegations or caselaw, Plaintiff fails to bring a negligence claim that has a reasonable possibility of surviving.

Even as Walgreens sells tobacco products a few feet from its pharmacy counter where medical prescriptions are filled, Illinois law does not support the Plaintiff's claims. In conclusion, Plaintiff is unable to establish a cause of action under Illinois law against the Retail Defendants. Therefore, the Court finds that Retail Defendants were fraudulently joined in this case, and removal by Manufacturer Defendants under 28 U.S.C. § 1332 was proper. The Court rejects Plaintiff's arguments for remand to the state court for the aforementioned reasons. Accordingly, Plaintiff's Motion for Remand is denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: November 6, 2018

3

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMASINA CLAY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:18-cv-03549 |
| | ) | |
| v. | ) | |
| | ) | |
| PHILIP MORRIS USA INC., R.J. REYNOLDS | ) | Hon. Charles R. Norgle, Sr. |
| TOBACCO COMPANY, LIGGETT GROUP | ) | |
| LLC, ITG BRANDS, LLC, and | ) | Mag. Judge Young B. Kim |
| WALGREENS, CO. | ) | |
| | ) | |
| Defendants. | ) | |

**<u>FIRST AMENDED COMPLAINT FOR DAMAGES</u>**

NOW COMES, THOMASINA CLAY, hereinafter "Plaintiff," and files this First Amended

Complaint against the Defendants, Philip Morris USA, INC., a foreign corporation, R.J. Reynolds

Tobacco Company, a foreign corporation, Liggett Group, LLC., a Foreign Limited Liability

Company and Walgreens Co., and alleges as follows:

*Parties & Jurisdiction*

1. At all times material the Plaintiff was and is a resident of Cook County, Illinois.

2. Thomasina Clay smoked cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants.

3. Thomasina Clay smoked cigarette products distributed and/or sold by Defendant WALGREENS, CO.

4. Defendant, PHILIP MORRIS USA, INC., is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Virginia with its principal place of business in the State of Virginia that conducts business in every county within the State of Illinois and did so during all times relevant to

1

this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of the cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of her laryngeal cancer. Service of process over this Defendant may be had through its registered agent, CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

5. Defendant, R.J. REYNOLDS TOBACCO COMPANY, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of her laryngeal cancer. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

6. Defendant, LIGGETT GROUP LLC, (f/k/a LIGGETT GROUP, INC., f/k/a BROOKE GROUP, LTD., Inc., f/k/a LIGGETT & MEYERS TOBACCO COMPANY), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business located in the State of North Carolina that conducts business in

2

every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of her laryngeal cancer. Service of process over this Defendant may be had through this Defendant's registered agent or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

7.     Defendant, ITG Brands, LLC, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Ms. Clay smoked and inhaled which caused and/or substantially contributed to the development of her laryngeal cancer. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

8.     Defendant, WALGREENS, CO., is a corporation authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Illinois with its principal place of business located in the State of Illinois. Defendant distributed and/or sold cigarettes which Ms. Clay smoked and inhaled which caused and/or substantially contributed to causing the development of her laryngeal cancer. Service

3

Case: 1:18-cv-03549 Document #: 87 Filed: 02/28/19 Page 4 of 34 PageID #:658

of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

9. Plaintiff, Thomasina Clay, was diagnosed with laryngeal cancer on or about April 18, 2016, caused by smoking cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants named herein.

10. Plaintiff's action is an action for damages in excess of the sum of FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS.

11. The wrongful conduct herein alleged, occurred, at least in part and/or the damages complained of by Ms. Clay were sustained in the county where the above styled Court sits or the Defendants herein reside in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

12. Plaintiff resides in the State of Illinois and/or one or more of the Defendants against whom this action is brought resides in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

13. Plaintiff would further show that Defendants at all times material to this cause of action, through their agents, alter-egos, officers and representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state; committed a tortious act within the state by allowing Ms. Clay to be exposed to an unreasonably dangerous product, to-wit: cigarette and/or cigarette smoke. Defendants failed to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Ms. Clay, or other persons similarly situated, of the risks, dangers and harm, to-wit: the

contracting of the diseases of lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and other diseases and/or injuries to which she was exposed by smoking cigarettes, resulting from the ordinary and foreseeable use of said products, and said tortious conduct is continuing and presently existing; caused injuries and death, which arose out of the acts and/or omissions which occurred inside and outside of the State of Illinois during the relevant period of time, at which time Defendants were engaged in solicitation or service activities within the State of Illinois, resulting in injuries to Ms. Clay. Therefore, jurisdiction properly lies in this Court, as to Plaintiff's action, pursuant to Illinois law.

14. The cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by Defendants herein, when used as intended, were more likely than not to induce in foreseeable users, such as the smoker, a state of addiction, habituation, habit formation and/or dependence characterized by the user's inability to terminate or restrict his/her chronic use.

15. At all times material to this action, the cigarette manufacturers, including but not limited to Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, individually and as successor by merger to Lorillard Tobacco Company, individually and as a successor by merger to Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company, as well as British American Tobacco, Liggett Group LLC, Vector Group LTD., and their predecessors, successors, agents and/or alter-egos (hereinafter referred to as "cigarette manufacturers") knew or should have known the following:

   a. that smoking cigarettes greatly increased the risk of a smoker developing lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup and other related physical conditions when used as intended;

   b. that the diseases and/or injuries listed above would be more likely experienced if users such as the Smoker did not restrict their intake of Defendants' cigarettes, or if they

began to use such products at an early age;

c. that use of the products as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

d. that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

e. that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

f. that cigarette sellers could develop a reasonably safe dose for foreseeable users;

g. that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the Smoker;

h. that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

i. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

### *Historical Allegations of the Defendants' Unlawful Conduct Giving Rise to the Lawsuit*

16. Prior to 1900, lung cancer was virtually unknown as a cause of death in the United States. By 1935, there were an estimated 4,000 lung cancer deaths annually, and by 1945 that figure had almost tripled.

17. By the 1920s, scientists were beginning to investigate the relationship between the concomitant rise in cigarette consumption and lung cancer, and to focus on the health consequences of smoking.

18. By the end of the 1940s and early 1950s, far more evidence linking smoking to disease began to appear, ranging from the ground-breaking statistical studies of two eminent British

statisticians, Bradford Hill and Sir Richard Doll, to the Graham and Wynder studies at Washington University, to animal research studies pointing to the carcinogenicity of cigarettes.

19. The mainstream media began to pay attention to the growing scientific literature and report on the scientists' findings. For example, in 1953, Reader's Digest, which was at the time one of the most popular publications in the country, published a series of articles titled "Cancer by the Carton" which relayed the scientific findings of Drs. Wynder and Graham. The magazine quoted one of the conclusions they reached in their American Cancer Society study which had been published in the American Medical Association's Journal of May 27, 1950 ("JAMA"), namely that "Excessive and prolonged use of tobacco, especially cigarettes, seems to be an important factor in the induction of bronchiogenic carcinoma." Such mainstream media publicity in popular magazines such as Time, Life, and Reader's Digest triggered understandable public concern.

20. In short, by 1953, there had been a very substantial rise in the annual per capita consumption of cigarettes and the number of deaths attributable to lung cancer; scientists were more and more convinced that a relationship existed between cigarette smoking and lung cancer; and the public was growing increasingly aware of and anxious about both developments.

21. In December 1953, Paul M. Hahn, President of American Tobacco Co., (American), sent telegrams to the presidents of the seven other major tobacco companies and one tobacco growers organization, inviting them to meet and develop an industry response to counter the negative publicity generated by the studies linking cigarette smoking and lung cancer. The telegrams were sent to: Edward A. Darr, President of Defendant Reynolds; Benjamin F. Few, President of Defendant Liggett; William J. Halley, President of Lorillard Tobacco Co., (Lorillard); Timothy V. Hartnett, President of Brown & Willliamson Tobacco Co., (B&W);

O. Parker McComas, President of Defendant Philip Morris; Joseph F. Cullman, Jr., President of Benson & Hedges, J.B. Hutson, President of Tobacco Associates, Inc.; and J. Whitney Peterson, President of United States Tobacco Co..

22.   Executives from every tobacco company listed above, with the exception of Liggett, met in New York City at the Plaza Hotel on December 14, 1953. The executives discussed (i) the negative publicity from the recent articles in the media, (ii) responding to the problem by jointly engaging a public relations counsel, and (iii) removing health themes from advertising. They also discussed Liggett's decision not to attend the meeting because "in the course of time the whole thing would blow over." The executives also authorized the five members of the group who had their offices in New York to engage the services of Hill & Knowlton on behalf of the whole committee; to meet with John Hill at the Plaza Hotel the next day, December 15th, to discuss the negative publicity problem; and to request that Hill & Knowlton, if it accepted the assignment, submit recommendations to the full committee at a subsequent meeting as to how to proceed. It is clear from all the surrounding circumstances that representatives of Hill & Knowlton had been contacted about taking on this assignment prior to December 14, 1953.

23.   The tobacco company executives did not meet, as they have suggested, in an altruistic response to requests from the scientific community that the industry fund research on smoking and health. Rather, they convened a strategy meeting of the highest company officials to formulate an industry-wide response (a) to the public's growing anxiety generated by the negative publicity about the direction of scientific research on cigarettes and cancer, and (b) to what they accurately understood to be a major threat to their corporations' economic future. While it is true that there was a recommendation "to do good science, independent science,", the

8

minutes of the meeting reveal that:

> "It was recommended that this [research] group undertake to enlist the cooperation of the National Institutes of Health of the U.S. Public Health Service in working out a program of scientific investigation through which the facts in the present controversy would be developed. This was considered highly advisable in that it would give to the program an aspect of independence to the program to a degree not obtainable in any other way."

24.    At the December 14, 1953 meeting, Paul Hahn of American and Timothy Hartnett of B&W told the other company presidents that they had taken definite steps to remove the health themes from the advertising programs on Pall Mall and Viceroy. Darr [of Reynolds] made the point that he could not concur in sponsoring an industry paid advertising campaign (if this is the course recommended by the Public Relations Counsel) as long as the health theme continued to be featured by any one of the companies represented on the committee. J. Whitney Peterson of United States Tobacco and Hartnett "expressed their agreement with Mr. Darr's views in this matter." Hill & Knowlton wanted to develop some understanding with the Defendants that

> "none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. (No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a given brand less likely to cause you-know-what. No "Play-Safe-with-Luckies.)"

25.    At the December 15, 1953 meeting, the participants were Paul Hahn of American, O. Parker McComas of Philip Morris, Joseph Cullman, Jr. of Benson & Hedges, J. Whitney Peterson of United States Tobacco, and representatives from Hill & Knowlton, including John Hill and Bert Goss. Hill & Knowlton was told that the industry viewed the "problem [posed by the scientific studies] as being extremely serious and worthy of drastic action." According to a Hill & Knowlton memo dated December 22, 1953, the public relations firm was asked to develop suggestions for dealing with the public relations problem confronting the industry as

9

a result of widely publicized assertions by a few medical research men regarding the link between cigarette smoking and lung cancer.

26. In an internal planning memorandum, Hill & Knowlton assessed their tobacco clients' problems in the following manner:

> "There is only one problem -- confidence, and how to establish it; public assurance, and how to create it -- in a perhaps long interim when scientific doubts must remain. And, most important, how to free millions of Americans from the guilty fear that is going to arise deep in their biological depths -- regardless of any pooh-poohing logic -- every time they light a cigarette. No resort to mere logic ever cured panic yet, whether on Madison Avenue, Main Street, or in a psychologist's office. And no mere recitation of arguments pro, or ignoring of arguments con, or careful balancing of the two together, is going to deal with such fear now. That, gentlemen, is the nature of the unexampled challenge to this office."

27. Ten days later, on December 24, 1953, Hill & Knowlton submitted a proposal regarding the tobacco industry's public relations campaign, recommending that the companies form a joint industry research committee that would sponsor independent scientific research on the health effects of smoking and announce the formation of the research committee nationwide as news and in advertisements. Hill & Knowlton also recommended that the companies fund objective research by scientists who were independent of the tobacco industry, and that an advisory board be established composed of a group of distinguished scientists from the fields of medicine, research and education "whose integrity is beyond question."

28. In fact, one of the questions posed by Hill & Knowlton to the Defendants was

> "whether the companies considere[d] that their own advertising and competitive practices have been a principal factor in creating a health problem? The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it."

29. Four days later, on December 28, 1953, another meeting was held at the Plaza Hotel and was attended by Paul Hahn of American; Edward Darr of Reynolds; Herbert A. Kent, Chairman of

10

Lorillard; Timothy Hartnett of B&W; O. Parker McComas of Philip Morris; Joseph Cullman of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; J. Whitney Peterson of United States Tobacco; and three people from the public relations firm of Hill & Knowlton, John Hill, Bert Goss, and Richard Darrow. The attendees agreed on Tobacco Industry Research Committee ("TIRC") as the official name of the research committee; chose Paul Hahn as temporary chairman of the committee; agreed that the search should begin immediately for a qualified director who, together with the companies' research directors, would recommend members for the research advisory board; and reviewed and accepted the Hill & Knowlton proposal regarding the tobacco industry's public relations campaign. The attendees also agreed on a mission statement for the new organization which stated that its "purposes and objectives" were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject.

30. Hill & Knowlton played a major role in creating, refining, and implementing the strategies adopted by the participants at the December meetings.

31. Following Hill & Knowlton's advice, the formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers" published in 448 newspapers throughout the United States. All sponsoring cigarette manufacturers and other tobacco industry entities were clearly identified.

32. The Frank Statement was subscribed to by the following domestic cigarette and tobacco product manufacturers, organizations of leaf tobacco growers, and tobacco warehouse associations that made up TIRC: American by Paul Hahn, President; B&W by Timothy Hartnett, President; Lorillard by Herbert Kent, Chairman; Defendant, Philip Morris by O.

11

Parker McComas, President; Defendant, Reynolds by Edward A. Darr, President; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc. by W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager; Stephano Brothers, Inc. by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson, President.

33.  The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years -- that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence.

The "Frank Statement" in its entirety stated as follows:

"RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings. Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.
Distinguished authorities point out:  1. That medical research of recent years indicates many possible causes of lung cancer. 2. That there is no agreement among the

12

authorities regarding what the cause is. 3. That there is no proof that cigarette smoking is one of the causes. 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of disease is a matter of deep concern to us.

Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer:1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. 3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

34.    The issuance of the "Frank Statement to Cigarette Smokers," was an effective public relations step. By promising the public that the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with an effective rationale for continuing to smoke.

35.    TIRC focused its energies and resources in two areas -- public relations and scientific research. First, it served as a sophisticated public relations unit for Defendants, especially in relation to growing public concern about the risks of smoking, by repeatedly attacking scientific studies that demonstrated the harms of cigarette smoke and insisting on the notion of an "open

question" regarding cigarette smoking and health. Second, it developed a scientific research program that focused on basic processes of disease rather than evaluating the risks and harms associated with smoking -- the very subject that the industry had pledged to pursue through TIRC. From the outset, the dual functions of TIRC were intertwined, with the scientific program of TIRC always subservient to the goals of public relations.

36. Defendants' denials of the link between smoking and disease kept away many excellent researchers. In an October 1969 memorandum to Ross R. Millhiser of Philip Morris, Helmut Wakeham, Vice President and Director of Research for Philip Morris, expressed concern that the efforts of the tobacco industry through CTR[1] and the American Medical Association have failed to involve the best investigators. "At the beginning of our support of smoking and health research, this failure may have been connected with our consistent denial of the statistics and our continued assertion that there is nothing to the cigarette causation hypothesis."

37. A year later, Wakeham again discussed CTR's strategy of frequent and public denials, in a December 1970 memorandum to Joseph Cullman, Chairman of Philip Morris and Chairman of the Executive Committee of the Tobacco Institute: "It has been stated that CTR is a program to find out the 'truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes cancer."

38. Virtually none of the research funded by TIRC/CTR centered on immediate questions relating to carcinogenesis and tobacco that could resolve the question of the harms brought about by cigarette smoking. Although some TIRC/CTR-funded researchers explored alternative

---

[1] In January of 1964, the TIRC Executive Committee agreed to change the name of the organization to the Council for Tobacco Research-U.S.A. (CTR).

14

hypotheses, TIRC/CTR did not typically pursue direct research on cigarettes and disease. Rather than addressing the constituents in tobacco smoke and their demonstrated effect on the human body, TIRC/CTR directed the majority of its resources to alternative theories of the origins of cancer centering on genetic factors and environmental risks. The major thrust of TIRC/CTR was to emphasize that human cancers were complex processes, difficult to study and difficult to understand, and to focus on the "need for more research." Although research funded by the Scientific Advisory Board (SAB) was irrelevant to the immediate questions associated with tobacco smoking and health, it did "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.'"

39. During a four-week visit to the United States in 1958, the three British scientists who met with representatives of TIRC and TIRC's SAB, as well as representatives of American, Liggett, and Philip Morris, reported that "Liggett & Meyers stayed out of TIRC originally because they doubted the sincerity of TIRC's motives and believed that the organization was too unwieldy to work efficiently. They remain convinced that their misgivings were justified. In their opinion TIRC has done little if anything constructive, the constantly reiterated 'not proven' statements in the face of mounting contrary evidence has thoroughly discredited TIRC, and the SAB of TIRC is supporting almost without exception projects which are not related directly to smoking and lung cancer."

40. The Defendants knew that the TIRC/CTR was funding research concerning cancer as a general issue, rather than the relationship of smoking to cancer.

41. In January 1968, Addison Yeaman, B&W Vice President and General Counsel, wrote: "Review of SAB's current grants indicates that a very sizable number of them are for projects

15

in what might be called 'basic research' without specific orientation to the problem of the relationship of the use of tobacco to human health."

42. In addition, Defendants appreciated the delays associated with the basic research approach. Janet Brown, outside counsel for American, explained CTR's strategy of undertaking only basic research funding, as opposed to funding questions directly related to tobacco and health to Cy Hetsko, Vice President and General Counsel for American, and Addison Yeaman, Vice President and General Counsel for B&W, at a January 1968 meeting. The rationale was that basic research kept alive the Defendants' open question argument on causation. Yeaman summarized Brown's position as: "First, we maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco, and Secondly, that the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco."

## COUNT I: NEGLIGENCE (Manufacturers)

This count applies ONLY to PHILIP MORRIS USA, INC., R.J. Reynolds Tobacco Company, Liggett Group LLC, and ITG Brands, LLC.

43. All of the allegations contained in paragraphs 1 through 42 are realleged herein.

44. Ms. Clay smoked various brands of cigarettes products that were designed, manufactured, advertised, marketed, distributed and/or sold by Defendants.

45. Ms. Clay alleges that she was exposed to Defendants' products as a smoker and/or bystander. Each exposure to such cigarette products of Defendants, caused Ms. Clay to inhale smoke from said products which caused Ms. Clay to develop laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

Each exposure to such products was harmful and caused or contributed substantially to Ms. Clay's aforementioned injuries. Ms. Clay's aforementioned injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendants of their cigarette products.

46. Ms. Clay was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by Defendants.

47. The aforementioned damages of Ms. Clay are the direct and proximate cause of the negligence of the Defendants, in that they produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendants knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to Ms. Clay's health and well-being. The Defendants, prior to selling and/or distributing its cigarette products, to which Ms. Clay was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. The Defendants also knew that Ms. Clay and others similarly situated would use and be exposed to their cigarette products in such a way as to cause Ms. Clay to inhale the smoke from said products.

48. Defendants' cigarette products contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Ms. Clay was exposed to them in that said products contained tar, nicotine and other harmful substances which Defendants knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death, to those, such as Ms. Clay who used and/or was exposed to them.

17

49.     Defendants knew that their cigarette products would be used by and around Ms. Clay without inspection for defects and that any such inspection would not have advised Ms. Clay of the fact that the Defendants' cigarette products could cause the injuries which she suffered.  Such facts made Defendants' cigarette products inherently and unreasonably dangerous in that Ms. Clay was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the aforementioned injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendants' cigarette products which she used or was exposed to.

50.     Ms. Clay alleges that there were methods of design and manufacture available and/or known to Defendants and unknown to her which could have been used by Defendants in the design and manufacture of their cigarette products to which Ms. Clay was exposed to make such products less dangerous.  Defendants were in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Ms. Clay and others similarly situated would come in contact with their cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of fatal and life threatening injuries including, but not limited to, head and neck cancer. Defendants were negligent in all of the following respects, same being the proximate cause of Ms. Clay's injuries and disabilities which acts of negligence have continued to the present time:

        a.  prior to July 1, 1969 in failing to warn and/or adequately warn foreseeable users, such as Ms. Clay, of the dangerous characteristics of cigarette products in that Defendants failed to warn foreseeable users that they could develop fatal injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer, as a result of smoking and/or inhaling smoke from Defendants' cigarette products;

        b.  prior to July 1, 1969 in failing to adequately warn foreseeable users, such as Ms.

18

Clay, of the extent of the dangers to one's health of smoking and/or inhaling smoke from Defendants' cigarette products and of the gravity of the risk and extent of danger that foreseeable users expose themselves to by smoking and/or inhaling smoke from Defendants' cigarette products;

c. prior to July 1, 1969 in failing to warn foreseeable users, such as Ms. Clay, to restrict their intake of cigarette smoke and in failing to provide guidelines on amount of consumption and reasonable safe dosage so as to reduce and/or eliminate the danger to the Plaintiff and others similarly situated;

d. prior to July 1, 1969 in failing to warn foreseeable users, such as Ms. Clay, that the use of cigarettes would more likely than not lead to addiction, habituation and/or dependence;

e. prior to July 1, 1969 in failing to warn foreseeable users, such as Ms. Clay, that quitting and/or limiting use would be extremely difficult if consumption was initiated at an early age and as cumulative consumption increased;

f. prior to July 1, 1969 in failing to disclose to consumers of cigarettes, such as Ms. Clay, the results of scientific research conducted by and/or known to Defendants which indicated that cigarettes may be dangerous, defective and/or addictive;

g. in designing and developing cigarette products that were more mild, had better taste and contained nicotine so that foreseeable users, such as Ms. Clay, would find smoking Defendants' products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

h. in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products Defendants designed, manufactured, advertised, marketed, distributed and/or sold;

i. in continuing to manufacture, distribute and sell cigarette products when Defendants knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Ms. Clay, when used as intended;

j. in concealing information while affirmatively misrepresenting to Ms. Clay and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Ms. Clay to unknowingly use and/or continue to use Defendants' cigarette products herself and expose herself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other

19

forms of cancer;

k. in failing to test and/or adequately test Defendants' cigarette products before offering them for sale and use by Ms. Clay, and other persons similarly situated;

l. in failing to remove and recall all of said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

m. prior to July 1, 1969 in failing to advise Ms. Clay and others similarly situated in the general community, whom the Defendants knew and/or should have known, and/or could have known, had been exposed to the inhalation of the cigarette smoke resulting from the ordinary and foreseeable use of said cigarette products, to cease all future exposure to the inhalation of all types of other fumes, smoke, dust and fibers, to keep dust and fibers on work clothes and tools away from the home environment, to be examined by a medical specialist to determine the nature and the extent of any and all disease caused by such exposure and inhalation and to receive any available medical treatment for such diseases;

n. in manipulating, failing to reduce and/or eliminating nicotine from Defendants' cigarette products to prevent Ms. Clay, who was addicted to the nicotine in Defendants' cigarette products, from quitting and/or reducing consumption;

o. in including nicotine, or artificially high levels of nicotine, in Defendants' cigarette products to prevent Ms. Clay and other persons similarly situated from quitting and/or reducing consumption; and/or,

p. in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process.

q. by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous.

r. by placing additives and ingredients in cigarettes to making them easier to inhale and addictive;

51. The Defendants' cigarette products to which Ms. Clay was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendants.

52. The Defendants' cigarette products failed to perform as safely as Ms. Clay expected they would in that they caused her to develop head and neck cancer as a result of her inhalation of cigarette smoke from Defendants' cigarette products.

53. Each of the Defendants' cigarette products suffered from a manufacturing and design defect

in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars and other substances which Defendants knew or should have known were extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

54. As a direct and proximate result of Defendants' negligence, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

### COUNT II: STRICT LIABILITY (Manufacturers)

This count applies all Defendants: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, LIGGETT GROUP, LLC., and ITG BRANDS, LLC.

55. All of the allegations contained in paragraphs 1 through 42 are realleged herein.

56. Defendants were and have been designers, manufacturers, advertisers, distributors and/or sellers of cigarette products.

57. The products complained of were cigarette products designed, manufactured, advertised, distributed and/or sold by Defendants and used by and/or in the vicinity of Ms. Clay.

58. The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream

21

of commerce, and/or caused to be placed into the stream of commerce, by the Defendants.

59.     Ms. Clay alleges that she was exposed to Defendants' cigarette products over many years during which time smoke from Defendants' cigarette products were inhaled by Ms. Clay which caused her to develop head and neck cancer and/or other injuries.

60.     At the time Defendants designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to, and did, reach Ms. Clay in a condition without substantial change from that in which such products were when within the possession of Defendants.

61.     The Defendants' cigarette products were in a condition unreasonably dangerous to users and/or bystanders, such as Ms. Clay and said products were expected to, and did, reach Ms. Clay without substantial change affecting that condition.

62.     The Defendants' cigarette products were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Ms. Clay, and said products were expected to, and did, reach Ms. Clay without substantial change affecting that condition.

63.     The Defendants' cigarette products were unreasonably dangerous because of their design in that the risk of danger to users and/or bystanders, such as Ms. Clay, outweighed the benefits.

64.     The Defendants' cigarette products were dangerous beyond the expectation of the ordinary user/consumer/bystander when used as intended or in a manner reasonably foreseeable by Defendants.

65.     The Defendants' cigarette products were unreasonably dangerous because a less dangerous design and/or modification was economically and scientifically feasible.

66.     Defendants' cigarette products were in a defective condition, unreasonably dangerous, in that those products:

22

a.  did not provide an adequate warning prior to July 1, 1969 of the potential harm that might result from exposure to said products and, alternatively, did not have adequate instructions for safe use of the products;

b.  prior to July 1, 1969 did not have warnings to persons, such as Ms. Clay, who had been, or reasonably may have been, exposed to Defendants' cigarette products, of their disease potential, the proper steps to take to reduce the harmful effects of previous exposure, the need to have periodic chest x-rays and medical examinations including the giving of a detailed medical history regarding previous exposure, and the need to have immediate and vigorous medical treatment for any and all respiratory problems;

c.  by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to Ms. Clay;

d.  contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substances or containing less of them;

e.  failed to filter the harmful substances so that during ordinary use, such materials would not be liberated into the air and/or breathed by the smoker such as Ms. Clay

f.  through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

g.  utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process; and/or,

h.  the nature and degree of the danger of Defendants' cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner.

i.  by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous.

j.  by placing additives and ingredients in cigarettes to making them easier to inhale and addictive;

67.  Ms. Clay, unaware of the defective and unreasonably dangerous condition of the Defendants' cigarette products, and at a time when such products were being used for the purposes for which they were intended, was exposed to and breathed smoke from Defendants' cigarette

products.

68. Defendants knew that their cigarette products would be used without inspection for defects, and by placing them on the market, represented that they would be safe.

69. Ms. Clay was unaware of the hazards and defects in the cigarette products of the Defendants, to-wit: That exposure to said products would cause Ms. Clay to develop cigarette related disease(s) which made said products unsafe for use.

70. Ms. Clay was caused to contract laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.

71. As a direct and proximate result of the product defects as described herein, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, and, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Thomasina Clay has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

### COUNT III: FRAUDULENT CONCEALMENT (Manufacturer)

This count applies ONLY to PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

72. All of the allegations contained in paragraphs 1 through 42 are realleged herein.

73. Beginning at an exact time unknown to Plaintiff, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a

24

campaign designed to deceive the public, Ms. Clay, physicians, the government and others as to the true dangers of smoking cigarettes. Defendants and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning:

a. the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendants' cigarettes did in fact contain carcinogenic materials;

b. their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;

c. the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

d. the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

e. the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

f. the risks of contracting cancer, including but not limited to lung cancer and throat cancer, from smoking cigarettes;

g. the dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

h. that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease;

i. that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

j. the use of ammonia technology and/or certain tobacco blends to boost the ph of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k. the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l. the lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m. that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n. that cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be

25

addicted to and/or dependent upon nicotine;

o. that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of Defendants' cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p. that smoke from Defendants' cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments including but not limited to lung cancer, bronchitis and pneumonia;

q. that the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters and/or tumor initiators including but not limited to those such as PAHs and nitrosamines found within cigarette smoke.

r. that switching to filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

s. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

74. The cigarette manufacturers, including Defendants herein, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by the Defendants and have withheld and/or failed to release over the last almost 65 years both because she does not have access to this information, and because to allege each and every such concealment of material fact herein

26

would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

75.  The cigarette manufacturers, including Defendants herein, carried out their campaign of concealment by concealing and suppressing facts, information and knowledge about the health dangers of smoking, including addiction. They concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of the nicotine content of their products to create and perpetuate smokers' addiction to cigarettes. The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

76.  In 1953 Dr. Ernst Wydner had published an article titled Experimental Production of Carcinoma with Cigarette Tar in the journal Cancer Research. In his experiments he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954 LIGGETT & MEYERS, assuming that whatever cigarettes were used in Dr. Wydner's study were not CHESTERFIELD or L & M, decided to repeat Dr. Wydner's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for LIGGETT & MEYERS, Mr. Darkis writes:

> "If Chesterfield turn out to be negative, and X (used by Wydner) as positive,
> it would then be possible to say, that by using Dr. Wydner's techniques,
> Chesterfield did not produce cancer in mice."

Of course when the experiments were finished in 1955 the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

77. A confidential "limited" LIGGETT & MEYERS document dated March 15, 1961 states, in part: (L&M - A Perspective Review)

    a. There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...

    b. What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what good is this? We've known this for several years - so what?

This document was written by an industry consultant for LIGGETT & MEYERS. This industry consultant conducted animal research from 1954-1984 for LIGGETT & MEYERS. This memo contained material facts known to and concealed by the Defendants since at least 1961 and unknown to Ms. Clay.

78. In 1964, TIRC changed its name to CTR, and was joined by Defendant, LIGGETT & MYERS. Defendants, R.J. REYNOLDS TOBACCO COMPANY, and PHILIP MORRIS USA, INC. were founding members of the TIRC/CTR. The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

79. Despite their "promise" which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by

28

the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

80.    Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was withheld from Ms. Clay and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

81.    In a July 17, 1963 memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation.""

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed, industry insiders knew it was nothing more than a "public relations" sham.

82.    In that same July 17, 1963 memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the

29

CTR writes:

> "Moreover, nicotine is addictive. We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:
>
> 1)They cause, or predispose to, lung cancer.
>
> 2)They contribute to certain cardiovascular disorders.
>
> 3)They may well be truly causative in emphysema, etc, etc."

The 1964 Surgeon's General Report was not issued for another 6 months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive but the cigarette industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite what the industry told the public the industry clearly understood that nicotine was addictive and cigarettes were a cause of lung cancer and other diseases.

83. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was material information which Defendants were under a duty to disclose and/or which it had assumed the duty of disclosing.

84. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Ms. Clay to smoke, fail to quit or reduce consumption for the Defendants' own pecuniary gain.

85. Ms. Clay and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendants herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes. The

30

aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Ms. Clay to smoke, fail to quit or reduce consumption. Ms. Clay was unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as unfiltered cigarettes. The knowledge and information concealed by the cigarette manufacturers, including the Defendants herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Ms. Clay.

86. As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay, smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

**COUNT IV: CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT**

This count applies to the following Defendants ONLY to: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

87. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through

31

42 and 72 through 86.

88. The Defendants, along other tobacco manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by the Defendants unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

89. The Defendants PHILLIP MORRIS USA, R.J. REYNOLDS and later LIGGETT GROUP, LLC, along with other entities including the TIRC/CTR, TI and persons including their in-house lawyers and outside retained counsel entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

90. The Defendants, through their employees, agents and representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

91. After the year 2000, the Defendants continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking including but not limited to the following acts:

   a. Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

   b. Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

   c. Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

32

    d.   Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

92.    The Defendants as it relates to their acts in furtherance of their conspiracy as alleged in this complaint continues through the present.

93.    The concealed and omitted information described in the aforementioned and preceding paragraphs was material information.

94.    Ms. Clay relied to her detriment upon the concealment and omission of such information.

95.    Each Defendant's acts and omissions, and those of TIRC/CTR, TI and other tobacco manufacturers, as well as their in-house and retained counsel, and all of them, constitute a successful conspiracy to commit fraud.

96.    Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as members of a civil conspiracy are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

97.    As a direct and proximate result of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay, smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to laryngeal

cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

### COUNT V: FRAUDULENT MISREPRESENTATION (Manufacturer)

This count applies to the following Defendants ONLY: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

98. All of the allegations contained in paragraphs 1 through 42 are realleged herein.

99. Beginning at an exact time unknown to Ms. Clay, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Ms. Clay, the government and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements and/or misrepresentations of material facts.

100. The cigarette manufacturers, including Defendants herein, made literally hundreds of misrepresentations to Ms. Clay and others similarly situated over the course of the last 50 years. Ms. Clay is unable to allege in full the thousands of pre-1969 advertisements, and the continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and their co-conspirators, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, the TOBACCO INSTITUTE, INC. ("TI") formed in 1958, and COUNCIL for

34

TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because she does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendant herein, which have this knowledge and information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

101. The cigarette manufacturers, including Defendants herein, carried out their campaign of fraud, false statements and/or misrepresentations in at least five ways:

   a. they agreed falsely to represent to Ms. Clay and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

   b. they misrepresented and confused the facts about the health dangers of smoking, including addiction. The cigarette manufacturers claimed, falsely, that there is insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

   c. the cigarette manufacturers, including Defendants herein, used lawyers to misdirect what purported to be objective scientific research, yet maintained to Ms. Clay and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

   d. to discourage meritorious litigation by Ms. Clay injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence in order to protect the cigarette manufacturers, including Defendants herein, existence and profits.

35

e.  by designing, selling and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers.  Defendants knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker.  Notwithstanding same, the Defendants marketed its "Light" cigarettes to consumers as a safer alternative.  Defendants manipulated the design of cigarettes to produce test results that were artificially low.  Furthermore, Defendants knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes.

102.  Cigarette manufacturers knew that cigarettes were dangerous and addictive. It became the practice, purpose and goal of the cigarette manufacturers to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals and through testimony before governmental bodies.

103.  Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the

manufacturers control TRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

104. Cigarette manufacturers when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

105. Cigarette manufacturers claimed attorney-client privilege to shield as many documents as possible from disclosure and destroyed and/or refused to produce documents related to health issues and the Plaintiff's claims.

106. Cigarette manufacturers when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimant for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

107. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

108. The aforementioned acts, false statements and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators for the purposes of inducing Plaintiff and others similarly situated to rely on such false statements and/or misrepresentations so as to induce persons such as Plaintiff to smoke, fail to quit or reduce consumption.

109. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-

37

conspirators were justifiably relied upon by Plaintiff, resulted in Plaintiff being unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as regular and/or unfiltered cigarettes. Such acts, false statements and/or misrepresentations were made by the Defendants who had knowledge superior to Plaintiff regarding the health aspects of cigarettes including their addictive nature.

110. As a direct and proximate result of the aforementioned acts, false statements and/or fraudulent misrepresentations which were made and/or caused to be made or concealed by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay, smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to head and neck cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

## COUNT VI: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION

This count applies to the following Defendants ONLY: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC.

111. Plaintiffs hereby realleges and incorporates the allegations contained in paragraphs 1 through 42 and 98 through 110.

112. The Defendants, along with other cigarette manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), unlawfully agreed to commit, and did commit, overt acts, false statements and/or fraudulent misrepresentations concerning information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

113. The acts, false statements and/or fraudulent misrepresentations described in the preceding paragraph was material information.

114. Ms. Clay relied to her detriment upon the acts, false statements and/or fraudulent misrepresentations of such information.

115. Each Defendant's acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and all of them, constitute a successful conspiracy to commit fraudulent misrepresentation.

116. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as a member of a civil conspiracy is liable for all acts and/or

39

omissions of any co-conspirator done in pursuance of the conspiracy.

117.   As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statements and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendants herein, and their co-conspirators, Plaintiff, Thomasina Clay, smoked and/or continued to smoke Defendants' cigarette products which caused her to develop injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries.  Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition.  The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

### COUNT VII: NEGLIGENCE (Distributor/Retailer)

This count applies to the following Defendant ONLY: WALGREENS, CO.

118.   Plaintiff re-alleges and incorporates the allegations of paragraphs 1-71 of this Complaint as if fully contained herein.

119.   At all relevant times Plaintiff was a smoker who purchased and consumed cigarettes from Defendant WALGREENS, CO.

120.   At all relevant times, Defendant WALGREENS, CO. knew or should have known that Plaintiff, as a member of the general public for whose use cigarettes were placed into commerce, would be likely to use cigarettes in the manner described in this Complaint.

121. At all relevant times, Defendant WALGREENS, CO. knew or had reason to know of the dangers associated with the manner and circumstances of Plaintiff's foreseeable use of cigarettes.

122. Tobacco products, such as cigarettes smoked and or consumed by Plaintiff, are not an ordinary or innocuous product.

123. Cigarettes are dangerous and well recognized to cause the death of fifty percent of consumers who smoke them.

124. There is no other product in Defendant WALGREENS, CO's inventory that is more dangerous or kills more consumers than cigarettes. Defendant WALGREENS, CO. had a broad range of knowledge about the components of cigarette smoke and how those components were unreasonably dangerous to its consumers, including that the components of cigarettes smoke contain carcinogenic, toxic and dangerous compounds.

125. At all relevant times, Defendant WALGREENS, CO. had knowledge of the defective and unreasonably dangerous nature of the cigarettes it sells to its consumers that far exceeded the knowledge or awareness of the health risks of smoking known by reasonable consumers, including Plaintiff.

126. At all relevant times, Defendant WALGREENS, CO. knew or should have known that reasonable consumers, including Plaintiff, did not have the knowledge about how cigarettes were defective that was possessed by Defendant Walgreens.

127. Defendant WALGREENS, CO. only recently began disclosing its superior knowledge to the public, long after Plaintiff had already been exposed to the defective and unreasonably dangerous cigarettes sold by Defendant WALGREENS, CO.

41

128. For example, Defendant WALGREENS, CO.'s own website now details particular, specific and scientific evidence of the dangerous components of the smoke from the cigarettes they sold.



*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018). WALGREENS, CO. now acknowledges that there are 7,000 chemicals in every puff of cigarette smoke from the cigarettes it sells to its consumers. These carcinogenic, toxic and dangerous components in cigarette smoke are not generally known by the reasonable consumer.

a. Acetone
b. Arsenic,
c. Butane
d. Cadmium
e. Ammonia
f. Toluene and
g. Formaldehyde

129. The Plaintiff and other reasonable consumers would not have knowledge of these dangerous chemicals in cigarettes.

130. Defendant WALGREENS, CO. acknowledges in its website that its knowledge is superior to that of its consumers, and candidly admits that particular harms from smoking are not well known or recognized by its consumers. Defendant WALGREENS, CO.'s website states **"Smoking affects you in more ways <u>than you know…</u>"**:



*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018).

131. Defendant WALGREENS, CO's website cites to many diseases not generally known to be caused by smoking cigarettes, including "[i]ncreased risk of cataracts and macular degeneration, which could lead to blindness…[r]isks of stroke, heart disease…[i]ncreased risk of erectile dysfunction and damaged/decreased sperm, which can lead to infertility or genetic defects in offspring." *Id*.

132. Defendant WALGREENS, CO.'s superior knowledge about the inherent dangers and defects of cigarettes arose in part from its close relationship with the tobacco industry.

43

Defendant WALGREENS, CO. was aware as of 1977 at the latest that the tobacco industry including the co-defendant cigarette manufacturers, had engaged in creating a "controversy" to dispute the harmful effects of tobacco products.

133. Defendant WALGREENS, CO. was actively engaged with the tobacco industry and the industry's co-conspirator, the Tobacco Institute, as shown by correspondence between Defendant WALGREENS, CO. and tobacco industry executives.

134. For example, Defendant WALGREENS, CO. reached out to the tobacco industry in March 1977 to declare what one tobacco executive described as its "willingness to take part in the smoking and health controversy on the side of the tobacco industry." *See* Letter from J. Kendrick Wells, III to Horace R. Kornegay dated March 29, 1977, Bates Number 687020794.[2]

135. Defendant WALGREENS, CO.'s Manager of News and Information Services, David C. Carlson, wrote to the president of the Tobacco Institute, Horace R. Kornegay, to explore possibilities of using its role as a "health center" to gain support for the tobacco industry:

> As you know, we at Walgreens are exploring the possibilities of an information program which will help both the tobacco Industry and ourselves. We don't want to step into the middle of a raging controversy, but as an established "health center" there are many, many things we can do to 'gain and maintain the understanding and support of the public."

*See* Letter from to Horace R. Kornegay, dated March 16, 1977, Bates Number TIMN0083432.

136. Defendant WALGREENS, CO. had a "real interest in being of every possible assistance" to the tobacco industry "in getting the true word put about." *See* Memorandum dated March 17, 1977, Bates Number TIMN0083434.

---

[2] Documents referenced by Bates Numbers can be accessed through UCSF Library and Center for Knowledge Management tobacco document archive located at https://www.industrydocumentslibrary.ucsf.edu/tobacco/.

137. As further example of its close relationship with the tobacco industry and its involvement in selling what it knew to be defective and unreasonably dangerous cigarettes to the public, including Plaintiff, when Defendant WALGREENS, CO. became aware in 1993 of litigation involving the tobacco industry's defective cigarette products, it sought indemnification from each of the major cigarette manufacturers for future lawsuits against it. *See* Letter from David L. Grobart to Jackie Gilbert, dated June 2, 1993, Bates Number 2064877537.

138. Additionally, Defendant WALGREENS, CO. was told directly by R.J. Reynolds personnel in 2008 that "[n]o tobacco product has been shown to be safe and without risks" and "[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals and is in the best interest of consumers, manufacturers and society". *See* RJRT Presentation, Bates Number 557062850.

139. These and other contacts that Defendant WALGREENS, CO. had with the tobacco industry, including the cigarette manufacturers, show that Defendant WALGREENS, CO. was aware of the defective and unreasonably dangerous nature of cigarettes, and that its knowledge was superior to the knowledge of the general public, including Plaintiff.

140. Indeed, Defendant WALGREENS, CO. knew as early as the 1990s that its co-defendants manufactured less hazardous cigarette products, like denicotinized cigarettes, low nicotine cigarettes, and non-combustible cigarette products.

141. Defendant WALGREENS, CO. chooses to continue selling defective cigarettes to the public despite industry standards and norms set by other national retailers, such as Target and CVS, and the majority of independent pharmacies and drugstores which have ceased cigarette sales.

142. Tobacco sales in pharmacies directly contradict the pharmacist's code of ethics, which states that pharmacists must be committed to the welfare of their patients and must act with honesty and integrity in professional relationships, avoid actions that compromise dedication to the best interests of their patients. *See* American Pharmacists Association Code of Ethics https://www.pharmacist.com/code-ethics (last accessed on November 1, 2018).Since 1971, the American Pharmaceutical Association position has recommended against the display and sale of cigarettes in pharmacies, which is in direct contradiction to the role of the pharmacy as a public health facility.

143. Defendant WALGREENS, CO. is aware that smoking is the leading cause of death in the United States, but chooses to ignore statistics to profit from the sale of defective cigarettes.

144. Defendant WALGRENS, CO. continues to sell defective cigarettes to consumers like Plaintiff in order to profit further on smoking cessation devices, such as nicotine replacement patches, gum and lozenges, as well as prescription nicotine replacement therapies, such as varenicline and bupropion.

145. At all relevant times, Defendant WALGREENS, CO. had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product which it knew or should have known was unreasonably dangerous and defective when put to the use for which it was designed, manufactured, distributed, marketed, and sold and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others when it knew or should have known that consumers and other users lacked such knowledge about the defects or dangerous conditions of the product.

146. In breach of this duty, Defendant WALGREENS, CO. sold and continued to sell cigarettes to Plaintiff and the general public which it knew were defective and unreasonably dangerous.

147. As a direct and proximate result of the negligence described herein, Plaintiff, Thomasina Clay, developed injuries caused by the consumption of cigarette products purchased from Defendant WALGREENS, CO., including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Plaintiff has suffered these losses.

### COUNT VIII: STRICT LIABILITY (Distributor/Retailer)

This count applies to the following Defendant ONLY: WALGREENS, CO.

148. All of the allegations contained in paragraphs 1 through 71 and 118-147 are realleged herein.

149. The Defendant, WALGREENS, CO. owed a duty to Ms. Clay and the general public to sell only products which were reasonably safe for their intended use, and to refrain from selling any product which was unreasonably dangerous and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others.

150. The Defendant WALGREENS, CO. breached said duty by placing into the stream of commerce, distributing, marketing, promoting and selling cigarette products that at the time the tobacco products left the possession of Defendant WALGREENS, CO., and at the time the

tobacco products entered into the stream of commerce, were in an unreasonably dangerous and

defective condition. These defects, of which Defendant WALGREENS, CO. had actual

knowledge, include but are not limited to:

a. the tobacco products contained tar that is deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

b. the tobacco products contained tar that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

c. the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and made it unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

d. the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

e. the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

f. the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

g. the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

h. the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

i. through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and made the tobacco product unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco

48

products;

j. through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

k. the nature and degree of the danger of Defendants' cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

l. the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco product;

m. the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe that when put to a use that is reasonably foreseeable, posing dangers that go beyond that of which an ordinary consumer would expect;

n. the tobacco products were in an unreasonably dangerous condition and not suitable for the uses intended and were defective;

o. the tobacco products failed to perform as safely as an ordinary consumer would expect when used in the manner reasonably foreseeable by the Defendant WALGREENS, CO.; and

p. the risk of danger of the tobacco products outweighed the benefits.

151. As a direct and proximate result of the product defects described herein, Plaintiff, Thomasina Clay, developed injuries caused by the consumption of cigarette products purchased from Defendant WALGREENS, CO, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and

suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Ms. Clay has suffered these losses.

### COUNT IX: WILLFUL AND WANTON (Manufacturers)

This count applies to the following Defendants ONLY to: PHILIP MORRIS USA, INC., R.J. REYNOLDS TOBACCO COMPANY, and LIGGETT GROUP, LLC. All of the allegations contained in paragraphs 1 through 117 are realleged herein.

152. At all times relevant herein, Defendants owed a duty to Ms. Clay to refrain from willful and wanton misconduct.

153. At all times relevant herein, Defendants, with a conscious disregard or utter indifference to the safety of Ms. Clay was guilty of willful and wanton misconduct in one or more of the following respects:

    a. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn and/or adequately warn foreseeable users, such as Ms. Clay, of the dangerous characteristics of cigarette products in that Defendants failed to warn foreseeable users that they could develop fatal injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer, as a result of smoking and/or inhaling smoke from Defendants' cigarette products;

    b. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to adequately warn foreseeable users, such as Ms. Clay, of the extent of the dangers to one's health of smoking and/or inhaling smoke from Defendants' cigarette products and of the gravity of the risk and extent of danger that foreseeable users expose themselves to by smoking and/or inhaling smoke from Defendants' cigarette products;

    c. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn foreseeable users, such as Ms. Clay, to restrict their intake of cigarette smoke and in failing to provide guidelines on

amount of consumption and reasonable safe dosage so as to reduce and/or eliminate the danger to the Plaintiff and others similarly situated;

d. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn foreseeable users, such as Ms. Clay, that the use of cigarettes would more likely than not lead to addiction, habituation and/or dependence;

e. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to warn foreseeable users, such as Ms. Clay, that quitting and/or limiting use would be extremely difficult if consumption was initiated at an early age and as cumulative consumption increased;

f. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to disclose to consumers of cigarettes, such as Ms. Clay, the results of scientific research conducted by and/or known to Defendants which indicated that cigarettes may be dangerous, defective and/or addictive;

g. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed in designing and developing cigarette products that were milder, had better taste and contained nicotine so that foreseeable users, such as Ms. Clay, would find smoking Defendants' products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

h. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products Defendants designed, manufactured, advertised, marketed, distributed and/or sold;

i. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others continued to manufacture, distribute and sell cigarette products when Defendants knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Ms. Clay, when used as intended;

j. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others concealed information while affirmatively misrepresenting to Ms. Clay and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable

use, which material misrepresentations induced Ms. Clay to unknowingly use and/or continue to use Defendants' cigarette products herself and expose herself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

k. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to test and/or adequately test Defendants' cigarette products before offering them for sale and use by Ms. Clay, and other persons similarly situated;

l. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to remove and recall all of said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

m. prior to July 1, 1969 knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed to advise Ms. Clay and others similarly situated in the general community, whom the Defendants knew and/or should have known, and/or could have known, had been exposed to the inhalation of the cigarette smoke resulting from the ordinary and foreseeable use of said cigarette products, to cease all future exposure to the inhalation of all types of other fumes, smoke, dust and fibers, to keep dust and fibers on work clothes and tools away from the home environment, to be examined by a medical specialist to determine the nature and the extent of any and all disease caused by such exposure and inhalation and to receive any available medical treatment for such diseases;

n. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others in manipulating, failing to reduce and/or eliminating nicotine from Defendants' cigarette products to prevent Ms. Clay, who was addicted to the nicotine in Defendants' cigarette products, from quitting and/or reducing consumption;

o. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others included nicotine, or artificially high levels of nicotine, in Defendants' cigarette products to prevent Ms. Clay and other persons similarly situated from quitting and/or reducing consumption;

p. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

q. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others designed and manufactured their cigarettes to be inhalable and thus

52

unreasonably dangerous; and/or

r. knowingly, intentionally, and with a conscious and reckless disregard for the safety of others failed placed additives and ingredients in cigarettes to making them easier to inhale and addictive.

154. As a direct and proximate result of Defendants' aforesaid willful and wanton conduct, Plaintiff, Thomasina Clay, developed injuries, including but not limited to laryngeal cancer, in addition to other related physical conditions which resulted in and directly caused her to suffer severe bodily injuries. Plaintiff, Thomasina Clay, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Plaintiff Thomasina Clay has suffered these losses.

**WHEREFORE**, Plaintiff, Thomasina Clay, prays for judgment against the Defendants and each of them jointly, individually and severally, on all of the aforementioned counts for compensatory damages against all Defendants herein, for their costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiffs may show themselves to be justly entitled.

## JURY DEMAND

Plaintiff respectfully requests the Court for a trial by jury.

Respectfully submitted this 25th day of February, 2019.

Thomasina Clay,

MEYERS & FLOWERS, LLC.

53

/s/ Craig D. Brown
Craig Brown, One of its Attorneys

Craig D. Brown
Peter J. Flowers
Jonathan P. Mincieli
Meyers & Flowers, LLC
3 N 2nd Street, Suite 300
St. Charles, IL 60174
Tel: (630) 232-6333
Fax: (630) 845-8982
cdb@meyers-flowers.com
pjf@meyers-flowers.com
jpm@meyers-flowers.com

# **<u>EXHIBIT 6</u>**



Smile     **Stay Well**     Be Beautiful

## Categories

Heart Health

Cold & Flu

Diabetes

Nutrition

First Aid

Women's Health

Fitness

General Health

Pharmacy

Quit Smoking

Travel & Global Health

Vaccines & Immunizations

Allergies



Smoking is the most preventable cause of death in the U.S. Here's why you should quit today.

Case: 1:26-cv-03513 Document #: 1 Filed: 03/30/26 Page 217 of 316 PageID #:217

# What's in a cigarette?

Nearly 7,000 chemicals are in every puff, such as...



**Toluene**
used to make paint

**Arsenic**
used in rat poison



**Tar**
material for paving roads

**Acetone**
found in nail polish remover

**Butane**
used in lighter fluid

**Formaldehyde**
used to preserve dead bodies



**Carbon Monoxide**
released in car exhaust fumes



**Cadmium**
found in battery acid

**Methanol**
found in rocket fuel



**Ammonia**
in household cleaners

**Nicotine**
used as insecticide

# Smoking affects you in more ways than you know...



**Ears**
Oxygen supply is reduced in the cochlea, an inner ear organ, which may lead to hearing loss.

**Eyes**
Increased risk of cataracts and macular degeneration, which can lead to blindness.

**Mouth**
Mouth sores, ulcers, gum disease, cavities and damaged taste can occur.

**Heart**
Risks of stroke, heart disease and heart attack are increased.

**Lungs**
Risk of emphysema, chronic bronchitis, exacerbations and infections are increased.

**Reproductive Organs (Women)**
Can lead to reduced fertility, failed embryo implantation, early menopause and low estrogen levels, which can cause thinning hair and memory problems; miscarriage, premature birth, stillbirth and illness.

**Reproductive Organs (Men)**
Increased risk of erectile dysfunction and damaged/decreased sperm, which can cause infertility or genetic defects in offspring.



### Mental Health
Regular smokers can experience nicotine withdrawal, which may cause anxiety, irritability and strong cravings for nicotine.



### Cancer
Increased risk for lip, tongue, throat, esophagus, lung, stomach, testicular, cervical and voice box cancer.



### Skin
Skin can become dull, grayish, dry and less elastic, leading to wrinkles and stretch marks.



### Blood System
White blood cells, which protect you from infection, can rise and increase risk of heart attacks, strokes, clots and cancer.



### Immune System
Levels of nutrients that heal wounds may decrease, which causes them to heal slower.



### Muscles
The blood and oxygen flow to your muscles may decrease, making it harder to build or keep muscles.



### Bones
Bone tissue and density can decrease, which may lead to fractured or weakened bones.



It's never too late to quit!

## Quit Smoking

Smoking effects your entire wellbeing. But in just an hour after your quit, your body can begin to repair itself!

See our smoking cessation services ›

**By Nancy Kupka PhD, RN**
Nancy is a Manager of Clinical Programs and Quality at Walgreens. She has worked in multiple facets of healthcare over her career.

---

*Sources*

1. *Centers for Disease Control and Prevention.  Smoking and Tobacco Use: Health Effects of Cigarette Smoking.* *http://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/effects_cig_smo* *(accessed 11/19/15).*

2. *National Health Service.  Smokefree NHS  How smoking affects your body.* *http://www.nhs.uk/smokefree/why-quit/smoking-health-problems. (accessed 11/19/15).*

3. *Smokefree.gov  18 ways smoking affects your health.  Smoking effects* *http://smokefree.gov/health-effects (accessed 11/19/15).*

4. *Smokefree.gov  18 ways smoking affects your health.  Quitting effects* *http://smokefree.gov/health-effects. (accessed 11/19/15).*

5. *U.S. Surgeon General The American Heart Association. Smoking: Do you really know the risks?* *http://www.heart.org/HEARTORG/HealthyLiving/QuitSmoking/QuittingSmoking/Smokin Do-you-really-know-the-risks_UCM_322718_Article.jsp#.VuhdO_krK00*

6. *Health Consequences of Involuntary Exposure to Tobacco Smoke; A Report of the Surgeon General.  Secondhand smoke: What it means to you. (2006)* *www.surgeongeneral.gov/library/reports/secondhandsmoke/secondhandsmoke.pdf (accessed 11/19/15).*

7. *Center for Disease Control and Prevention. Within 20 Minutes of Quitting.* *http://www.cdc.gov/tobacco/data_statistics/sgr/2004/posters/20mins/index.htm (access 4/13/16).*

#walgreens   #quit smoking   #general health   #women's health   #cigarettes   #health   #wellness

2 years ago



# **EXHIBIT 7**

*Mr. C. H. Judge*
*as info.*

March 16, 1977

*Ast Stevens ~*
*Pls return.*
*Helen — sus 4/11/77*

Mr. Horace R. Kornegay
President
Tobacco Institute
1776 K Street, N.W.
Washington, D.C. 20006

Thank you, Mr. Kornegay,

for taking time from your busy schedule to chat with me about the tobacco industry. Altho I've been smoking for nearly thirty years, I am constantly amazed at how little I know of your industry!

As you know, we at Walgreens are exploring the possibilities of an information program which will help both the tobacco industry and ourselves. We don't want to step into the middle of a raging controversy, but as an established "health center" there are many, many things we can do to "gain and maintain the understanding and support of the public."

As a first step, I need more information. I certainly would like a copy of the booklet used in North Carolina. You will have to be my guide from there on.

Thank you again for your cooperation.

Sincerely,

David C. Carlson
Manager, News and Information Services

DCC:hs

cc: A. B. Clarke
A. J. Bass, Jr.
Bob Schwab

T 0023341

TIMN 0083432

Source: http://industrydocuments.library.ucsf.edu/tobacco/docs/hsyy0146

# EXHIBIT 8

THIS NOTICE. IT IS DUE TO THE QUALITY
OF THE DOCUMENT BEING FILMED.

*5&T*
*Anti-Smo.*
*Gen.*

(502) 774-7649

March 29, 1977

Mr. Horace R. Kornegay
Tobacco Institute, Inc.
1776 K. Street, N.W.
Washington, D. C.   20006

Dear Horace:

Re:  David Carlson of Walgreen's

We understand that Mr. Carlson has written to you to indicate
his business' willingness to take part in the smoking and
health controversy on the side of the tobacco industry.

This contact began with a conversation between Mr. Carlson
and A. B. Clarke, who is Director of Sales Operations for B&W,
at a recent meeting. The Senior Buyer for Walgreen's has a
close relationship with Mr. Clarke and that is probably the
reason Mr. Carlson approached Mr. Clarke.

We would very much like to know what response is given to
Mr. Carlson. The opportunity presented here needs no emphasis;
this could easily lead to participation by all major drug
chains in activities supporting the tobacco industry. Mr.
Clarke would be delighted to participate in any way in further
contacts with Walgreen's.

Thanks.

Cordially,

/s/ JKW

J. Kendrick Wells, III

JKW/gam

cc:  E. Pepples
     A. B. Clarke

68702 0794

Source: https://www.industrydocuments.ucsf.edu/docs/skpx0107

# **EXHIBIT 9**

MEMORANDUM

TO:        WILLIAM KLOEPFER, JR.                    March 17, 1977

FROM:      HORACE R. KORNEGAY

SUBJECT:   WALGREEN DRUGS                                    Confidential

We may have an opportunity to engage in another project similar to the one with Mr. Munford of the Majik Markets. Here is the story:

Curtis Judge called me and told me about Bud Bass' meeting with David C. Carlson, manager of News and Information Services for Walgreen Drugs. In the conversation with Bud, Mr. Carlson expressed an interest in being of assistance to the tobacco industry in getting the true word put about. Curt suggested that I call Mr. Carlson which I have done. He indicated a real interest in being of every possible assistance to us but said quite frankly he did not know what to do or where he could be of help. I then suggested that we send him some literature about the Institute as well as of the PR project which we had promoted for his study and information. I further told him that I would call him in about two weeks and that we would agree upon a mutually convenient time and place to meet and discuss what and how he and his company could be of help. I further told-him that I would want you with me in our meeting. Please have George or someone get up some literature pertinent to this possible project and send it to Mr. Carlson at 200 Wilmot Road, Deerfield, Illinois  60015. For your information, his telephone number is 312/948-5000, Ext. 2920.

HK

------------------------------------------------------------

**CONFIDENTIAL:**
**MINNESOTA TOBACCO LITIGATION**

T0023343

**TIMN 0083434**

Source: http://industrydocuments.library.ucsf.edu/tobacco/docs/jsyy0146

# **EXHIBIT 10**

Case: 1:26-cv-03513 Document #: 1 Filed: 03/30/26 Page 228 of 316 PageID #:228

Law Division Motion
**1910 - No Fee Paid**
**1919 - Fee Paid**
**Jury Demand**

**(Rev. 12/31/15) CCG N067**

FILED
2/25/2026 3:22 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36829973

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

_____County_____ DEPARTMENT/ __1st_____ DISTRICT

Frank Apa, _____

**v.**

R.J. Reynolds Tobacco Company, et al. _____

**No.** _____2026L002215_____

## JURY DEMAND

The undersigned demands a jury trial.

/s/ ____Peter J. Flowers_____
**(Signature)**

☑ Atty. No.: __6210847/Firm 56079__
Name: __Peter J. Flowers__
Atty. for: __Plaintiff__
Address: __3 N. Second St., Suite 300__
City/State/Zip: __St. Charles, IL 60174__
Telephone: __630-232-6333__
Primary Email: __pjf@meyers-flowers.com__
Secondary Emai: __cdb@meyers-flowers.com__
Tertiary Email: __jpm@meyers-flowers.com__

**Dated:** __02/25/2026__

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Page 1 of 1

**Civil Action Cover Sheet - Case Initiation** (05/27/16) CCL 0520

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

Frank Apa,

v.

R.J. Reynolds Tobacco Company, et al.

FILED
2/25/2026 3:22 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36829973

No. _____2026L002215_____

FILED DATE: 2/25/2026 3:22 PM  2026L002215

## CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☒ Yes ☐ No

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
   (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☒ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
   (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

By: /s/ Peter J. Flowers
_____
(Attorney)                    (Pro Se)

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

**(FILE STAMP)**

### COMMERCIAL LITIGATION
CASE TYPES:
- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
   (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
   (Please specify below.**)
- ☐ 075 Other Commercial Litigation
   (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** _____
_____

Primary Email: pjf@meyers-flowers.com

Secondary Email: cdb@meyers-flowers.com

Tertiary Email: jpm@meyers-flowers.com

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED
2/25/2026 3:22 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36829973

| | |
|---|---|
| FRANK APA, | ) |
| | ) |
| Plaintiff, | ). |
| | ) |
| v. | ) |
| | ) |
| R.J. REYNOLDS TOBACCO COMPANY, | ) |
| PHILIP MORRIS USA INC., LIGGETT GROUP | ) |
| LLC, and WALGREEN CO., | ) |
| | ) |
| Defendants. | ) |

Case No **2026L002215**

**JURY DEMANDED**

### COMPLAINT AT LAW

NOW COMES, Plaintiff, FRANK APA, by his attorneys MEYERS & FLOWERS and The ALVAREZ FIRM, and files this Complaint at Law against the Defendants, R.J. REYNOLDS TOBACCO COMPANY, a foreign corporation, PHILIP MORRIS USA INC., a foreign corporation, LIGGETT GROUP LLC., a Foreign Limited Liability Company, and WALGREEN CO. an Illinois Corporation, and alleges as follows:

### *Parties & Jurisdiction*

1. At all times material Plaintiff, FRANK APA (hereinafter sometimes referred to as "Mr. Apa") was a resident of Cook County, Illinois.

2. FRANK APA smoked cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants, including but not limited to Viceroy cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by defendant R.J. REYNOLDS TOBACCO COMPANY ("R.J. Reynolds"), as well as Marlboro cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by defendant PHILIP MORRIS USA INC. ("Philip Morris").

1

FILED DATE: 2/25/2026 3:22 PM    2026L002215

3.    FRANK APA began smoking cigarettes at age 13 in 1972. He smoked Viceroy brand cigarettes from the early 1970s until the 1980s, switching to Marlboro brand cigarettes in the 1980s until he quit smoking in 2024.

4.    FRANK APA smoked cigarette products that he purchased from Defendant WALGREEN CO.

5.    Defendant, R.J. Reynolds, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of Kool brand cigarette products which Mr. Apa smoked and inhaled which caused and/or substantially contributed to the development of his emphysema. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

6.    Defendant, Philip Morris, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Virginia with its principal place of business in the State of Virginia that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution of cigarette products and conspired with other Defendants to fraudulently misrepresent and conceal the dangers of smoking,

cigarettes smoked and inhaled by Mr. Apa, which caused and/or substantially contributed to the development of Mr. Apa's emphysema. Service of process over this Defendant may be had through its registered agent, United Agent Group Inc., 1320 Tower Road, Schaumburg, Illinois 60173 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

7. Defendant, LIGGETT GROUP LLC, (f/k/a LIGGETT GROUP, INC., f/k/a BROOKE GROUP, LTD., Inc., f/k/a LIGGETT & MEYERS TOBACCO COMPANY) ("Liggett"), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business located in the State of Delaware that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution of cigarette products and conspired with other Defendants to fraudulently misrepresent and conceal the dangers of smoking, cigarettes smoked and inhaled by Mr. Apa, which caused and/or substantially contributed to the development of Mr. Apa's emphysema. Service of process over this Defendant may be had through this Defendant's registered agent, C T Corporation System, 208 So. LaSalle St., Suite 814, Chicago, Illinois 60604 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

8. Defendant, WALGREEN CO. ("Walgreens"), is a corporation authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Illinois with its principal place of business located in the State of Illinois. Defendant distributed and/or sold cigarettes which Mr. Apa purchased, smoked and

3

inhaled which caused and/or substantially contributed to causing the development of his emphysema. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

9. FRANK APA, was diagnosed with COPD/emphysema on or shortly after May 2024, caused by smoking cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants named herein. Sometime thereafter, Plaintiff reasonably became aware that his emphysema was related to his smoking.

10. Plaintiff's action is an action for damages in excess of the sum of FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS.

11. The wrongful conduct herein alleged, occurred, at least in part and/or the damages complained of by Mr. Apa were sustained in the county where the above styled Court sits, or the Defendants herein reside in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

12. Plaintiff resides in the State of Illinois and/or one or more of the Defendants against whom this action is brought resides in the county where the above styled Court sits and thus venue of this action properly lies in the Circuit Court of Cook County pursuant to Illinois law.

13. The Plaintiff would further show that Defendants at all times material to this cause of action, through their agents, alter-egos, officers and representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state; committed a tortious act within the state by allowing Mr. Apa to be exposed to an unreasonably dangerous product, to-wit: cigarette and/or cigarette smoke. Defendants failed

4

to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Mr. Apa, or other persons similarly situated, of the risks, dangers and harm, to-wit: the contracting of the diseases of lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and other diseases and/or injuries to which he was exposed by smoking cigarettes, resulting from the ordinary and foreseeable use of said products, and said tortious conduct is continuing and presently existing; caused injuries and death, which arose out of the acts and/or omissions which occurred inside and outside of the State of Illinois during the relevant period of time, at which time Defendants were engaged in solicitation or service activities within the State of Illinois, resulting in injuries to Mr. Apa. Therefore, jurisdiction properly lies in this Court, as to Plaintiff's action, pursuant to Illinois law.

14. The cigarette products designed, manufactured, advertised, marketed, distributed and/or sold by Defendants herein, when used as intended, were more likely than not to induce in foreseeable users, such as Mr. Apa, a state of addiction, habituation, habit formation and/or dependence characterized by the user's inability to terminate or restrict his/her chronic use.

15. At all times material to this action, the cigarette manufacturers, including but not limited to Philip Morris, R.J. Reynolds, individually and as successor by merger to Lorillard Tobacco Company, individually and as a successor by merger to Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company, as well as British American Tobacco, Liggett Group LLC, Vector Group LTD., Liggett and their predecessors, successors, agents and/or alter-egos (hereinafter referred to as "cigarette manufacturers") knew or should have known the following:

   a. that smoking cigarettes greatly increased the risk of a smoker developing lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory

5

FILED DATE: 2/25/2026 3:22 PM   2026L002215

system, immune system, genetic makeup and other related physical conditions when used as intended;

b.  that the diseases and/or injuries listed above would be more likely experienced if users such as the Smoker did not restrict their intake of Defendants' cigarettes, or if they began to use such products at an early age;

c.  that use of the products as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

d.  that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

e.  that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

f.  that cigarette sellers could develop a reasonably safe dose for foreseeable users;

g.  that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the Smoker;

h.  that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced; and

i.  that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

### *Historical Allegations of the Defendants' Unlawful Conduct Giving Rise to the Lawsuit*

16.  Prior to 1900, lung cancer was virtually unknown as a cause of death in the United States. By 1935, there were an estimated 4,000 lung cancer deaths annually, and by 1945 that figure had almost tripled.

17.  By the 1920s, scientists were beginning to investigate the relationship between the concomitant rise in cigarette consumption and lung cancer, and to focus on the health consequences of smoking.

FILED DATE: 2/25/2026 3:22 PM   2026L002215

18. By the end of the 1940s and early 1950s, far more evidence linking smoking to disease began to appear, ranging from the ground-breaking statistical studies of two eminent British statisticians, Bradford Hill and Sir Richard Doll, to the Graham and Wynder studies at Washington University, to animal research studies pointing to the carcinogenicity of cigarettes.

19. The mainstream media began to pay attention to the growing scientific literature and report on the scientists' findings. For example, in 1953, Reader's Digest, which was at the time one of the most popular publications in the country, published a series of articles titled "Cancer by the Carton" which relayed the scientific findings of Drs. Wynder and Graham. The magazine quoted one of the conclusions they reached in their American Cancer Society study which had been published in the American Medical Association's Journal of May 27, 1950 ("JAMA"), namely that "Excessive and prolonged use of tobacco, especially cigarettes, seems to be an important factor in the induction of bronchiogenic carcinoma." Such mainstream media publicity in popular magazines such as Time, Life, and Reader's Digest triggered understandable public concern.

20. In short, by 1953, there had been a very substantial rise in the annual per capita consumption of cigarettes and the number of deaths attributable to lung cancer; scientists were more and more convinced that a relationship existed between cigarette smoking and lung cancer; and the public was growing increasingly aware of and anxious about both developments.

21. In December 1953, Paul M. Hahn, President of American Tobacco Co., (American), sent telegrams to the presidents of the seven other major tobacco companies and one tobacco growers' organization, inviting them to meet and develop an industry response to counter the negative publicity generated by the studies linking cigarette smoking and lung cancer. The

telegrams were sent to: Edward A. Darr, President of Defendant Reynolds; Benjamin F. Few, President of Defendant Liggett; William J. Halley, President of Lorillard Tobacco Co., (Lorillard); Timothy V. Hartnett, President of Brown & Williamson Tobacco Co., (B&W); O. Parker McComas, President of Defendant Philip Morris; Joseph F. Cullman, Jr., President of Benson & Hedges, J.B. Hutson, President of Tobacco Associates, Inc.; and J. Whitney Peterson, President of United States Tobacco Co.

22. Executives from every tobacco company listed above, except for Liggett, met in New York City at the Plaza Hotel on December 14, 1953. The executives discussed (i) the negative publicity from the recent articles in the media, (ii) responding to the problem by jointly engaging a public relations counsel, and (iii) removing health themes from advertising. They also discussed Liggett's decision not to attend the meeting because "in the course of time the whole thing would blow over." The executives also authorized the five members of the group who had their offices in New York to engage the services of Hill & Knowlton on behalf of the whole committee; to meet with John Hill at the Plaza Hotel the next day, December 15th, to discuss the negative publicity problem; and to request that Hill & Knowlton, if it accepted the assignment, submit recommendations to the full committee at a subsequent meeting as to how to proceed. It is clear from all the surrounding circumstances that representatives of Hill & Knowlton had been contacted about taking on this assignment prior to December 14, 1953.

23. The tobacco company executives did not meet, as they have suggested, in an altruistic response to requests from the scientific community that the industry fund research on smoking and health. Rather, they convened a strategy meeting of the highest company officials to formulate an industry-wide response (a) to the public's growing anxiety generated by the negative publicity about the direction of scientific research on cigarettes and cancer, and (b)

8

FILED DATE: 2/25/2026 3:22 PM    2026L002215

to what they accurately understood to be a major threat to their corporations' economic future. While it is true that there was a recommendation "to do good science, independent science,", the minutes of the meeting reveal that:

> "It was recommended that this [research] group undertake to enlist the cooperation of the National Institutes of Health of the U.S. Public Health Service in working out a program of scientific investigation through which the facts in the present controversy would be developed. This was considered highly advisable in that it would give to the program an aspect of independence to the program to a degree not obtainable in any other way."

24.     At the December 14, 1953, meeting, Paul Hahn of American and Timothy Hartnett of B&W told the other company presidents that they had taken definite steps to remove the health themes from the advertising programs on Pall Mall and Viceroy. Darr [of Reynolds] made the point that he could not concur in sponsoring an industry paid advertising campaign (if this is the course recommended by the Public Relations Counsel) if the health theme continued to be featured by any one of the companies represented on the committee. J. Whitney Peterson of United States Tobacco and Hartnett "expressed their agreement with Mr. Darr's views in this matter." Hill & Knowlton wanted to develop some understanding with the Defendants that

> "none is going to seek a competitive advantage by inferring to its public that its product is less risky than others. (No claims that special filters or toasting, or expert selection of tobacco, or extra length in the butt, or anything else, makes a given brand less likely to cause you-know-what. No "Play-Safe-with-Luckies.)"

25.     At the December 15, 1953, meeting, the participants were Paul Hahn of American, O. Parker McComas of Philip Morris, Joseph Cullman, Jr. of Benson & Hedges, J. Whitney Peterson of United States Tobacco, and representatives from Hill & Knowlton, including John Hill and Bert Goss. Hill & Knowlton was told that the industry viewed the "problem [posed by the scientific studies] as being extremely serious and worthy of drastic action." According to a

9

Hill & Knowlton memo dated December 22, 1953, the public relations firm was asked to develop suggestions for dealing with the public relations problem confronting the industry because of widely publicized assertions by a few medical research men regarding the link between cigarette smoking and lung cancer.

26.     In an internal planning memorandum, Hill & Knowlton assessed their tobacco clients' problems in the following manner:

> "There is only one problem -- confidence, and how to establish it; public assurance, and how to create it -- in a perhaps long interim when scientific doubts must remain. And most important, how to free millions of Americans from the guilty fear that is going to arise deep in their biological depths -- regardless of any pooh-poohing logic -- every time they light a cigarette. No resort to mere logic ever cured panic yet, whether on Madison Avenue, Main Street, or in a psychologist's office. And no mere recitation of arguments pro, or ignoring of arguments con, or careful balancing of the two together, is going to deal with such fear now. That, gentlemen, is the nature of the unexampled challenge to this office."

27.     Ten days later, on December 24, 1953, Hill & Knowlton submitted a proposal regarding the tobacco industry's public relations campaign, recommending that the companies form a joint industry research committee that would sponsor independent scientific research on the health effects of smoking and announce the formation of the research committee nationwide as news and in advertisements. Hill & Knowlton also recommended that the companies fund objective research by scientists who were independent of the tobacco industry, and that an advisory board be established composed of a group of distinguished scientists from the fields of medicine, research and education "whose integrity is beyond question."

28.     In fact, one of the questions posed by Hill & Knowlton to the Defendants was

> "whether the companies considere[d] that their own advertising and competitive practices have been a principal factor in creating a health problem? The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it."

10

29. Four days later, on December 28, 1953, another meeting was held at the Plaza Hotel and was attended by Paul Hahn of American; Edward Darr of Reynolds; Herbert A. Kent, Chairman of Lorillard; Timothy Hartnett of B&W; O. Parker McComas of Philip Morris; Joseph Cullman of Benson & Hedges; J.B. Hutson, President of Tobacco Associates, Inc.; J. Whitney Peterson of United States Tobacco; and three people from the public relations firm of Hill & Knowlton, John Hill, Bert Goss, and Richard Darrow. The attendees agreed on Tobacco Industry Research Committee ("TIRC") as the official name of the research committee; chose Paul Hahn as temporary chairman of the committee; agreed that the search should begin immediately for a qualified director who, together with the companies' research directors, would recommend members for the research advisory board; and reviewed and accepted the Hill & Knowlton proposal regarding the tobacco industry's public relations campaign. The attendees also agreed on a mission statement for the new organization which stated that its "purposes and objectives" were to aid and assist research into tobacco use and health, and particularly into the alleged relationship between the use of tobacco and lung cancer, and to make available to the public factual information on this subject.

30. Hill & Knowlton played a major role in creating, refining, and implementing the strategies adopted by the participants at the December meetings.

31. Following Hill & Knowlton's advice, the formation and purpose of TIRC was announced on January 4, 1954, in a full-page advertisement called "A Frank Statement to Cigarette Smokers" published in 448 newspapers throughout the United States. All sponsoring cigarette manufacturers and other tobacco industry entities were clearly identified.

32. The Frank Statement was subscribed to by the following domestic cigarette and tobacco product manufacturers, organizations of leaf tobacco growers, and tobacco warehouse

11

associations that made up TIRC: American by Paul Hahn, President; B&W by Timothy Hartnett, President; Lorillard by Herbert Kent, Chairman; Defendant, Philip Morris by O. Parker McComas, President; Defendant, Reynolds by Edward A. Darr, President; Benson & Hedges by Joseph Cullman, Jr., President; Bright Belt Warehouse Association by F.S. Royster, President; Burley Auction Warehouse Association by Albert Clay, President; Burley Tobacco Growers Cooperative Association by John Jones, President; Larus & Brother Company, Inc. by W.T. Reed, Jr., President; Maryland Tobacco Growers Association by Samuel Linton, General Manager; Stephano Brothers, Inc. by C.S. Stephano, Director of Research; Tobacco Associates, Inc. by J.B. Hutson, President; and United States Tobacco by J. Whitney Peterson, President.

33. The Frank Statement set forth the industry's "open question" position that it would maintain for more than forty years -- that cigarette smoking was not a proven cause of lung cancer; that cigarettes were not injurious to health; and that more research on smoking and health issues was needed. In the Frank Statement, the participating companies accepted "an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health." The companies promised that they would fulfill the obligations they had undertaken in the Frank Statement by funding independent research through TIRC, free from any industry influence.

The "Frank Statement" in its entirety stated as follows:

"RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings. Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed. At the same time, we feel it is in the public interest

12

to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.

Distinguished authorities point out: 1. That medical research of recent years indicates many possible causes of lung cancer. 2. That there is no agreement among the authorities regarding what the cause is. 3. That there is no proof that cigarette smoking is one of the causes. 4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during these years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of disease is a matter of deep concern to us.

Many people have asked us what are we going to do to meet the public's concern aroused by the recent reports. Here is the answer:1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. 2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE ["TIRC"]. 3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men [sic] from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

34.     The issuance of the "Frank Statement to Cigarette Smokers," was an effective public relations step. By promising the public that the industry was absolutely committed to its good health, the Frank Statement allayed the public's concerns about smoking and health, reassured smokers, and provided them with an effective rationale for continuing to smoke.

35.    The Frank Statement was but the first of hundreds, if not thousands, of statements reassuring the public of the safety of cigarette smoking. The industry would push the "open question" as far as the late 1990s.

36.    Shortly after the Frank Statement was published, Philip Morris, through a publicized speech, told the public that the industry would "stop business tomorrow" if it thought its products was harming smokers.

37.    TIRC focused its energies and resources in two areas -- public relations and scientific research. First, it served as a sophisticated public relations unit for Defendants, especially in relation to growing public concern about the risks of smoking, by repeatedly attacking scientific studies that demonstrated the harms of cigarette smoke and insisting on the notion of an "open question" regarding cigarette smoking and health. Second, it developed a scientific research program that focused on basic processes of disease rather than evaluating the risks and harms associated with smoking -- the very subject that the industry had pledged to pursue through TIRC. From the outset, the dual functions of TIRC were intertwined, with the scientific program of TIRC always subservient to the goals of public relations.

38.    In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish many advertisements, including one entitled "Some frank words about Smoking and Research," which stated in part:

> "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come about only through persistent scientific research."

> "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public"

14

"In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study."

"We know we have a special responsibility to help scientists determine the facts about tobacco use and health.:

"The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

39. Defendants' denials of the link between smoking and disease kept away many excellent researchers. In an October 1969 memorandum to Ross R. Millhiser of Philip Morris, Helmut Wakeham, Vice President and Director of Research for Philip Morris, expressed concern that the efforts of the tobacco industry through CTR[1] and the American Medical Association have failed to involve the best investigators. "At the beginning of our support of smoking and health research, this failure may have been connected with our consistent denial of the statistics and our continued assertion that there is nothing to the cigarette causation hypothesis."

40. A year later, Wakeham again discussed CTR's strategy of frequent and public denials, in a December 1970 memorandum to Joseph Cullman, Chairman of Philip Morris and Chairman of the Executive Committee of the Tobacco Institute: "It has been stated that CTR is a program to find out the 'truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes cancer."

---

[1] In January of 1964, the TIRC Executive Committee agreed to change the name of the organization to the Council for Tobacco Research-U.S.A. (CTR).

15

41.     Virtually none of the research funded by TIRC/CTR centered on immediate questions relating to carcinogenesis and tobacco that could resolve the question of the harms brought about by cigarette smoking. Although some TIRC/CTR-funded researchers explored alternative hypotheses, TIRC/CTR did not typically pursue direct research on cigarettes and disease. Rather than addressing the constituents in tobacco smoke and their demonstrated effect on the human body, TIRC/CTR directed most of its resources to alternative theories of the origins of cancer centering on genetic factors and environmental risks. The major thrust of TIRC/CTR was to emphasize that human cancers were complex processes, difficult to study and difficult to understand, and to focus on the "need for more research." Although research funded by the Scientific Advisory Board (SAB) was irrelevant to the immediate questions associated with tobacco smoking and health, it did "create the appearance of [Defendants] devoting substantial resources to the problem without the risk of funding further 'contrary evidence.'"

42.     During a four-week visit to the United States in 1958, the three British scientists who met with representatives of TIRC and TIRC's SAB, as well as representatives of American, Liggett, and Philip Morris, reported that "Liggett & Meyers stayed out of TIRC originally because they doubted the sincerity of TIRC's motives and believed that the organization was too unwieldy to work efficiently. They remain convinced that their misgivings were justified. In their opinion TIRC has done little if anything constructive, the constantly reiterated 'not proven' statements in the face of mounting contrary evidence has thoroughly discredited TIRC, and the SAB of TIRC is supporting almost without exception projects which are not related directly to smoking and lung cancer."

43.     The Defendants knew that the TIRC/CTR was funding research concerning cancer as a general issue, rather than the relationship of smoking to cancer.

16

44. In January 1968, Addison Yeaman, B&W Vice President and General Counsel, wrote: "Review of SAB's current grants indicates that a very sizable number of them are for projects in what might be called 'basic research' without specific orientation to the problem of the relationship of the use of tobacco to human health."

45. In addition, Defendants appreciated the delays associated with the basic research approach. Janet Brown, outside counsel for American, explained CTR's strategy of undertaking only basic research funding, as opposed to funding questions directly related to tobacco and health to Cy Hetsko, Vice President and General Counsel for American, and Addison Yeaman, Vice President and General Counsel for B&W, at a January 1968 meeting. The rationale was that basic research kept alive the Defendants' open question argument on causation. Yeaman summarized Brown's position as: "First, we maintain the position that the existing evidence of a relationship between the use of tobacco and health is inadequate to justify research more closely related to tobacco, and Secondly, that the study of the disease keeps constantly alive the argument that, until basic knowledge of the disease itself is further advanced, it is scientifically inappropriate to devote the major effort to tobacco."

46. Following a 1964 Surgeon General's report which discussed the connection between smoking and lung cancer, the industry publicly called for "more research" for the purpose of suggesting that the health question about cigarette smoking was not yet clear, despite the industry's own internal decision not to conduct research directly related to tobacco and health.

47. In 1966 the Tobacco Institute issued a press release where it stated on behalf of the industry:

> "Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. The tobacco industry is supporting much of this research and will continue to do so."

17

48. Defendants continued throughout the 1970s, 1980s, and 1990s to encourage the impression that there was a genuine and continuing controversy regarding the health hazards of smoking.

49. The tobacco industry frequently attacked the Surgeon General. For example, the industry preempted the Surgeon General's 1979 report on national news networks, stating the report was "suspect from the start". The industry later attacked the Surgeon General following the 1988 report on the addictive nature of cigarettes with a press release titled, "CLAIMS THAT CIGARETTES ARE ADDICTIVE CONTRADICT COMMON SENSE".

50. Later in 1994, after the industry executives testified before congress that cigarettes were not addictive and had not been proven to cause cancer, Philip Morris continued to adhere to the controversy by stating "Both smokers and non-smokers deserve to know the facts, not innuendo, about cigarettes.

> Yesterday, Philip Morris and other U.S. tobacco manufacturers helped to set the record straight by speaking before a Congressional committee…
> Fact: Philip Morris does not add nicotine to its cigarettes…
> Fact: Philip Morris does not "manipulate" nicotine levels…
> Fact: Philip Morris does not believe cigarette smoking is addictive…
> Fact: None of the ingredients added in the manufacture of cigarettes is harmful as used…

51. From 1953 through 2009 and continuing through today, Defendants made false or misleading statements including but not limited to the following:

- denying that smoking "is" addictive;

- that smoking is not injurious to health;

- that it is unknown if smoking causes serious diseases;

- that scientific and medical community has not reached a consensus about the harms of smoking;

- that no one knows what causes cancer;

18

FILED DATE: 2/25/2026 3:22 PM   2026L002215

- that the tobacco industry made an honest effort to study the harms of smoking and a causal relationship had not need proven; and

- that filter, low tar and low nicotine, lights and ultra-light are safe, safer and/or directly and/or indirectly made statements about their safety and efficacy.

52. Throughout the same period, Defendants publicly attacked the validity of research suggesting any harmful effects from smoking.

53. The purpose of this campaign was to create an impression in the public's mind—including smokers like Mr. Apa—that the health issue remained undecided and smoking was not addictive or injurious to health.

### COUNT I: NEGLIGENCE (Manufacturers)

This count applies only to R.J. REYNOLDS and PHILIP MORRIS.

54. The allegations contained in paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

55. Mr. Apa smoked Viceroy and Marlboro brand cigarette products that were designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants, which Mr. Apa used and smoked in his daily life.

56. Mr. Apa was exposed to Defendants' products as a smoker and/or bystander. Each exposure to such cigarette products of Defendant caused Mr. Apa to inhale smoke from said products which caused Mr. Apa to develop emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries. Each exposure to such products was harmful and caused or contributed substantially to Mr. Apa's injuries. Mr. Apa's injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendants of their cigarette products.

19

57. Mr. Apa was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants.

58. The damages of Mr. Apa are the direct and proximate cause of the negligence of the Defendants, in that they produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendants knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to Mr. Apa's health and well-being. The Defendants, prior to selling and/or distributing their cigarette products, to which Mr. Apa was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. The Defendants also knew that Mr. Apa and others similarly situated would use and be exposed to their cigarette products in such a way as to cause Mr. Apa to inhale the smoke from said products.

59. Defendants' cigarette products, including Viceroy and Marlboro cigarettes, contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Mr. Apa was exposed to them in that said products contained tar, nicotine and other harmful substances which the Defendants knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death, to those, such as Mr. Apa who used and/or was exposed to them.

60. Defendants knew that their cigarette products would be used by and around Mr. Apa without inspection for defects and that any such inspection would not have advised Mr. Apa of the fact that the Defendants' cigarette products could cause the injuries which he suffered. Such

20

facts made Defendants' cigarette products inherently and unreasonably dangerous in that Mr. Apa was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendants' cigarette products which he used or was exposed to.

61.     Mr. Apa alleges that there were methods of design and manufacture available and/or known to the Defendants and unknown to him which could have been used by the Defendants in the design and manufacture of its cigarette products to which Mr. Apa was exposed to make such products less dangerous. Defendants were in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Mr. Apa and others similarly situated would encounter its cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of fatal and life threatening injuries including, but not limited to, head and neck cancer. Defendants were negligent in all the following respects, same being the proximate cause of Mr. Apa's injuries, disabilities and ultimate death which acts of negligence have continued to the present time:

    a.  in designing and developing cigarette products that were more mild, had better taste and contained nicotine so that foreseeable users, such as Mr. Apa, would find smoking Defendants' products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

    b.  in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products the Defendants designed, manufactured, advertised, marketed, distributed and/or sold;

    c.  in continuing to manufacture, distribute and sell cigarette products when the Defendants knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Mr. Apa, when used as intended;

21

FILED DATE: 2/25/2026 3:22 PM   2026L002215

d.  in concealing information while affirmatively misrepresenting to Mr. Apa and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Mr. Apa to unknowingly use and/or continue to use Defendant's cigarette products himself and expose himself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

e.  in failing to test and/or adequately test Defendants' cigarette products before offering them for sale and use by Mr. Apa, and other persons similarly situated;

f.  in failing to remove and recall all said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

g.  in manipulating, failing to reduce and/or eliminating nicotine from the Defendants' cigarette products to prevent Mr. Apa, who was addicted to the nicotine in Defendants' cigarette products, from quitting and/or reducing consumption;

h.  in including nicotine, or artificially high levels of nicotine, in Defendants' cigarette products to prevent Mr. Apa and other persons similarly situated from quitting and/or reducing consumption;

i.  in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

j.  by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous; and/or

k.  by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

62.  The Defendants' cigarette products to which Mr. Apa was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendants.

22

63. The Defendants' cigarette products failed to perform as safely as Mr. Apa expected it would in that they caused him to develop head and neck cancer because of his inhalation of cigarette smoke from Defendants' cigarette products.

64. Each of the Defendants' cigarette products suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars and other substances which Defendants knew or should have known was extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

65. As a direct and proximate result of Defendants' negligent acts and/or omissions, Plaintiff, Frank Apa, developed injuries, including but not limited to emphysema , in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA, prays for judgment against the Defendants R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

## COUNT II: STRICT LIABILITY (Manufacturers)

This count applies only to Defendants R.J. REYNOLDS  and PHILIP MORRIS.

66. The allegations contained in paragraphs 1 through 53 are reincorporated and are realleged as if fully set forth herein.

67. Defendants were and have been designers, manufacturers, advertisers, distributors and/or sellers of cigarette products, including but not limited to Viceroy and Marlboro cigarettes.

23

68. The products complained of were cigarette products designed, manufactured, advertised, distributed and/or sold by Defendants and used by and/or in the vicinity of the Mr. Apa.

69. The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by the Defendants.

70. Mr. Apa was exposed to Defendants' cigarette products over many years during which time smoke from Defendants' cigarette products were inhaled by Mr. Apa which caused him to develop head and neck cancer and/or other injuries and death.

71. At the time Defendants designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to, and did, reach Mr. Apa in a condition without substantial change from that in which such products were when within the possession of Defendants.

72. The Defendants' cigarette products were in a condition unreasonably dangerous to users and/or bystanders, such as Mr. Apa and said products were expected to, and did, reach Mr. Apa without substantial change affecting that condition.

73. The Defendants' cigarette products were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Mr. Apa, and said products were expected to, and did, reach Mr. Apa without substantial change affecting that condition.

74. The Defendants' cigarette products were unreasonably dangerous because of their design in that the risk of danger to users and/or bystanders, such as Mr. Apa, outweighed the benefits.

75. The Defendants' cigarette products were dangerous beyond the expectation of the ordinary user/consumer/bystander when used as intended or in a manner reasonably foreseeable by Defendants.

24

76. The Defendants' cigarette products were unreasonably dangerous because a less dangerous design and/or modification was economically and scientifically feasible.

77. Defendants' cigarette products were in a defective condition, unreasonably dangerous, in that those products:

   a. by design contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful to Mr. Apa;

   b. contained tar, nicotine, carcinogens, toxic gasses, and other substances deleterious, poisonous, and highly harmful when and after it became feasible to design and manufacture reasonably comparable products not containing those substances or containing less of them;

   c. failed to filter the harmful substances so that during ordinary use, such materials would not be liberated into the air and/or breathed by the smoker such as Mr. Apa;

   d. through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all;

   e. utilized tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

   f. the nature and degree of the danger of Defendants' cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

   g. by designing and manufacturing their cigarettes to be inhalable and thus unreasonably dangerous; and/or

   h. by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

25

78. Mr. Apa, unaware of the defective and unreasonably dangerous condition of the Defendants' cigarette products, and at a time when such products were being used for the purposes for which they were intended, was exposed to and breathed smoke from Defendants' cigarette products.

79. Defendants knew that their cigarette products would be used without inspection for defects, and by placing them on the market, represented that they would be safe.

80. Mr. Apa was unaware of the hazards and defects in the cigarette products of the Defendants, to-wit: That exposure to said products would cause Mr. Apa to develop cigarette related disease(s) which made said products unsafe for use.

81. Mr. Apa was caused to contract emphysema , in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

82. As a direct and proximate result of the strict liability of the Defendants, Plaintiff, Frank Apa, developed injuries, including but not limited to emphysema , in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA, prays for judgment against Defendant R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

### COUNT III: FRAUDULENT CONCEALMENT (Manufacturer)

This count applies only to R.J. REYNOLDS and PHILIP MORRIS.

83. The allegations contained in paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

26

FILED DATE: 2/25/2026 3:22 PM   2026L002215

84.   Defendants and other cigarette manufacturers had a duty to disclose material information regarding cigarettes' health hazards because they were in a superior position to consumers, including Mr. Apa. This superior position was established due to the following:

   a.   As the designers, developers and manufacturers of their cigarette products, Defendants and other cigarette makers solely possessed knowledge of the ingredients in their products, which they kept strictly confidential from the public;

   b.   As the designers, developers and manufacturers of their cigarette products, Defendants and other cigarette makers were solely aware of additives to their cigarette products and the amounts of such additives, which they kept strictly confidential from the public;

   c.   As the designers, developers and manufacturers of their cigarette products, Defendants and other cigarette makers were solely aware of the effects that additives to their cigarette products had on consumers, which they kept strictly confidential from the public;

   d.   Defendants and other cigarette makers undertook research regarding the addictive nature of their cigarettes and knew that nicotine was highly addictive. Moreover, they knew that their cigarettes are highly addictive due to the amount of nicotine they chose to maintain in each cigarette;

   e.   Defendants and other cigarette makers advertised and sold filtered, low-tar, and mild cigarettes products, which touted or implied health benefits. However, Defendants knew that these purported benefits were illusory, and that the public—even the US government and physicians—were being misled by their false promises;

   f.   Defendants and other cigarette makers undertook internal research regarding the health effects of their cigarettes and knew that cigarette use caused COPD, cancer and other diseases. More importantly, they knew that consumers, including Mr. Apa, were not aware of this scientific determination, and that the public's ignorance was the driving force behind their cigarette sales and growing revenue;

   g.   The dangers of smoking are not open and obvious to consumers, especially young consumers, because the harm could occur and accumulate imperceptibly for decades before resulting in COPD and cancer;

   h.   The significant increase in cancer caused by cigarettes is detectable only in aggregate over decades of statistical studies, which the tobacco industry persistently discredited and publicly disputed over client's lifetime;

   i.   The tobacco industry had superior knowledge not only to consumers but even to the FDA in that it knew the FDA's methodology of measuring tar from filtered cigarettes did not accurately measure tar-intake in actual consumer use; and

27

FILED DATE: 2/25/2026 3:22 PM   2026L002215

j.   The addictiveness of nicotine at the level that Defendants put into each cigarette was known to the tobacco manufacturers, and specifically designated by the manufacturers to maintain sales, but was impossible for consumers to detect.

85.   Defendants and other cigarette makers also assumed a duty to disclose material information to their consumers, including Mr. Apa. Their assumption of duty began with the Frank Statement but continued and was reaffirmed repeatedly throughout Mr. Apa's lifetime, as exhibited by the following conduct:

a.   As part of the Frank Statement published in over 400 newspapers across the United States, the tobacco industry stated, "we believe the products we make are not injurious to health." The companies "accept[ed] an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health" thereby assuming a duty to disclose to the public of any hazards discovered that might affect smokers' health.

b.   In addition to the Frank Statement above, the Defendants individually or through the acts of their agents, employees and representatives, further assumed or acknowledged their duty to disclose, and not fraudulently conceal, the harms and addictive nature of smoking cigarettes through various statements to the public or through internal correspondence, including but not limited to the following:

   i.   Shortly after the Frank Statement was published, George Weissman, a Philip Morris Vice President, through a publicized speech in 1954, told the public that "if we had any thought or knowledge that in any way we were selling a product harmful to consumers, we would stop business tomorrow."

   ii.   Robert N. Dupuis, Chairman of the Industry Technical Group of the Tobacco Industry Research Committee, stated in 1955 on See It Now on CBS, regarding harmful components in smoke: "As we find these components we publish the results of our work in technical journals which are available to any scientist in any part of the world. So far we've found none that give us any cause for concern. *If we do find any that we consider harmful, and so far we have not, we will remove these from smoke and still retain the pleasure of your favorite cigarette.*" [Emphasis added].

   iii.   On June 7, 1955, Timothy Hartnett, Chairman of the Tobacco Industry Research Committee, repeated that the industry had "accepted an interest in people's health as a basic responsibility paramount to every other consideration in our business. And that's where we stand today."

28

iv. Lorillard's 1953 annual report told its shareholders: "[w]e believe Lorillard products are not injurious to anyone's health, but that we accept as an inherent responsibility of our corporate citizenship the obligation to make the public's health our business."

v. In 1971, Joseph Cullman III, the Chairman and Chief Executive Officer of Philip Morris, appeared on Face the Nation on CBS and stated, "when as and if any ingredient in cigarette smoke is identified as being injurious to human health we are confident that we can eliminate that ingredient."

vi. Internally, the industry recognized it assumed a duty to inform the public of hazards associated with cigarettes. On April 4, 1978, Ernest Pepples, General Counsel for B&W, sent a letter to J.E. Edens at B&W Industries describing the purpose of the CTR and its statements to the public: "Originally, the CTR was organized as a public relations effort. The industry told the world CTR would look at the diseases which were being associated with smoking. *There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. The manufacturer has a duty to know its product…*" [Emphasis added].

vii. Horace Kornegay, President and Executive Director of the Tobacco Institute, stated on the NBC Today Show on January 10, 1979, stated "if we know what the criminal element is…then every effort will be made to remove it from the product."

viii. RJ Reynolds president Gerald H. Long, in a May 19, 1986, interview for Insight Magazine asserted that if he ever "saw or thought there were any evidence whatsoever that conclusively proved that, in some way, tobacco was harmful to people, and I believed it in my heart and my soul, then I would get out of the business."

c. In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish many advertisements, including one entitled "Some frank words about Smoking and Research," which stated in part:

i. "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come about only through persistent scientific research."

ii. "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public"

29

FILED DATE: 2/25/2026 3:22 PM   2026L002215

iii. "In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study."

iv. "We know we have a special responsibility to help scientists determine the facts about tobacco use and health."

v. "The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

d. In 1966 the Tobacco Institute issued a press release where it stated on behalf of the industry: "Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. The tobacco industry is supporting much of this research and will continue to do so."

e. The TIRC was formed in 1954 by cigarette manufacturers, including the Defendants in this case, with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking. However, despite these promises, the TIRC and later CTR concealed information regarding the lack of bona fide research being done on the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease.

f. The tobacco industry and its organizations invested an enormous amount of time, effort and money to curate a decades-long promise, which instilled a false belief in the public that Defendants and their fellow cigarette makers proactively sought the truth regarding smoking's health hazards and would discontinue a product that they knew to be cancer-causing. This false belief was passed down, overtly or implicitly, from adults to children through generations of American consumers, including Mr. Apa.

86. The Defendants also had a duty to disclose by making half-truths about the harms of smoking while also actively concealing their knowledge as to the actual harms. In making the aforementioned half-truths, suppressing the totality of material facts and passing them

30

FILED DATE: 2/25/2026 3:22 PM   2026L002215

off as the entirety of the truth regarding what it knew about the health consequences of smoking and the addictive nature of cigarettes, Defendants also created in itself a duty to disclose all material information in its possession.

87. Due to the Defendants' superior position, assumption of duty to disclose material information by express statements, and assumption of duty by affirmative misrepresentations, active concealment and half-truths, Mr. Apa placed his trust and confidence in Defendants to disclose all of the harmful effects of their cigarettes. Mr. Apa and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendants herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after the industry chose to voluntarily speak regarding their cigarette products, efforts to support research into the harms and addictive nature of smoking, ensuring the public they would disclose and remove any harmful elements of tobacco smoke they discovered, and even remove cigarettes from the market or stop business if they found them harmful to human health. Mr. Apa also reasonably and justifiably relied on Defendants to disclose information including but not limited to the fact that smoking causes small cell lung cancer and COPD, that the nicotine level designed into each of Defendants' cigarettes would cause strong addiction, and that filter, low-tar and mild cigarette designs do not actually reduce the risk of smoking.

88. However, rather than disclosing the truth, Defendants, other cigarette makers, TIRC and TI collectively undertook a misinformation campaign to fraudulently induce the public and Mr. Apa to believe that they were in favor of protecting consumers' health, and that the issues of nicotine addictiveness and the carcinogenic nature of tobacco were unproven by scientific research.

31

89.     Beginning at an exact time unknown to Mr. Apa and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Mr. Apa, physicians, the government and others as to the true dangers of smoking cigarettes. Defendants and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning:

   a. the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendants' cigarettes did in fact contain carcinogenic materials;

   b. their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;

   c. the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

   d. the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

   e. the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

   f. the risks of contracting cancer, including but not limited to lung cancer, laryngeal cancer esophageal cancer, other head and neck cancers, tongue/oral cavity cancer, bladder cancer and other forms of cancer, from smoking cigarettes;

   g. the dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

   h. that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease;

   i. that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

   j. the use of ammonia technology and/or certain tobacco blends to boost the ph of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is

32

FILED DATE: 2/25/2026 3:22 PM  2026L002215

less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k.  the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l.  the lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m.  that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n.  that cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

o.  that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of Defendants' cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p.  that smoke from Defendants' cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments including but not limited to lung cancer, bronchitis and pneumonia;

q.  that the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters and/or tumor initiators including but not limited to those such as PAHs and nitrosamines found within cigarette smoke.

r.  that switching to filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

33

s. by continuing even today to fraudulently market and sell multiple brands as "filtered" causing smokers to wrongly believe that filtered cigarettes reduce the harms of smoking based on the implication of filtration of smoke and therefore relative safety compared to unfiltered cigarettes  However, Defendants and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes; and/or

t. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

90. The cigarette manufacturers, including Defendants herein, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by the Defendants and have withheld and/or failed to release over the last almost 65 years both because he does not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

91. The cigarette manufacturers, including Defendants herein, carried out their campaign of concealment by concealing and suppressing facts, information and knowledge about the health dangers of smoking, including addiction. They concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of

34

the nicotine content of their products to create and perpetuate smokers' addiction to cigarettes. The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

92.     In 1953 Dr. Ernst Wydner had published an article titled Experimental Production of Carcinoma with Cigarette Tar in the journal Cancer Research. In his experiments he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954 LIGGETT & MEYERS, assuming that whatever cigarettes were used in Dr. Wydner's study were not CHESTERFIELD or L & M, decided to repeat Dr. Wydner's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for LIGGETT & MEYERS, Mr. Darkis writes:

> "If Chesterfield turn out to be negative, and X (used by Wydner) as positive,
> it would then be possible to say, that by using Dr. Wydner's techniques,
> Chesterfield did not produce cancer in mice."

Of course, when the experiments were finished in 1955 the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

93.     A confidential "limited" LIGGETT & MEYERS document dated March 15, 1961 states, in part: (L&M - A Perspective Review)

    a.   There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...

    b.   What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what good is this? We've known this for several years - so what?

35

This document was written by an industry consultant for LIGGETT & MEYERS. This industry consultant conducted animal research from 1954-1984 for LIGGETT & MEYERS. This memo contained material facts known to and concealed by the Defendant since at least 1961 and unknown to Mr. Apa.

94. In 1964, TIRC changed its name to CTR, and was joined by Defendant, Liggett. Defendants, R.J. Reynolds, and Philip Morris were founding members of the TIRC/CTR. The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

95. Despite their "promise" which purposely created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

96. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was withheld from Mr. Apa and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison

36

Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

"The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

97. In a July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

"The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation.""

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed, industry insiders knew it was nothing more than a "public relations" sham.

98. In that same July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

"Moreover, nicotine is addictive. We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:

1)They cause, or predispose to, lung cancer.

2)They contribute to certain cardiovascular disorders.

3)They may well be truly causative in emphysema, etc, etc."

The 1964 Surgeon's General Report was not issued for another 6 months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive, but the cigarette

37

FILED DATE: 2/25/2026 3:22 PM    2026L002215

industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite what the industry told the public the industry clearly understood that nicotine was addictive, and cigarettes were a cause of lung cancer and other diseases.

99. The cigarette manufacturers, including Defendants herein, knew for decades that the "tar and nicotine levels", as measured by the so-called Cambridge Filter Method or FTC method, were inaccurate – and seriously underestimated the levels of poisons delivered into the lungs. Yet they continued to tout the tar and nicotine numbers on cigarette packs and marketing materials, inducing smokers to believe lower tar and lower nicotine cigarettes were safer, until 2008 when the Federal Trade Commission ultimately rescinded its guidance concerning tar and nicotine yields.

100. The cigarette manufacturers, including Defendants herein, continue even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking and despite knowing internally that such cigarettes are just as addictive, dangerous, and deadly as non-filtered cigarettes.

101. The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Mr. Apa to smoke, fail to quit or reduce consumption for the Defendant's own pecuniary gain.

102. Mr. Apa and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendant herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after

38

the industry chose to repeatedly and publicly deny the harms of smoking, the addictive nature of cigarettes/nicotine and the carcinogenic effects of tobacco.

103.    The aforementioned information and/or knowledge concealed and/or suppressed by the cigarette manufacturers, including Defendants herein, and their co-conspirators was concealed for the purposes of inducing Mr. Apa to smoke, fail to quit or reduce consumption. Mr. Apa was unaware of the extent of danger of the Defendants' cigarette products, the addictive nature of the Defendants' cigarette products, and that low tar, low nicotine and/or filtered cigarettes were just as dangerous as unfiltered cigarettes. The knowledge and information concealed by the cigarette manufacturers, including the Defendants named herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Mr. Apa.

104.    Indeed, Mr. Apa was not aware of any dangers of smoking cigarettes when he first began to smoke in the early 1960s or prior thereto.  Had the Defendants not for many years concealed and/or suppressed its knowledge of the dangers of its cigarette products (or spread false information designed to cause confusion) from Mr. Apa and the public, including that the products caused cancer and other serious health issues, Mr. Apa would not have started smoking, and his risk of injury from cigarettes, including emphysema , would have been eliminated.

105.    Mr. Apa was also not aware that cigarettes were as addictive as they are.  Had the Defendants not concealed and/or suppressed its knowledge of the addictiveness of its cigarette products from Mr. Apa and the public, Mr. Apa would not have started smoking or would have stopped smoking at an earlier age or significantly reduced his cigarette intake, and his risk of injury from cigarettes, including emphysema, would have been reduced or eliminated.

39

106. Had the Defendants not concealed and/or suppressed their knowledge of the dangers of its cigarette products from Mr. Apa and the public, including the dangers of light cigarettes, Mr. Apa would have stopped smoking entirely or significantly reduced his cigarette intake, and his risk of injury from cigarettes, including COPD, would have been reduced or eliminated.

107. The knowledge and information concealed by the cigarette manufacturers, including the Defendants named herein, was concealed by entities which had superior knowledge regarding the health aspects of cigarettes than Mr. Apa.

108. Mr. Apa did not have access to the Defendants' research, information and/or knowledge about the true dangers of the cigarette products that was concealed, hidden and/or suppressed by Defendants and their co-conspirators, did not have the resources or ability to perform such research or otherwise learn this information, and could not have discovered through reasonable diligence the information about the true dangers of cigarettes that was known and concealed and/or suppressed by Defendants.

109. As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including Defendants herein and its co-conspirators, Frank Apa, smoked and/or continued to smoke and was otherwise exposed to Defendants' cigarette products which caused him to develop injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendant R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

40

## COUNT IV: CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT
### (Manufacturers)

This count applies to Defendants R.J. Reynolds, Philip Morris, and Liggett.

110. The allegations in paragraphs 1-53 and 83 through 108 are reincorporated and realleged as if fully contained herein.

111. The Defendants, along other tobacco manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by the Defendants unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

112. The Defendants R.J. Reynolds, Phillip Morris, and later Liggett, along with other entities including the TIRC/CTR, TI and persons including their in-house lawyers and outside retained counsel entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

113. The Defendants, through their employees, agents and representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

114. During its four decade history, the TIRC/CTR never acknowledged that smoking had been proven to be a cause of multiple cancer types or other serious diseases in smokers, the addictive nature of nicotine, and the fact that light cigarettes are no safer than regular cigarettes, even though the vast majority of CTR funded scientists themselves believed that

41

FILED DATE: 2/25/2026 3:22 PM   2026L002215

cigarette smoking was responsible for a wide range of serious, and often fatal, injuries including multiple cancers, understood the addictive nature of nicotine and also knew that light cigarettes were no safer than regular cigarettes.

115.   After the year 2000, the Defendants continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking including but not limited to the following acts:

    a.   Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

    b.   Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

    c.   Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

    d.   Continuing to market and/or advertise lights, ultra-lights, and low tar cigarettes under color brand name descriptors such as "Gold" and "Silver" and informing smokers "pack will be changing, but your cigarette will stay the same" following the federal ban on the use of "lights," "mild" and "low" tar descriptors in 2010.

    e.   Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

116.   The Defendants as it relates to their acts in furtherance of their conspiracy as alleged in this complaint continues through the present.

117.   The concealed and omitted information described in the aforementioned and preceding paragraphs was material information.

118.   Mr. Apa relied both directly and indirectly to his detriment upon the Defendants' concealment and omission of such material information.  Mr. Apa, during the course of his smoking history, heard some or all these false and misleading statements and/or similar statements made directly or indirectly by the Defendants, believed some or all of the Defendants' and their co-conspirators' false and misleading statements, and relied to his

42

detriment by smoking and continuing to smoke based on such false and misleading statements.

119. Had Defendants and their co-conspirators not concealed and omitted the aforementioned information from Mr. Apa and the public, Mr. Apa would have not started smoking and/or reduced the number of cigarettes and/or stopped smoking at an earlier age, and his risk of injury from cigarettes would have been reduced or eliminated.

120. Each Defendant's acts and omissions, and those of TIRC/CTR, TI and other tobacco manufacturers, as well as their in-house and retained counsel, and all of them, constitute a successful conspiracy to commit fraud.

121. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as members of a civil conspiracy are liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

122. As a direct and proximate result of the fraudulent concealment of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendants and their co-conspirators, Frank Apa, smoked and continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused injuries,

43

FILED DATE: 2/25/2026 3:22 PM 2026L002215

including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendants R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP, LLC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

### COUNT V: FRAUDULENT MISREPRESENTATION (Manufacturer)

This count applies to only the following Defendant R.J. Reynolds and Philip Morris.

123. The allegations contained in paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

124. Beginning at an exact time unknown to Mr. Apa, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a campaign designed to deceive the public, Mr. Apa, the government and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements and/or misrepresentations of material facts in interviews, testimony and print, radio and television advertising.

125. The cigarette manufacturers, including Defendants herein, made literally hundreds of misrepresentations to Mr. Apa and others similarly situated over the course of the last 50 years. Mr. Apa is unable to allege in full the thousands of pre-1969 advertisements, and the continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and their co-conspirators, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, the TOBACCO INSTITUTE, INC. ("TI") formed in 1958, and COUNCIL

44

for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because he does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

126. The cigarette manufacturers, including Defendants herein, carried out their campaign of fraud, false statements and/or misrepresentations in at least five ways:

a. they agreed falsely to represent to Mr. Apa and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

b. they misrepresented and confused the facts about the health dangers of smoking, including addiction. The cigarette manufacturers claimed, falsely, that there is insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

c. the cigarette manufacturers, including Defendants herein, used lawyers to misdirect what purported to be objective scientific research, yet maintained to Mr. Apa and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

d. to discourage meritorious litigation by Mr. Apa injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence to protect the cigarette manufacturers, including Defendants herein, existence and profits.

e. by designing, selling and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers. Defendants knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker. Notwithstanding same, the Defendants marketed its "Light" cigarettes to consumers as a safer alternative. Defendants manipulated the design of cigarettes to produce test results that were artificially low. Furthermore, Defendants knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes.

45

f. by continuing to fraudulently market and sell "mild", "low tar", and "light" cigarettes through 2010 despite knowing they were no safer than full flavor cigarettes and knowing consumers perceived them as safer. The cigarette manufacturers, including Defendant herein, were ultimately prohibited by Congress from marketing "mild", "low tar", and "light" cigarettes when Congress passed the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (June 22, 2009), which became effective on June 22, 2010. Despite the congressional ban, the cigarette manufacturers, including Defendant herein, have continued to market and sell even today the same "mild", "low tar", and "light" cigarettes, only now these cigarettes are marketed with a new coloring scheme instead of the banned light descriptors. These cigarettes are the same or substantially the same cigarettes as the pre-prohibition cigarettes. Consumers often perceive the color descriptors on packaging as suggesting less harmful to smoke than regular or full flavor brands. The cigarette manufacturers, including Defendant herein, is thus able to continue fraudulently misrepresenting the "light", "low tar" and "mild" cigarette marketing the ban was designed to prevent.

g. by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking. The word "filter" implies filtration of the smoke and therefore relative safety. However, Defendants and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes.

127. Cigarette manufacturers, including the Defendants knew that cigarettes were dangerous and addictive. It became the practice, purpose and goal of the cigarette manufacturers to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals and through testimony before governmental bodies.

128. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general

46

counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

129. Despite Defendants' and the industry's promises "to help scientists determine the facts about tobacco use and health" and claiming to support research concerning tobacco and health, Defendants and the industry did not conduct the research they represented that they would conduct.

130. Instead of conducting the research it promised to do, Defendants focused its efforts on attacking health-related research that showed the dangers of smoking to keep alive a public controversy over whether tobacco smoke was harmful.

131. The industry paid for advertisements in major newspapers to attack legitimate research. For example, in 1969 the American Tobacco Company, a successor to R.J. Reynolds Tobacco Company stated in the New York Times, "[w]e believe the anticigarette theory is a bum rap."

132. Defendants continued to avoid studying the health effects of smoking while at the same time continuing to publicly insist on the need for more research.

133. The industry's purpose was to give smokers what one industry executive called a "crutch" that would justify their continued smoking.

134. Instead of focusing their efforts on health issues as it represented it would do, Defendants focused on research into modifying their cigarettes to increase their addictiveness.

47

135. Rather than making its research public as it had represented it would do, Defendants publicly denied and suppressed the results of its research.

136. Defendants continued to engage in a course of conduct where it represented to the public many times throughout the years that they would conduct research and disclose results to the public, while at the same time either hiding any potentially damning results or not conducting bona fide research at all.

137. Throughout the years, Defendants have continued to state that cigarettes were not dangerous, and they would either remove harmful constituents or stop making cigarettes altogether. Some examples include:

> A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, authenticated information about cigarette smoking and health."

> In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we don't accept that."

> In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

> Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

> In a 1978 magazine interview William Dwyer, vice president of the Tobacco Institute, stated: "we take the view that the best science can say is that cigarette smoking may be hazardous. And then it may not be."

> A 1978 Philip Morris publication entitled "Facts About the Smoking Controversy" stated: "scientists have not determined what causes cancer…cigarettes have never been proven unsafe."

48

In 1984, Ed Horrigan, Chairman of R.J. Reynolds spoke on Nightline and told the public, "It is not known whether cigarettes cause cancer. It has not been causally established."

In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health…Science is science. Proof is proof. That is why the controversy over smoking and health remains an open one."

In 1988, in response to the United States Surgeon General's report that cigarettes are addictive, and nicotine is the drug in tobacco that causes addictions, issuing a press release knowingly and disingenuously stating "Claims that cigarettes are addictive is irresponsible and scare tactics."

In 1994, CEOs from the seven largest cigarette companies, including Defendants herein, knowingly providing false and misleading testimony under oath before the United States Congress that it had not been proven that cigarettes were addictive, caused disease, or caused one single person to die.

138. Defendants continued to make these and similar statements well into the 1990s with the goal of convincing smokers to keep smoking, not reducing their smoking, and/or not quitting.

139. Defendants and the tobacco industry promoted their message through many press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. Defendants and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

140. Industry spokespersons appeared on news shows, on commercials and public television to state that the evidence concerning the health effects of tobacco was based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease, and that cigarette smoking was not addictive.

49

141. Cigarette manufacturers when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

142. Cigarette manufacturers claimed attorney-client privilege to shield as many documents as possible from disclosure and destroyed and/or refused to produce documents related to health issues and Mr. Apa's claims.

143. Cigarette manufacturers when sued for smoking-related injuries, conducted the litigation in such a way as to cause the maximum expenditure of time and resources by the claimant for the purposes of exhausting their adversaries' resources and to discourage other meritorious litigation.

144. The acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and its co-conspirators were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

145. The aforementioned acts, false statements and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and their co-conspirators for the purposes of inducing Mr. Apa and others similarly situated to rely on such false statements and/or misrepresentations to induce persons such as Mr. Apa to smoke, fail to quit or reduce consumption.

146. Defendants knew that Mr. Apa, as well as other customers, did not hold sufficient information to understand or appreciate the dangers of the cigarettes that he smoked. These misrepresentations and false statements about the health hazards of cigarettes also include the following statements which were heard, read, and relied upon by Plaintiff, FRANK APA, who remembered these statements or substantially similar statements, made by the Defendants, their co-conspirators, and their spokesmen and women:

50

a. "The record shows many of the most well-respected doctors openly challenge anti-cigarette claims. A California doctor said as a scientist, I find no persuasive evidence that cigarette smoking causes Chronic Obstructive Pulmonary Disease and Congestive Heart Failure." The "Other Side of the Smoking Controversy" published in 1971 by the Tobacco Institute Project Truth.

b. "It is not known whether cigarettes cause cancer, it has not been casually established." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

c. "Despite all of the research to date there has been no causal link established [between cigarette smoking and cancer.]" Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

d. "As a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over 10 years that would say again that science is still puzzled over these forces." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

e. "There is absolutely no proof that cigarettes are addictive." Edward Horrigan, CEO of R.J. Reynolds, Congressional Testimony 1982.

f. "To my knowledge, it's not been proven that cigarette smoking causes cancer." William Campbell, CEO Philip Morris, Congressional Testimony, 1993.

g. "No, I don't believe that tobacco smoking is addictive." William Campbell, CEO Philip Morris, Congressional Testimony, 1993.

h. "Is it your position that it has never been proven that cigarette smoking has caused a single person to die? That is my position, yes." James Johnston, R.J. Reynolds Tobacco Company, Congressional Testimony 1994.

147. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by or on behalf of Defendants and the other cigarette manufacturers were made to induce the public and Mr. Apa to believe that cigarettes were not addictive or harmful to their health, to start smoking and become addicted to nicotine.

148. Furthermore, Mr. Apa relied on all the Defendants' false and misleading marketing and advertising of cigarettes about the health hazards of cigarettes, including, but are not limited to, the following:

51

a. False and misleading statements and suggestions from Defendants, claiming that filter makes the smoking safer or cleaner. These false and misleading marketing tactics regarding filtered cigarettes caused Mr. Apa to smoke a filtered cigarette and continue to smoke filtered cigarettes.

b. False and misleading statements from Defendants' CEOs at the 1994 Congressional hearing, where they denied that nicotine is addictive or that smoking causes cancer;

149. Mr. Apa, during the course of his smoking history, heard some or all of the false or misleading statements and/or similar statements made directly or indirectly by the Defendants, including advertisements and other marketing materials falsely representing or suggesting that cigarettes were not as dangerous from a health standpoint than they actually are, that there was no link between cigarettes and various types of lung diseases such as emphysema, COPD, that cigarettes was not addictive, and that light cigarettes were safer and less hazardous than other cigarettes.

150. Believing and relying upon these false and misleading statements made by the cigarette manufacturers in its direct advertisements to consumers and by the manufacturers and its co-conspirators in interviews, testimony and publications, Mr. Apa did not recognize the significant health risk posed by cigarettes not limited to but including the risk of developing emphysema.

151. In further reliance upon the false and misleading statements made by the cigarette manufacturers in its direct advertisements to consumers and by the manufacturers and its co-conspirators in interviews, testimony and publications, Mr. Apa switched to filtered cigarettes, believing them to reduce any potential health risk connected to cigarette smoking.

152. The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers either directly or indirectly, including Defendants herein, were justifiably relied upon by Mr. Apa, resulting in him being unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of

Defendants' cigarette products. Such acts, false statements and/or misrepresentations were made by the Defendant who had knowledge superior to Mr. Apa regarding the health aspects of cigarettes including their addictive nature.

153. Had Defendants not made the aforementioned false statements and/or misrepresentations about the dangers of its cigarette products to Mr. Apa and the public, Mr. Apa would have stopped smoking at an earlier age and/or reduced the number of cigarettes that he consumed, and his risk of injury from cigarettes, including emphysema, would have been reduced or eliminated.

154. As a direct and proximate result of the aforementioned acts, false statements and/or fraudulent misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, Mr. Apa continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused him to develop injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA, prays for judgment against Defendant R.J. REYNOLDS TOBACCO COMPANY and PHILIP MORRIS USA INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

## COUNT VI: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION
### (Manufacturers)

This count applies to only the following Defendants: R.J. Reynolds, Philip Morris, and Liggett.

155. The allegations in paragraphs 1 through 53 and 123 through 153are realleged and reincorporated as if fully set forth herein.

FILED DATE: 2/25/2026 3:22 PM    2026L002215

156. The Defendants, along with other cigarette manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), unlawfully agreed to commit, and did commit, overt acts, false statements and/or fraudulent misrepresentations concerning information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

157. During its four decade history the TIRC/CTR never acknowledged that smoking had been proven to be a cause of cancer or other serious diseases in smokers while maintaining publicly that smoking had not been proven to cause disease, even though the vast majority of CTR funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often, fatal diseases.

158. The acts, false statements and/or fraudulent misrepresentations described in the preceding paragraphs were material information.

159. Mr. Apa relied to his detriment upon the acts, false statements and/or fraudulent misrepresentations of such information. Mr. Apa, during the course of his smoking history heard, some or all the false or misleading statements and/or similar statements made directly or indirectly by the Defendants and their co-conspirators, believed some or all of the Defendants' and their co-conspirators false or misleading statements and relied to his detriment and continued to smoke cigarettes based on such false or misleading statements.

160. Had Defendants not made the aforementioned false statements and fraudulent misrepresentations of such information to Mr. Apa, he would have reduced the number of

54

cigarettes that he consumed and/or stopped smoking at an earlier age, and his risk of injury from cigarettes, including emphysema, would have been reduced or eliminated.

161. Each Defendant's acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and all of them, constitute a successful conspiracy to commit fraudulent misrepresentation.

162. Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendants as a member of a civil conspiracy is liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

163. As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statements and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendants and their co-conspirators, Mr. Apa continued to smoke and/or was otherwise exposed to Defendants' cigarette products which caused him to develop injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendants, R.J. REYNOLDS TOBACCO COMPANY, PHILIP MORRIS USA INC., and LIGGETT GROUP

55

LLC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just.

## COUNT VII: NEGLIGENCE (Distributor/Retailer)

This count applies to only Defendant Walgreens.

164. The allegations of paragraphs 1 through 53 are reincorporated and realleged as if fully set forth herein.

165. At all relevant times Mr. Apa was a smoker who purchased and consumed cigarettes from Defendant Walgreens.

166. At all relevant times, Defendant Walgreens knew or should have known that Plaintiff, as a member of the public for whose use cigarettes were placed into commerce, would be likely to use cigarettes in the manner described in this Complaint.

167. At all relevant times, Defendant Walgreens knew or had reason to know of the dangers associated with the manner and circumstances of Mr. Apa's foreseeable use of cigarettes.

168. Tobacco products, such as cigarettes smoked and or consumed by Mr. Apa, are not an ordinary or innocuous product.

169. Cigarettes are dangerous and well recognized to cause the death of fifty percent of consumers who smoke them.

170. There is no other product in Defendant Walgreens' inventory that is more dangerous or kills more consumers than cigarettes. Defendant Walgreens had a broad range of knowledge about the components of cigarette smoke and how those components were unreasonably dangerous to its consumers, including that the components of cigarettes smoke contain carcinogenic, toxic and dangerous compounds.

FILED DATE: 2/25/2026 3:22 PM   2026L002215

171. At all relevant times, Defendant Walgreens had knowledge of the defective and unreasonably dangerous nature of the cigarettes it sells to its consumers that far exceeded the knowledge or awareness of the health risks of smoking known by reasonable consumers, including Mr. Apa.

172. At all relevant times, Defendant Walgreens knew or should have known that reasonable consumers, including Mr. Apa, did not have the knowledge about how cigarettes were defective that was possessed by Defendant Walgreens.

173. Defendant Walgreens only recently began disclosing its superior knowledge to the public, long after Mr. Apa had already been exposed to the defective and unreasonably dangerous cigarettes sold by Defendant Walgreens

174. For example, Defendant Walgreens' own website now details particular, specific and scientific evidence of the dangerous components of the smoke from the cigarettes they sold.



*See*   https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body

(last accessed on November 1, 2018). WALGREEN CO. now acknowledges that there are

7,000 chemicals in every puff of cigarette smoke from the cigarettes it sells to its consumers. These carcinogenic, toxic and dangerous components in cigarette smoke are not generally known by the reasonable consumer.

   a. Acetone
   b. Arsenic,
   c. Butane
   d. Cadmium
   e. Ammonia
   f. Toluene and
   g. Formaldehyde

175. Mr. Apa and other reasonable consumers would not have knowledge of these dangerous chemicals in cigarettes.

176. Defendant Walgreens acknowledges in its website that its knowledge is superior to that of its consumers and candidly admits that particular harms from smoking are not well known or recognized by its consumers. Defendant WALGREEN CO.'s website states **"Smoking affects you in more ways <u>than you know</u>…"**:



Smoking affects you in more ways than you know...

**Ears**
Oxygen supply is reduced in the cochlea, an inner ear organ, which may lead to hearing loss.

**Eyes**
Increased risk of cataracts and macular degeneration, which can lead to blindness.

**Mouth**
Mouth sores, ulcers, gum disease, cavities and damaged taste can occur.

**Heart**
Risks of stroke, heart disease and heart attack are increased.

**Lungs**
Risk of emphysema, chronic bronchitis, exacerbations and infections are increased.

**Reproductive Organs (Women)**
Can lead to reduced fertility, failed embryo implantation, early menopause and low estrogen levels, which can cause thinning hair and memory problems; miscarriage, premature birth, stillbirth and illness.

**Reproductive Organs (Men)**
Increased risk of erectile dysfunction and damaged/decreased sperm, which can cause infertility or genetic defects in offspring.

58

FILED DATE: 2/25/2026 3:22 PM   2026L002215

*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018).

177. Defendant Walgreens' website cites to many diseases not generally known to be caused by smoking cigarettes, including "[i]ncreased risk of cataracts and macular degeneration, which could lead to blindness…[r]isks of stroke, heart disease…[i]ncreased risk of erectile dysfunction and damaged/decreased sperm, which can lead to infertility or genetic defects in offspring." *Id.*

178. Defendant Walgreens' superior knowledge about the inherent dangers and defects of cigarettes arose in part from its close relationship with the tobacco industry. Defendant WALGREEN CO. was aware as of 1977 at the latest that the tobacco industry including the co-defendant cigarette manufacturers, had engaged in creating a "controversy" to dispute the harmful effects of tobacco products.

179. Defendant Walgreens was actively engaged with the tobacco industry and the industry's co-conspirator, the Tobacco Institute, as shown by correspondence between Defendant Walgreens and tobacco industry executives.

180. For example, Defendant Walgreens reached out to the tobacco industry in March 1977 to declare what one tobacco executive described as its "willingness to take part in the smoking and health controversy on the side of the tobacco industry." *See* Letter from J. Kendrick Wells, III to Horace R. Kornegay dated March 29, 1977, Bates Number 687020794.[2]

181. Defendant Walgreens Manager of News and Information Services, David C. Carlson, wrote to the president of the Tobacco Institute, Horace R. Kornegay, to explore possibilities of using its role as a "health center" to gain support for the tobacco industry:

---

[2] Documents referenced by Bates Numbers can be accessed through UCSF Library and Center for Knowledge Management tobacco document archive located at https://www.industrydocumentslibrary.ucsf.edu/tobacco/.

> As you know, we at Walgreens are exploring the possibilities of an information program which will help both the tobacco Industry and ourselves. We don't want to step into the middle of a raging controversy, but as an established "health center" there are many, many things we can do to 'gain and maintain the understanding and support of the public."

*See* Letter from to Horace R. Kornegay, dated March 16, 1977, Bates Number TIMN0083432.

182. Defendant Walgreens had a "real interest in being of every possible assistance" to the tobacco industry "in getting the true word put about." *See* Memorandum dated March 17, 1977, Bates Number TIMN0083434.

183. As further example of its close relationship with the tobacco industry and its involvement in selling what it knew to be defective and unreasonably dangerous cigarettes to the public, including Mr. Apa, when Defendant Walgreens became aware in 1993 of litigation involving the tobacco industry's defective cigarette products, it sought indemnification from each of the major cigarette manufacturers for future lawsuits against it. *See* Letter from David L. Grobart to Jackie Gilbert, dated June 2, 1993, Bates Number 2064877537.

184. Additionally, Defendant Walgreens was told directly by R.J. Reynolds personnel in 2008 that "[n]o tobacco product has been shown to be safe and without risks" and "[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals and is in the best interest of consumers, manufacturers and society". *See* RJRT Presentation, Bates Number 557062850.

185. These and other contacts that Defendant Walgreens had with the tobacco industry, including the cigarette manufacturers, show that Defendant Walgreens was aware of the defective and unreasonably dangerous nature of cigarettes, and that its knowledge was superior to the knowledge of the public, including Mr. Apa.

186. Indeed, Defendant Walgreens knew as early as the 1990s that its co-defendants manufactured less hazardous cigarette products, like denicotinized cigarettes, low nicotine cigarettes, and non-combustible cigarette products.

187. Defendant Walgreens chooses to continue selling defective cigarettes to the public despite industry standards and norms set by other national retailers, such as Target and CVS, and most independent pharmacies and drugstores which have ceased cigarette sales.

188. Tobacco sales in pharmacies directly contradict the pharmacist's code of ethics, which states that pharmacists must be committed to the welfare of their patients and must act with honesty and integrity in professional relationships, avoid actions that compromise dedication to the best interests of their patients. *See* American Pharmacists Association Code of Ethics https://www.pharmacist.com/code-ethics (last accessed on November 1, 2018).Since 1971, the American Pharmaceutical Association position has recommended against the display and sale of cigarettes in pharmacies, which is in direct contradiction to the role of the pharmacy as a public health facility.

189. Defendant Walgreens is aware that smoking is the leading cause of death in the United States but chooses to ignore statistics to profit from the sale of defective cigarettes.

190. Defendant Walgreens continues to sell defective cigarettes to consumers like Mr. Apa to profit further on smoking cessation devices, such as nicotine replacement patches, gum and lozenges, as well as prescription nicotine replacement therapies, such as varenicline and bupropion.

191. At all relevant times, Defendant Walgreens had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product

61

which it knew or should have known was unreasonably dangerous and defective when put to the use for which it was designed, manufactured, distributed, marketed, and sold and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others when it knew or should have known that consumers and other users lacked such knowledge about the defects or dangerous conditions of the product.

192. In breach of this duty, Defendant Walgreens sold and continued to sell cigarettes to Mr. Apa and the public which it knew were defective and unreasonably dangerous.

193. Had Defendant Walgreens not sold to Mr. Apa cigarette products that it knew were defective and unreasonably dangerous, Mr. Apa would have smoked less cigarettes and/or stopped smoking at an earlier age, and his risk of injury from cigarettes would have been reduced or eliminated.

194. As a direct and proximate result of the aforementioned negligent acts and/or omissions of the Defendant, Mr. Apa developed injuries, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendant WALGREEN CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

## COUNT VIII: STRICT LIABILITY (Distributor/Retailer)

This count applies to only Defendant Walgreens.

195. The allegations contained in paragraphs 1 through 82 are reincorporated and realleged as if fully set forth herein.

196. The Defendant, Walgreens owed a duty to Mr. Apa and the public to sell only products which were reasonably safe for their intended use, and to refrain from selling any product which was

62

FILED DATE: 2/25/2026 3:22 PM   2026L002215

unreasonably dangerous, and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others.

197. The Defendant Walgreens breached said duty by placing into the stream of commerce, distributing, marketing, promoting and selling cigarette products that at the time the tobacco products left the possession of Defendant Walgreens, and at the time the tobacco products entered into the stream of commerce, were in an unreasonably dangerous and defective condition. These defects, of which Defendant Walgreens had actual knowledge, include but are not limited to:

   a. the tobacco products contained tar that is deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

   b. the tobacco products contained tar that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

   c. the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and made it unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

   d. the tobacco products contained nicotine that is deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

   e. the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

   f. the tobacco products contained carcinogens that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

   g. the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and made them unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

   h. the tobacco products contained toxic gasses and other substances that are deleterious, poisonous, highly harmful and unsafe that when put to a use that is

reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

i. through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and made the tobacco product unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco products;

j. through the use of filters, manufacturing methods, engineering methods and/or materials utilized were designed in such a way to make smoking Defendants' cigarette products more tasteful, pleasurable and less likely to trigger the smoker's own biological self defense mechanisms which otherwise may have limited and/or altered the smoker's behavior in such a way that the smoker may have smoked less, inhaled less deeply or not at all and unsafe that when put to a use that is reasonably foreseeable, poses dangers that go beyond that of which an ordinary consumer would expect;

k. the nature and degree of the danger of Defendant's cigarette products were beyond the expectation of the ordinary consumer when used as intended or in a reasonably foreseeable manner;

l. the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe when put to a use that is reasonably foreseeable considering the nature and function of the tobacco product;

m. the tobacco products contained additives and ingredients in cigarettes to make them easier to inhale and addictive, thus prolonging consumer's exposure to the tobacco products in such a manner that made the tobacco products unsafe that when put to a use that is reasonably foreseeable, posing dangers that go beyond that of which an ordinary consumer would expect;

n. the tobacco products were in an unreasonably dangerous condition and not suitable for the uses intended and were defective;

o. the tobacco products failed to perform as safely as an ordinary consumer would expect when used in the manner reasonably foreseeable by the Defendant WALGREENS CO.; and/or

p. the risk of danger of the tobacco products outweighed the benefits.

64

198.    As a direct and proximate result of the aforementioned defects described herein, Mr. Apa developed injuries caused by the consumption of cigarette products purchased from Defendant Walgreens, including but not limited to emphysema, in addition to other related physical conditions which resulted in and directly caused him to suffer severe bodily injuries.

**WHEREFORE**, Plaintiff, FRANK APA prays for judgment against Defendant WALGREEN CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) , plus costs of suit, pre-judgment and post-judgment interest and any other and further relief that the Court deems just..

## JURY DEMAND

Plaintiff respectfully requests the Court for a trial by jury.

Dated: February 25, 2026

Respectfully submitted,

FRANK APA

MEYERS & FLOWERS, LLC.

*/s/ Peter J. Flowers*
Peter J. Flowers, One of its Attorneys

Peter J. Flowers, Esq.
Craig D. Brown, Esq.
Jonathan P. Mincieli, Esq.
Thomas M. Connelly, Esq.
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois   60174
(630) 232-6333
pjf@meyers-flowers.com
cdb@meyers-flowers.com
jpm@meyers-flowers.com
tmc@meyers-flowers.com

Chicago Office:
225 W. Wacker, Suite 1515
Chicago, IL  60606

65

FILED DATE: 2/25/2026 3:22 PM   2026L002215

-- and --

Michael A. Alvarez
Alex Alvarez Jr.
Andi Hernandez
THE ALVAREZ LAW FIRM
3251 Ponce De Leon
Coral Gables, FL 33156
(305) 444-7675
Michael@talf.law
Alexjr@talf.law
Andi@talf.law
Tobacco@integrityforjustice.com

66

FILED
2/25/2026 5:18 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36833536

| | |
|---|---|
| **2120 - Served** | **2121 - Served** |
| **2220 - Not Served** | **2221 - Not Served** |
| **2320 - Served By Mail** | **2321 - Served By Mail** |
| **2420 - Served By Publication** | **2421 - Served By Publication** |

**Summons - Alias Summons**                    **(08/01/18) CCG 0001 A**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Frank Apa,

_____
(Name all parties)

v.

RJ Reynolds Tobacco Company, Philip Morris
USA Inc., Liggett Group LLC and Walgreen Co.

Case No. _____

☑ **SUMMONS**  ☐ **ALIAS SUMMONS**

To each Defendant:  Liggett Group LLC, c/o CT Corp Systems, 208 S. LaSalle St., #814, Chicago, IL  60604

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons,** not counting the day of service.  To file your answer or appearance you need access to the internet.  Please visit www.cookcountyclerkofcourt.org to initiate this process.  Kiosks with internet access are available at all Clerk's Office locations.  Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service.  If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 3

**Summons - Alias Summons**                                      **(08/01/18) CCG 0001 B**

**E-filing is now mandatory for documents in civil cases with limited exemptions.  To e-file, you must first create an account with an e-filing service provider.  Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.  If you need additional help or have trouble e-filing, visit http:// www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.**

2/25/2026 5:18 PM Mariyana T. Spyropoulos

Atty. No.: 56079                                    Witness:

Atty Name: Peter J. Flowers

Atty. for: Plaintiff                                MARIYANA T. SPYROPOULOS, Clerk of Court

Address: 3 N. Second St., #300

City: Chicago                                        Date of Service:
                                                     (To be inserted by officer on copy left with
State: IL     Zip: 60174                             Defendant or other person):

Telephone: 630.232-6333

Primary Email: pjf@meyers-flowers.com

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

◉ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

FILED
2/25/2026 5:18 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36833536

**2120 - Served**      **2121 - Served**

**2220 - Not Served**      **2221 - Not Served**

**2320 - Served By Mail**      **2321 - Served By Mail**

**2420 - Served By Publication**   **2421 - Served By Publication**

**Summons - Alias Summons**          **(08/01/18) CCG 0001 A**

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Frank Apa,

(Name all parties)

v.

RJ Reynolds Tobacco Company, Philip Morris
USA Inc., Liggett Group LLC and Walgreen Co.

Case No. _____

☑ **SUMMONS**    ☐ **ALIAS SUMMONS**

To each Defendant:   Philip Morris USA Inc., c/o United Agent Group Inc.

1320 Tower Road, Schaumburg, IL 60173-4309

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons,** not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

**Summons - Alias Summons**        **(08/01/18) CCG 0001 B**

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http:// www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.**

2/25/2026 5:18 PM Mariyana T. Spyropoulos

Witness: _____

Atty. No.: 56079

Atty Name: Peter J. Flowers

Atty. for: Plaintiff

Address: 3 N. Second St., #300

City: Chicago

State: IL   Zip: 60174

Telephone: 630.232-6333

Primary Email: pjf@meyers-flowers.com

MARIYANA T. SPYROPOULOS, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with
Defendant or other person):

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 2 of 3

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

○   Richard J Daley Center
50 W Washington
Chicago, IL 60602

○   District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○   District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○   District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○   District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○   District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○   Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○   Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○   Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

○   Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○   Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○   Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○   Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○   Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○   County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○   Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

◉   Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○   Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

FILED
2/25/2026 5:18 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36833536

| | |
|---|---|
| **2120 - Served** | **2121 - Served** |
| **2220 - Not Served** | **2221 - Not Served** |
| **2320 - Served By Mail** | **2321 - Served By Mail** |
| **2420 - Served By Publication** | **2421 - Served By Publication** |

**Summons - Alias Summons**                                            **(08/01/18) CCG 0001 A**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Frank Apa,

_____

(Name all parties)

v.

Case No. _____

RJ Reynolds Tobacco Company, Philip Morris
USA Inc., Liggett Group LLC and Walgreen Co.

☑ **SUMMONS**   ☐ **ALIAS SUMMONS**

R.J. Reynolds Tobacco Company, c/o Illinois Corporation Services

To each Defendant:   801 Adlai Stevenson Drive, Springfield IL 62703

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons,** not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 3

**Summons - Alias Summons**          **(08/01/18) CCG 0001 B**

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.**

2/25/2026 5:18 PM Mariyana T. Spyropoulos

Atty. No.: 56079          Witness: _____

Atty Name: Peter J. Flowers

Atty. for: Plaintiff

Address: 3 N. Second St., #300

City: Chicago        MARIYANA T. SPYROPOULOS, Clerk of Court

State: IL   Zip: 60174       Date of Service: _____

Telephone: 630.232-6333      (To be inserted by officer on copy left with Defendant or other person):

Primary Email: pjf@meyers-flowers.com

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 2 of 3

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

● Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

## AFFIDAVIT OF SERVICE

| Case: 2026L002215 | Court: Circuit Court of Cook County, Illinois | | County: Cook, IL | Job: 15322953 | FILED 3/4/2026 1:24 PM Mariyana T. Spyropoulos CIRCUIT CLERK COOK COUNTY, IL 2026L002215 |
|---|---|---|---|---|---|
| Plaintiff / Petitioner: Frank Apa | | | Defendant / Respondent: RJ Reynolds Tobacco Co, et al | | |
| Received by: Blue 22, LLC. | | | For: Meyers & Flowers, LLC | | Calendar, Z 36939226 |
| To be served upon: Liggett Group, LLC | | | | | |

William Vincent deposes and says that he/she is either a licensed and/or registered employee/agent of a Private Detective Agency, licensed by the Illinois Department of Professional Regulation and therefore authorized, pursuant to the provisions of Chapter 735, Code of Civil Procedure, Section 5/2-202, Illinois Compiled Statutes, to serve process in the above cause.

**Recipient Name / Address:**   Liggett Group, LLC c/o CT Corporation by Derrick Hackett, 208 S La Salle St 17th Floor, Chicago, IL 60604

**Manner of Service:**   Corporation, Mar 2, 2026, 1:32 pm CST

**Documents:**   Summons and Complaint

**Additional Comments:**
1) Successful Attempt: Mar 2, 2026, 1:32 pm CST at 208 S La Salle St 17th Floor, Chicago, IL 60604 received by Liggett Group, LLC c/o CT Corporation by Derrick Hackett. Age: 30s; Ethnicity: African American; Gender: Male; Weight: Thin; Height: 5'8"; Hair: Black; Relationship: Intake Specialist;

Under penalties of perjury as provided by law pursuant to section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

_Wm Vincent_     03/02/2026

William Vincent     **Date**
117-000192 Licensed Detective Agency

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, Z

ClientCaseID: 69      84891      CaseReturnDate: 2/26/26

Affidavit of A PRIVATE INVESTIGATOR

FILED
3/4/2026 1:24 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
36939226

# COOK COUNTY STATE OF ILLINOIS, CIRCUIT COURT

Case Number **2026L002215**

I, JOHN PENNELL

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND LICENSED AS A PRIVATE DETECTIVE (LICENSE # 115.002074) UNDER THE PRIVATE DETECTIVE ACT OF 2004.

## CORPORATE SERVICE

THAT I SERVED THE WITHIN   SUMMONS & COMPLAINT
ON THE WITHIN NAMED DEFENDANT R.J. REYNOLDS TOBACCO COMPANY
PERSON SERVED BAYLON ELFGEN, AUTHORIZED AGENT
BY LEAVING A COPY OF EACH WITH THE SAID DEFENDANT ON 2/26/26

69 X .25 = 17.25

That the sex, race and approximate age of the whom I left the   SUMMONS & COMPLAINT
are as follow:

Sex MALE    Race WHITE    Age 24    Height 6'3"    Build 250#    Hair BRN

LOCATION OF SERVICE   **801 ADLAI STEVENSON DR. SPRINGFIELD, IL, 62703**

Date Of Service 2/26/26      Time of Service 2:15 PM

JOHN PENNELL      2/26/2026
A PRIVATE INVESTIGATOR
PRIVATE DECTECTIVE # 115.002074

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, Z

## AFFIDAVIT OF SERVICE

| Case: 2026L002215 | Court: Circuit Court of Cook County, Illinois | County: Cook, IL | Job: 15322944 | FILED 3/4/2026 1:24 PM Mariyana T. Spyropoulos CIRCUIT CLERK COOK COUNTY, IL 2026L002215 |
|---|---|---|---|---|
| Plaintiff / Petitioner: Frank Apa | | Defendant / Respondent: RJ Reynolds Tobacco Co, et al | | Calendar, Z 36939226 |
| Received by: Blue 22, LLC. | | For: Meyers & Flowers, LLC | | |
| To be served upon: Phillip Morris USA, Inc | | | | |

William Vincent deposes and says that he/she is either a licensed and/or registered employee/agent of a Private Detective Agency, licensed by the Illinois Department of Professional Regulation and therefore authorized, pursuant to the provisions of Chapter 735, Code of Civil Procedure, Section 5/2-202, Illinois Compiled Statutes, to serve process in the above cause.

**Recipient Name / Address:**   Phillip Morris USA, Inc by United Agent Group to Patty Stach, 1320 Tower Road, Schaumburg, IL 60173
**Manner of Service:**   Corporation, Mar 2, 2026, 12:47 pm CST
**Documents:**   Summons and Complaint

**Additional Comments:**
1) Successful Attempt: Mar 2, 2026, 12:47 pm CST at 1320 Tower Road, Schaumburg, IL 60173 received by Phillip Morris USA, Inc by United Agent Group to Patty Dtach. Age: 50s; Ethnicity: Caucasian; Gender: Female; Weight: Avg; Height: 5'5"; Hair: Gray; Relationship: Registered Agent;

Under penalties of perjury as provided by law pursuant to section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

_Wm Vincent_                          03/02/2026
_____     _____
William Vincent                     **Date**
117-000192 Licensed Detective Agency

Date: 3/25/2026

CIRCUIT COURT OF COOK COUNTY
LAW DIV. RM. 801,  DALEY CENTER.
CHICAGO IL-60602


Apa Frank



-


BrownCraig D
cdb@meyers-flowers.com


Notice of In Person Case Management

CASE: 2026L002215 / Frank Apa -vs- Philip Morris USA Inc.,Liggett Group LLC,R.J. Reynolds
Tobacco Co

All Law Division Motion Calendar Initial Case Management dates will be held In Person,
In-Person Court Date: Tuesday  April  28  2026  09:45 AM
Room Court Room 2204 Calendar  Z
For all questions on the initial CMC date,
email: LAW.CALZcc@cookcountyil.gov or phone: (312) 603-4646

FILED
3/26/2026 2:13 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
37301339

| 2120 - Served | 2121 - Served |
|---|---|
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |

| Summons - Alias Summons | (08/01/18) CCG 0001 A |
|---|---|

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Frank Apa,

_____
(Name all parties)

v.

RJ Reynolds Tobacco Company, Philip Morris
USA Inc., Liggett Group LLC and Walgreen Co.

Case No. **2026L002215**

☑ **SUMMONS**     ☐ **ALIAS SUMMONS**

To each Defendant:   Walgreen Co., c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive, Springfield IL 62703

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**

**cookcountyclerkofcourt.org**

Page 1 of 3

**Summons - Alias Summons**                                    **(08/01/18) CCG 0001 B**

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.**

Atty. No.: 56079

Atty Name: Peter J. Flowers

Atty. for: Plaintiff

Address: 3 N. Second St., #300

City: Chicago

State: IL     Zip: 60174

Telephone: 630.232-6333

Primary Email: pjf@meyers-flowers.com

Witness: _____

3/26/2026 2:13 PM Mariyana T. Spyropoulos

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with
Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

◉ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

ClientCaseID: 69            85601            CaseReturnDate: 3/27/26

FILED
3/30/2026 10:28 AM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L002215
Calendar, Z
37338018

Affidavit of A PRIVATE INVESTIGATOR

## COOK COUNTY STATE OF ILLINOIS, CIRCUIT COURT

Case Number **2026L002215**

I, JOHN PENNELL

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND LICENSED AS A PRIVATE DETECTIVE (LICENSE # 115.002074) UNDER THE PRIVATE DETECTIVE ACT OF 2004.

## CORPORATE SERVICE

THAT I SERVED THE WITHIN   SUMMONS & COMPLAINT
ON THE WITHIN NAMED  DEFENDANT  WALGREEN CO.
PERSON SERVED **BAYLON ELFGEN, AUTHORIZED AGENT**
BY LEAVING A COPY OF EACH WITH THE SAID DEFENDANT ON 3/27/26

69 x 25 = 17.75

That the sex, race and approximate age of the whom I left the    SUMMONS & COMPLAINT
are as follow:

Sex  MALE       Race   WHITE       Age   24      Height   6'3"       Build   250#       Hair   BRN

LOCATION OF SERVICE   **801   ADLAI STEVENSON DR.
SPRINGFIELD, IL, 62703**

Date Of Service    **3/27/26**          Time of Service    3:15 PM

JOHN  PENNELL                                3/27/2026
**A PRIVATE INVESTIGATOR**
PRIVATE DECTECTIVE # 115.002074

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

# **EXHIBIT 11**

**District 1**

## Case Summary

**Case No. 2026L002215**

| | | | |
|---|---|---|---|
| **Frank Apa -vs- Philip Morris USA Inc.,Liggett Group LLC,R.J. Reynolds Tobacco Company,Walgreen Co.** | § § § § § | Location: Judicial Officer: Filed on: Cook County Attorney Number: | **District 1** **Calendar, Z** **02/25/2026** **56079** |

---

### Case Information

Case Type: Other Personal Injury / Wrongful Death - Jury

Case Status: **02/25/2026  Pending**

---

### Assignment Information

**Current Case Assignment**
Case Number        2026L002215
Court              District 1
Date Assigned      02/25/2026
Judicial Officer   Calendar, Z

---

### Party Information

| | | *Lead Attorneys* |
|---|---|---|
| **Plaintiff** | **Apa, Frank** | **Flowers, Peter John** *Retained* |
| **Defendant** | **Liggett Group LLC** | |
| | **Philip Morris USA Inc.** | |
| | **R.J. Reynolds Tobacco Company** | |
| | **Walgreen Co.** | |

---

### Events and Orders of the Court

04/28/2026   **First Time Case Management**  (9:45 AM)   (Judicial Officer: Saltouros, Stephanie D.)
              Resource: Location L2204 Court Room 2204
              Resource: Location D1 Richard J Daley Center

03/30/2026   Affidavit Of Service Filed
              *Aff of Serv - Def Walgreen Co.*

03/26/2026   Summons Issued And Returnable
              *Summons - Def Walgreen Co.*
              Party:  Plaintiff Apa, Frank
              *Summons - Def Walgreen Co.*

03/25/2026   Electronic Notice Sent
              Party:  Plaintiff Apa, Frank
              Party 2:  Attorney Brown, Craig D

03/25/2026   Electronic Notice Sent

**District 1**

## Case Summary

**Case No. 2026L002215**

| | | |
|---|---|---|
| | Party: Plaintiff Apa, Frank | |
| | Party 2: Attorney Brown, Craig Daniel | |

03/25/2026
Electronic Notice Sent
    Party: Plaintiff Apa, Frank
    Party 2: Attorney Flowers, Peter John

03/25/2026
Electronic Notice Sent
    Party: Plaintiff Apa, Frank
    Party 2: Attorney Mincieli, Jonathan Peter

03/04/2026
Affidavit Of Service Filed
    *Affidavit of Service - Def PM*
    Party: Plaintiff Apa, Frank
    *Affidavit of Service - Def PM*

03/04/2026
Affidavit Of Service Filed
    *Affidavit of Service - Def RJR*
    Party: Plaintiff Apa, Frank
    *Affidavit of Service - Def RJR*

03/04/2026
Affidavit Of Service Filed
    *Affidavit of Service - Def Liggett*
    Party: Plaintiff Apa, Frank
    *Affidavit of Service - Def Liggett*

02/25/2026 New Case Filing

02/25/2026
Summons Issued And Returnable
    *Apa Summons - Def RJR*
    Party: Plaintiff Apa, Frank
    *Apa Summons - Def RJR*

02/25/2026
Summons Issued And Returnable
    *Apa Summons - Def PM*
    Party: Plaintiff Apa, Frank
    *Apa Summons - Def PM*

02/25/2026
Summons Issued And Returnable
    *Apa Summons - Def Liggett*
    Party: Plaintiff Apa, Frank
    *Apa Summons - Def Liggett*

02/25/2026
Other Personal Injury Complaint Filed (Jury Demand)
    *Apa Complaint*
    Party: Plaintiff Apa, Frank
    Party 2: Attorney Flowers, Peter John
    *Apa Complaint*

02/25/2026
Exhibits Filed
    *Apa Civil Action Cover Sheet*
    Party: Plaintiff Apa, Frank
    Party 2: Attorney Flowers, Peter John
    *Apa Civil Action Cover Sheet*

02/25/2026
Exhibits Filed
    *Apa Jury Demand*
    Party: Plaintiff Apa, Frank
    Party 2: Attorney Flowers, Peter John

    Printed on 03/30/2026 at 11:36 AM

**District 1**

## Case Summary

**Case No. 2026L002215**

*Apa Jury Demand*